# Exhibit 2

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| TAEWOO KIM, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>   vs.<br><br>JUMP TRADING, LLC and KANAV KARIYA,<br><br>                    Defendants. | Case No.   1:23-cv-02921<br><br><u>CLASS ACTION</u><br><br><br><br><br><br><br><br><u>DEMAND FOR JURY TRIAL</u> |

COMPLAINT FOR VIOLATIONS OF THE COMMODITY EXCHANGE ACT,
CFTC REGULATIONS, AND COMMON LAW UNJUST ENRICHMENT

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

PARTIES ...............................................................................................................4

JURISDICTION AND VENUE ...........................................................................4

FACTUAL ALLEGATIONS ................................................................................6

I.      Digital Assets and Crypto Commodities..........................................................6

        A.     The Blockchain and Foundations of Crypto Assets.....................................6

        B.     Crypto Commodities and Stablecoins...........................................................8

II.     The Terra Blockchain and Its Stablecoin, UST ...............................................10

        A.     Jump Trading's Relationship with TFL and Sales of LUNA, UST, and aUST.......................................................................................................11

        B.     Jump Manipulates the Market for UST and aUST to Maintain the Appearance of UST's $1 Peg...................................................................13

        C.     TFL and Jump's Cover-Up of UST's and aUST's Instability and the May 2021 Price Manipulation............................................................15

        D.     The Collapse of UST, aUST, and the Terra Blockchain in May 2022........................................................................................................23

III.    Defendants Successfully Concealed Their Misconduct until February 2023 ...................24

IV.    Plaintiff Purchased UST and aUST During the Class Period and Suffered Damages............................................................................................................26

CLASS ACTION ALLEGATIONS .....................................................................27

COUNT I ...............................................................................................................29

COUNT II ..............................................................................................................36

COUNT III .............................................................................................................40

PRAYER FOR RELIEF ........................................................................................40

DEMAND FOR JURY TRIAL .............................................................................41

Plaintiff Taewoo Kim ("Plaintiff"), individually and on behalf of all others similarly situated, brings this class action against Defendants Jump Trading, LLC ("Jump" or "Jump Trading") and Kanav Kariya ("Kariya," and together with Jump, "Defendants").  Plaintiff's allegations are based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which investigation included, among other things, a review of the whitepaper of the digital assets at issue, press releases, media reports, and other publicly disclosed reports and information about Defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein, after a reasonable opportunity for discovery.  Plaintiff hereby alleges as follows:

## INTRODUCTION

1.      This is a class action on behalf of all persons who, during the period from May 23, 2021 to May 31, 2022, inclusive (the "Class Period"), purchased the digital assets UST or aUST in the United States and were damaged thereby (the "Class").  Defendants schemed with Do Kwon ("Kwon") and his company Terraform Labs Pte. Ltd. ("TFL") to manipulate the market price for UST and aUST and to conceal their manipulation, for their own benefit, which ultimately resulted in the destruction of billions of dollars' worth of assets held by the Class.

2.      In 2019, Kwon and TFL began selling the digital assets LUNA, UST, and aUST. Kwon and TFL intended for LUNA to function like other digital assets, such as Bitcoin, with a fluctuating value based on market conditions, the forces of supply and demand, and its perceived value.  UST, by contrast, would purportedly function as a so-called "stablecoin," with a value continuously pegged at $1, which was designed to appeal to the public as a safe place to store crypto assets.  According to Kwon and TFL, UST's $1 peg would be automatically maintained through an algorithm permitting UST to be exchanged for $1 worth of LUNA, and vice versa, creating opportunities for arbitrage that would theoretically correct any deviation in UST's price from the $1

peg without the need for manual intervention. In addition, Kwon and TFL touted the possibility of earning stable returns by depositing UST in a "yield-bearing" account called the "Anchor Protocol," in exchange for a deposit receipt in the form of aUST, which could later be swapped for the original amount of UST, plus interest.

3. Defendant Jump was an early partner and primary financial backer of TFL. Between November 2019 and September 2020, Jump entered into a series of agreements with TFL and its affiliates to borrow tens of millions of LUNA tokens from TFL and to provide market-making services for transactions in LUNA, UST, and aUST, in exchange for the opportunity to purchase LUNA tokens at a steep discount, which could then be resold into the market to further Jump's own profit.

4. In May 2021, TFL's purported algorithm failed to keep the price of UST pegged to $1. Rather than publicly acknowledging the inability of TFL's algorithm to maintain UST's advertised peg price (which was fundamental to the perceived market value of UST and aUST), TFL and Kwon secretly schemed with Defendant Jump to manipulate the market prices for UST and aUST by making secret, coordinated trades to prop up UST to its $1 peg. As part of the scheme, Jump purchased more than 62 million UST tokens between approximately May 23 and May 27, 2021, causing UST's price to artificially inflate to $1 and causing a corresponding rise in aUST's price.

5. To incentivize and reward Jump for its manipulation of the markets for UST and aUST, TFL and Kwon agreed to modify the parties' prior agreements and instead unconditionally convey to Jump more than 61.4 million LUNA tokens at a greater than 99% discount from their then-current market price. Jump later resold those LUNA tokens into the market at a staggering profit of over *$1.28 billion*.

6.     Jump's manipulation of the market prices of UST and aUST, and its aiding and abetting of TFL's and Kwon's effort to manipulate the markets for UST and aUST, violated the Commodity Exchange Act ("CEA").

7.     In addition, during the Class Period, Defendants actively concealed and aided and abetted TFL's and Kwon's concealment of Jump's May 2021 intervention to maintain the artificial $1 peg for UST.  In addition to directly trading UST and aUST tokens, Jump also helped grow the market and investor base for UST and aUST through its "Wormhole" bridge protocol, which was adopted by TFL in August 2021 as the preferred mechanism for transferring UST between the Terra, Ethereum, Binance, and later Solana blockchains.  But the artificial peg could not be indefinitely maintained.  By May 31, 2022, the price of UST and aUST (as well as LUNA and the entire Terra blockchain) had collapsed completely.  As a direct and proximate result of Defendants' misconduct, Class members have sustained billions of dollars in economic losses and actual damages under applicable law.

8.     Defendants' misconduct was not revealed until after the U.S. Securities and Exchange Commission ("SEC") filed a complaint against TFL and Kwon on February 16, 2023 (the "SEC Complaint").  Although the SEC Complaint did not affirmatively name Jump as the party that aided and abetted TFL and Kwon in manipulating the prices of UST and aUST in May 2021, referring instead to an unnamed "U.S. Trading Firm," multiple individuals with knowledge of Jump's May 2021 intervention to manipulate the prices of UST and aUST have stated that the unnamed firm that aided TFL and Kwon in their manipulation was in fact Jump Trading.

9.     Federal prosecutors have also reportedly begun investigating Jump for possible market manipulation in connection with UST.  And Kwon was recently arrested in Montenegro as a fugitive from justice and charged in the Southern District of New York with commodities fraud and other crimes.  Like the SEC Complaint, the criminal indictment against Kwon alleges that, in May

2021, he "contacted representatives of a United States trading and investment firm ('Firm-1') to obtain their assistance in altering the market price of UST," and "Firm-1 . . . deployed trading strategies designed to alter the market price of UST." It appears that the unnamed firm referenced in Kwon's criminal indictment is Jump.

## PARTIES

10.     Plaintiff Taewoo Kim is a citizen of New Jersey and resides in Palisades Park, New Jersey. Plaintiff purchased UST and aUST during the Class Period in the United States, and suffered losses as a result of Defendants' conduct.

11.     Defendant Jump Trading, LLC is a limited liability company incorporated in Delaware, with its principal place of business in Chicago, Illinois. Jump Trading is also an SEC-registered broker-dealer and serves as a market maker on certain exchanges. In court filings and elsewhere, Jump Trading has described Jump Crypto as its "cryptocurrency arm."

12.     Defendant Kanav Kariya is a resident of Illinois. He currently is the President of Jump Trading's cryptocurrency arm, Jump Crypto, a position he has held since September 2021. Previously, Kariya was a software engineering intern, quantitative researcher, and director of strategic initiatives for digital assets at Jump Trading.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over all claims in this action pursuant to 28 U.S.C. §1332(d)(2)(A), because this case is a class action where the aggregate claims of all members of the proposed Class exceed $5,000,000, exclusive of interest and costs, and Plaintiff and most members of the proposed Class are citizens of a state different from Defendants.

14.     This Court also has subject matter jurisdiction over the federal claims in this action pursuant to 28 U.S.C. §1331 because they arise under the laws of the United States.

15.     This Court also has exclusive jurisdiction over the CEA claims in this action pursuant to 7 U.S.C. §25(c).

16.     This Court additionally has supplemental subject matter jurisdiction over Plaintiff's state law claim pursuant to 28 U.S.C. §1367(a) because that claim is so closely connected to the federal law claims brought herein as to form part of the same case or controversy.

17.     Venue is proper in this judicial District pursuant to 28 U.S.C. §1391(b) and (c), and 7 U.S.C. §25(c), because Defendants transact business in, are found in, and/or have agents in this District, and because some of the actions giving rise to this complaint took place in this District.  In particular, Defendant Jump Trading is headquartered in this District, and Defendant Kariya resides in this District.

18.     The Court has personal jurisdiction over Defendants.  Defendants transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme throughout the United States, including in this District.  The scheme has been directed at, and has had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.  The Court also has personal jurisdiction over Defendants and proper venue over this action under the nationwide service of process provisions of 7 U.S.C. §25(c).

## FACTUAL ALLEGATIONS

### I.     Digital Assets and Crypto Commodities

####      A.     The Blockchain and Foundations of Crypto Assets

19.     This case concerns crypto assets.[1]  Crypto assets are digital assets that use a variety of cryptographic principles to secure transactions, control the creation of additional units, and verify their transfer.  The key technology allowing the creation of crypto assets is the blockchain.

20.     The challenge that had previously prevented the creation of digital assets is the need to allow for secure transfers to exactly one recipient at a time.  In general, digital files are transmitted by duplication; if someone emails a photograph to a friend, both the sender and the recipient now have copies of the photograph.  While that duplication may be helpful for a photograph, it would quickly make any digital asset valueless through duplication and inflation, as one individual could send the same digital asset to many counterparties.  The elaborate measures used to prevent counterfeiting of physical currencies do not have effective digital analogues.

21.     Bitcoin, which was the first prominent digital asset, solved this problem with a digital ledger system called the "blockchain," which tracks the ownership and transfer of every Bitcoin in existence.  Each Bitcoin user has a digital "address" used to receive Bitcoin.  The Bitcoin blockchain lists, publicly, every address and the number of Bitcoin associated with that address.  By looking at the blockchain, anyone can see every Bitcoin transaction in which that address has engaged.  By providing a full transaction history of each Bitcoin, the blockchain allows for the secure exchange of all Bitcoin.  Any attempt to duplicate a Bitcoin or to transfer it to multiple people at once would be

---

[1]     One commonly used umbrella term that collectively describes the many different types of digital assets and the many hundreds of digital tokens in circulation is "cryptocurrencies."  To avoid embedding any assumptions about the nature of these assets in this umbrella term, Plaintiff herein uses the term "crypto assets" to describe the full range of digital assets, though these terms are often used interchangeably.

futile, because a Bitcoin user could use the blockchain to verify each transaction involving that Bitcoin. There is thus no effective way to counterfeit Bitcoin.

22. The blockchain has become the foundational technology for crypto assets. While crypto assets vary tremendously, they generally rely on the blockchain to ensure that transactions are secure and non-duplicable. A blockchain "protocol" is an algorithm that determines how a blockchain, or a specific feature of a blockchain, functions. A blockchain protocol can record smart contracts, which automatically execute the terms of a contract when certain triggering conditions are met.

23. Control of crypto assets is attested primarily through control of cryptographic keys. These cryptographic keys have two components: a public key and a private key. This cryptographic system of transfer and exchange is generally the same across most crypto assets. To use Bitcoin as an example, the public key is used to produce the Bitcoin address. A Bitcoin address is a destination for transfers of Bitcoin, like the account number of a conventional bank account. Bitcoin addresses are long strings of alphanumeric text, often abbreviated by a small group of numbers and letters appearing in the string, such as 1s5F or R3w9. A private key allows the owner of a Bitcoin address to access it, akin to a long PIN or password for a conventional bank account.

24. Those who wish to transfer Bitcoin need to know the recipient's Bitcoin address, just as one transferring funds to a conventional bank account needs to know the account number for that bank account. When they have the recipient's address, transferors can use their private keys to authorize the transfer of Bitcoin, just as one would use a PIN or password to authorize a transfer between traditional bank accounts.

25. A transfer of Bitcoin is public to the extent that anyone can see the transferor's Bitcoin address, the recipient's Bitcoin address, and the quantity of assets transferred. That is (to take a hypothetical example), anyone could see that Bitcoin address 1s5F transferred 10.3 Bitcoin to

Bitcoin address R3w9.  The names of the individuals or entities that control these addresses, on the other hand, are not recorded on the blockchain and ordinarily are not accessible to the public.

### B.    Crypto Commodities and Stablecoins

26.    Bitcoin, in addition to pioneering the use of the blockchain, is also notable for having a decentralized supply of tokens based on the work of individuals not in control of the Bitcoin blockchain.  This feature is core to the idea of Bitcoin, but, unlike the blockchain, is not universal among crypto assets generally.

27.    Bitcoin maintains its blockchain and provides for new Bitcoin to enter the economy through a consensus mechanism known as "proof-of-work," or "mining."   Individuals "mine" Bitcoin by having sophisticated computer programs perform complex, resource-intensive automated verifications of past transactions, which are then added to the blockchain.  Those who mine Bitcoin – "miners" – are rewarded with new Bitcoin.

28.    The mining process creates a scarcity that underlies the value of Bitcoin.  Bitcoin is designed so it gets harder and harder to mine.  The more Bitcoin produced, the more complex and resource-intensive the computations required for a miner to receive new Bitcoin.  This process ensures that the supply of Bitcoin will not rise sharply or unpredictably, thus preventing a flood of new Bitcoin that could undercut the value of the preexisting Bitcoin.  Likewise, the number of Bitcoin that miners receive as a reward is halved roughly every four years.  This will continue until all Bitcoin have been mined, at which point miners will receive fees paid solely by network users.

29.    Bitcoin's distribution system thus roughly mirrors the availability of natural resources like gold or silver.  While the supply of Bitcoin continues to grow as more of it is mined, the growth rate of that supply is logarithmic and will eventually cease entirely, ensuring the market is not flooded and Bitcoin is not devalued.  This ensures market participants that their Bitcoin will not diminish in value due to sudden inflation.

30.     Bitcoin's predetermined issuance schedule and strong speculative demand contribute to wild fluctuations in price.  Bitcoin's extreme price volatility has inhibited its adoption as a medium of exchange or store of value.  That is because a rational purchaser will generally not want to pay for goods or services with a currency that may soon rise significantly in value, and a rational seller will generally not want to be paid for goods or services with a currency that may soon decline significantly in value.  Such challenges are exacerbated in the context of economic relationships that take place over time, such as employment contracts.

31.     So-called "stablecoins" were developed as a solution to the volatility of other crypto assets by pegging their value to a reference asset such as another crypto asset (like Bitcoin), an exchange-traded commodity (like gold), or a fiat currency (like the U.S. dollar).  Broadly speaking, a stablecoin's peg can be maintained in one of two ways: holding sufficient reserves of the reference asset as collateral, or employing algorithms and smart contracts to control the supply of stablecoins in circulation.

32.     The Commodity Futures Trading Commission ("CFTC") views stablecoins as commodities.

33.     On October 15, 2021, the CFTC issued orders simultaneously filing and settling charges (for $42.5 million) against several entities doing business as "Tether" and "Bitfinex" in connection with the U.S. dollar tether token ("USDT") stablecoin.  The orders reflected the CFTC's view that USDT was a commodity traded in interstate commerce.

34.     The CFTC's December 13, 2022 complaint against Sam Bankman-Fried, FTX Trading Ltd., and Alameda Research LLC ("Alameda"), filed in the Southern District of New York, reiterated the CFTC's view that stablecoins like USDT are commodities.

35.     On March 8, 2023, CFTC Chair Rostin Behnam confirmed the CFTC's view that stablecoins are commodities, telling reporters: "Based on the cases that [the CFTC has] brought

around stablecoins, I think that there's a strong legal argument that USDC and other similar stablecoins would be commodities." Behnam was referring to USD Coin, another stablecoin pegged to the U.S. dollar that is issued by the company Circle.

## II. The Terra Blockchain and Its Stablecoin, UST

36.     In 2018, Kwon and TFL began creating the Terra blockchain (also called the "Terra Protocol" or simply "Terra") with the aim of creating a successful stablecoin. Terra's initial crypto asset, LUNA, was first offered on January 30, 2019. LUNA was not a stablecoin but was rather the native token of the Terra blockchain, allowing its holders to vote on governance decisions and to lock up (or "stake") their LUNA in exchange for rewards (for example, receipt of transaction fees from other users or additional, newly minted LUNA tokens).

37.     In April 2019, Kwon and researchers from TFL published a white paper entitled "Terra Money: Stability and Adoption" (the "UST Whitepaper"), which proposed a family of stablecoins pegged to the value of the world's major fiat currencies, including a stablecoin called TerraUSD ("UST") pegged to the U.S. dollar. The white paper explained:

> Recognizing strong regionalities in money, Terra aims to be a family of cryptocurrencies that are each pegged to the world's major currencies. Close to genesis, the protocol will issue Terra currencies pegged to USD, EUR, CNY, JPY, GBP, KRW, and the IMF SDR.[2] Over time, more currencies will be added to the list by user voting. . . .

> It is important, however, for Terra currencies to have access to shared liquidity. For this reason, the system supports atomic swaps among Terra currencies at their market exchange rates. A user can swap TerraKRW for TerraUSD instantly at the effective KRW/USD exchange rate. This allows all Terra currencies to share liquidity and macroeconomic fluctuations; a fall in demand by one currency can quickly be absorbed by the others.

---

[2]     These currency abbreviations correspond, respectively, to U.S. dollars, Euros, Chinese Yuan, Japanese Yen, British pounds sterling, South Korean won, and special drawing rights of the International Monetary Fund.

38.    In the UST Whitepaper and elsewhere, TFL and Kwon stated that UST would maintain its $1 peg through an algorithm tying the supply of UST to that of LUNA and creating arbitrage opportunities for traders.  Specifically, this algorithm would purportedly maintain UST's price at $1 through a complex system in which, rather than being backed by actual dollars, UST would be "minted" (*i.e.*, created) and "burned" (*i.e.*, destroyed) in parallel with LUNA.   For example, holders of LUNA could swap $1 worth of LUNA for 1 UST based on LUNA's then-current market price.  And holders of UST could likewise exchange 1 UST for $1 worth of LUNA.

39.    The algorithm theoretically provided an arbitrage opportunity for traders to help keep the price of UST pegged at one dollar.  If, for example, UST slipped to $0.95, traders could buy UST at that price then burn it to mint $1 worth of LUNA, earning $0.05 profit in the exchange.  In theory, traders seeking arbitrage opportunities would continue to bid up the price of UST until it regained its $1 peg.

40.    On or around April 24, 2019, TFL and Kwon publicly launched the Terra blockchain and created one billion LUNA tokens.  The initial code for the Terra blockchain was written by Kwon, though TFL also maintained code repositories that enabled employees to maintain and update the Terra blockchain's coding and protocols.

**A.    Jump Trading's Relationship with TFL and Sales of LUNA, UST, and aUST**

41.    Defendant Jump Trading was an early partner and financial backer of TFL and the Terra blockchain.  During a March 1, 2022 episode of Jump Crypto's podcast "The Ship Show," Kwon and Jump Crypto President Kariya stated that they first met in 2019 to discuss Terra and UST.

42.    Beginning in or around November 2019, Kwon (on behalf of TFL or one or more of its wholly owned subsidiaries) negotiated and executed a series of agreements with Jump.  Pursuant to these agreements, TFL loaned 30 million LUNA tokens to Jump so that it could provide market-making services for LUNA and UST.  A market maker provides liquidity for an asset by standing

ready to sell or buy the relevant assets on demand, ensuring there is a counterparty to every transaction. In exchange for its services, Jump would receive compensation, including in the form of significantly discounted LUNA tokens, after meeting certain benchmarks in its trading of UST. Kwon emailed a small group of investors to inform them that the purpose of the transaction was to "improve liquidity" of LUNA, because of the "lackluster . . . performance of the LUNA token." Jump began selling LUNA into the market in July 2020.

43.     TFL and a subsidiary subsequently loaned Jump an additional 65 million LUNA tokens in September 2020. Under the terms of this second loan agreement, Jump needed to meet certain thresholds to receive the discounted LUNA tokens. Jump met the first threshold and began receiving LUNA tokens pursuant to TFL's loan in January 2021.

44.     Also in or around September 2020, TFL and Kwon launched UST and announced plans to make UST available on "every major blockchain." Kwon stated that UST's stabilizing algorithm would avoid the kinds of "emergency measures" necessary to restore the $1 pegs for other stablecoins, like the Dai stablecoin available on the Ethereum blockchain. Kwon further stated that UST's sister stablecoin TerraKRW had a proven track record of success across Asia, and he marketed the ability of UST to "be swapped to TerraKRW (and visa versa [sic]) on-chain with negligible [foreign-exchange] fees."

45.     Kwon further marketed the possibility of depositing UST into TFL's "yield-bearing" savings account called the Anchor Protocol. Similar to a savings-and-loan bank, the Anchor Protocol allowed individuals to deposit UST with TFL, which TFL then loaned out to borrowers but did not retain control over. TFL provided each depositor with a deposit receipt in the form of an "Anchor Terra" token called "aUST," which provided the depositor with a redemption right for the amount of UST originally deposited, plus interest. To withdraw UST from the Anchor Protocol, the depositor could swap his aUST for UST at an exchange rate reflecting accrued interest. TFL

publicly touted the Anchor Protocol not as a pooled investment product but rather as "a principal-protected savings product with instant withdrawals and a stable interest rate." Just as UST could be instantly swapped for $1 worth of other Terra stablecoins or LUNA, aUST could be instantly swapped for the original amount of UST that was deposited, plus interest. The Anchor Protocol was publicly launched on March 17, 2021.

46.     Two days later, on March 19, 2021, TFL announced "Terra Bridge," TFL's online portal for transferring assets between the Terra, Ethereum, and Binance blockchains through the use of smart contracts to burn assets from the source blockchain and mint an equivalent amount of assets on the destination blockchain.

47.     As of May 19, 2021, there were approximately 2.1 billion UST tokens in circulation.

**B.     Jump Manipulates the Market for UST and aUST to Maintain the Appearance of UST's $1 Peg**

48.     Until mid-May 2021, there were no significant market disruptions to UST or aUST.

49.     Then, on May 19, 2021, UST unexpectedly fell below $1, dropping by nearly 10%. In response, on or around May 23, 2021, TFL and Kwon secretly began scheming with Jump to artificially inflate the prices of UST and aUST by having Jump covertly purchase massive amounts of UST to restore the false appearance of UST's $1 peg, at least temporarily. The criminal indictment against Kwon alleges that, in or around May 2021, Kwon "contacted representatives of a United States trading and investment firm ('Firm-1') to obtain their assistance in altering the market price of UST." It appears that the unnamed firm referenced in Kwon's criminal indictment is Jump.

50.     Following these discussions, from May 23 to May 27, 2021, Jump made net purchases of more than 62 million UST tokens. The trades were made on multiple crypto trading platforms to further conceal Jump's manipulative activities. Jump personnel located in the United States initiated and made these purchases. Indeed, the criminal indictment against Kwon alleges that "[i]n or about May 2021, Firm-1, which acted through employees located in the Southern District

and elsewhere, deployed trading strategies designed to alter the market price of UST." As depicted in the chart below, prepared by the SEC, UST's market price began to rise on May 23, 2021, just as Jump began its large-scale purchases, and was artificially inflated to near its $1 peg within days.



51. These high-volume trades were intended by Jump to send, and succeeded in sending, a false signal to the market that TFL's algorithm had achieved the re-pegging of UST to its $1 peg, so that prices for UST and aUST generated as a result of Jump's transactions were not representative of true supply and demand for UST and aUST.

52. To compensate Jump for its secret market manipulation, and in furtherance of their scheme, Kwon (on behalf of TFL) agreed to remove from the parties' loan agreement certain conditions requiring Jump to achieve requisite trading benchmarks before receiving discounted LUNA tokens. The criminal indictment against Kwon alleges that TFL's "agree[ment] to modify an existing loan between TFL and Firm-1 to compensate Firm-1 for their assistance in altering the market price of UST" was made "[o]n or about May 23, 2021." Specifically, TFL agreed to convey to Jump more than 61.4 million LUNA tokens (the remaining payments set in the original agreements) over the next four years at $0.40 per token, even during periods when LUNA was trading at more than $90 per token in secondary markets. These modified terms were memorialized

in an agreement signed on July 21, 2021.  As a result of this scheme, Jump earned over ***$1.28 billion***

by selling the steeply discounted LUNA it had acquired under the modified agreements.

53.     After UST was artificially inflated to its apparent $1 peg in late-May 2021,

purchasers poured billions of dollars more into UST and aUST.

### C.     TFL and Jump's Cover-Up of UST's and aUST's Instability and the May 2021 Price Manipulation

54.     Following Jump's artificial inflation of UST to its apparent $1 peg and manipulation

of the price of aUST, TFL, Kwon, Kariya, and other Jump representatives falsely and misleadingly

represented to the public that UST's $1 peg had been restored by TFL's algorithm (and not Jump's

intervention), giving the market the false and misleading impression that the re-peg had occurred

without the active intervention of Jump's massive purchases of UST, that TFL's algorithm worked,

that UST was likely to remain effectively pegged to $1, and that UST and aUST were far more

valuable and less risky than was in fact the case.

55.     For example, in a series of tweets on May 23, 2021 – following Kwon's secret deal

with Jump and in the midst of Jump's large-scale purchases intended to manipulate the market for

UST and aUST – Kwon responded to critics, whom he called "cockroaches," and falsely denied that

UST's price was being manipulated as follows:







56.     The next day, May 24, 2021, TFL bragged on Twitter about UST's purported self-correction, using further deceptive language as follows: "Terra is designed with explicit, real-time levers . . . that traditional banking models cannot match. . . .  Algorithmic, calibrated adjustments of economic parameters are more effective than faxes and suits in meetings."  These tweets by TFL concealed the truth about Jump's manipulative intervention to artificially restore the appearance of UST's $1 peg as follows:



57.     On August 9, 2021, TFL announced that Terra Bridge would begin using a protocol called "Wormhole" to facilitate asset transfers between the Terra, Ethereum, and Binance blockchains, and would begin allowing transfers to and from the Solana blockchain.   This announcement came just days after Jump, which was already a major partner of Solana, acquired Wormhole.  TFL stated that it "view[ed] the Wormhole bridge as a powerful opportunity to expand the supply of UST (a key growth metric) and induce further protocol seigniorage, benefitting LUNA stakers and holders."   TFL further explained: "Immediate advantages include Solana's reduced [decentralized finance] protocol reliance on centralized, custodial stablecoins under regulatory scrutiny, access to aUST [on the Anchor Protocol] and its 20% APY Anchor rate, and eventually . . . Secret UST (sUST) – a private, infinitely scalable stablecoin sourced from Secret Network and available on Solana via Terra."  TFL further stated that "[u]ptake of UST across the Solana and Terra Wormhole bridge [was] expected to be massive, as aptly demonstrated by only 2 stablecoin pools on Solana accounting for ~$100 million in liquidity already."  The Jump-controlled Wormhole bridge continued to fuel the enormous growth and increasing investor base of UST and aUST.

58.     The next day, Kwon tweeted his excitement about Wormhole's ability to make UST available on the Solana blockchain, stating in pertinent part as follows:



59.     In September 2021, following the formal announcement of Jump Crypto as Jump's cryptocurrency arm, TFL tweeted congratulations, mentioning that Jump had been a "consummate Terra partner" that had "quietly played a pivotal role in the Terra ecosystem for a long time":



60.     In response, Kariya tweeted that it had "been a real pleasure" working with Kwon and TFL "over the last couple years."  Both TFL and Kariya failed to disclose Jump's intervention to restore UST's $1 peg, as reflected in the following tweets:



61.     On October 11, 2021, Jump Crypto officers Peter Johnson and Shanav Mehta published an article on the website of Jump's affiliate Jump Capital, entitled "Stablecoins: The Impending Rise of Multi-Trillion Dollar Market." This article appears to have been written and published from the United States and hosted on servers located in the United States. The article described UST as a "prominent example" of an algorithmic stablecoin and "the most elegant solution for creating a highly scalable and more decentralized stablecoin." The article failed to disclose Jump's active intervention to prop up UST to $1 after TFL's algorithm had failed.

62.     On October 20, 2021, Kwon tweeted that Wormhole "brings UST" to the Solana, Ethereum, and Binance blockchains, writing that "Web3 will be a network of connected blockchains, and $UST will pave its highways."

63.     In January 2022, TFL announced the formation of a non-profit organization called the Luna Foundation Guard ("LFG"), which would purportedly serve as an asset reserve to defend UST's $1 peg. Six venture capital firms funded LFG, including Jump Crypto. Kwon, his TFL co-cofounder Nicholas Platias, Jump Crypto President Kariya, and three others comprised LFG's "independent" Governing Council. LFG had no employees of its own. The announcement also characterized the May 2021 de-pegging of UST as a source of "important lessons." In this announcement, LFG and TFL declared that "UST weathered a massive, reflexive drawdown in the LUNA price in May [2021]" "[b]y concentrating almost explicitly on bootstrapping the demand-side of algorithmic stablecoins." The announcement – which was approved by Kariya and Jump from within the United States – failed to mention that it was Jump's scheme with TFL and Kwon to manipulate the market for UST and aUST, and not TFL's algorithm, that had propped up the price of UST to its apparent $1 peg.

64.     LFG's website further repeated the false claims that UST's $1 peg was effectively maintained by its algorithm, stating that unlike other stablecoins "backed by fixed deposits of the

pegged fiat currency or over-collateralized in another DeFi asset, the value of Terra's family of stablecoins is maintained through a system of arbitrage incentives, open market operations, and dynamic protocol levers that maintain robust peg stability . . . primarily accomplished by the Terra protocol design." The website further stated that "[n]either LFG nor any other entity that assisted with the UST Reserve protocol profit from it." This statement omitted the fact that Jump had made over *$1.28 billion* in profits from selling the LUNA tokens it received at a steep discount in exchange for artificially propping up the price of UST and aUST. LFG was initially funded with 50 million LUNA tokens provided by TFL, which at the time were valued at billions of dollars.

65.     Also in January 2022, Kariya published a Twitter thread in an attempt to quell any "panic" surrounding UST, stating that it was "difficult to imagine a sustained mass exodus to UST given the circumstances. In the event it occurs, there is potential for UST to be sold/burned and provide some downward pressure on Luna price." Kariya was referring to the purported algorithm and arbitrage-based opportunities keeping the UST at its purported $1 peg, but he made no mention of Jump's prior active involvement in artificially manipulating the price of UST and aUST after TFL's algorithm had failed in May 2021. Kariya published this Twitter thread from within the United States, as follows:





66. On March 1, 2022, Kwon and Kariya recorded the first episode of Jump Crypto's podcast "The Ship Show." The episode was recorded in, hosted in, and disseminated from within the United States. During that episode, Kwon reiterated the false statement that UST maintained its $1 peg in a "purely algorithmic kind of way," without disclosing the scheme to manipulate UST and aUST prices to maintain UST's apparent $1 peg, stating in pertinent part as follows:

> So the easy way of explaining how UST maintains peg is that LUNA absorbs the volatility of Terra stablecoins. So at any given point, you can mint one Terra USD by burning a dollars [sic] worth of LUNA, and then you can always redeem one Terra USD for a dollars [sic] worth of LUNA as well. So during times in which the market demand for UST falls, there's an arbitrage incentive. So for example, if LUNA starts to trade at 90 cents, then traders can make money by buying UST from the open market, swapping it to LUNA and then capture a 10% arb[itrage] profit. On the other side, if UST is trading at 1.1 dollars, you can buy a dollars [sic] worth of LUNA from the market, swap it to UST and then capture 10% arb[itrage] profit that way. So insofar as you have a liquid market for LUNA at some market value, UST is able to facilitate minting redemptions in a highly scalable, ***purely algorithmic kind of way***.

Emphasis added.

67. Kwon further misrepresented during the episode that UST's "slippage" and "deviat[ion] from the peg" in May 2021 had been "naturally" and "automatically self-heal[ed]" by TFL's algorithm. Kwon falsely and misleadingly omitted the truth about Jump's active intervention to prop up the price of UST and manipulate the price of aUST. Kariya participated in the podcast but failed to correct any of Kwon's false and misleading statements.

68.     During the same episode, Kariya expressly noted Jump's years-long relationship with

TFL, while misleadingly omitting any mention of Jump's active role in propping up the price of

UST in May 2021, stating in pertinent part as follows:

> So there's a place that the LFG comes into it arguments is [sic] Do talked
> about how you can potentially create or redeem UST by interacting with LUNA
> markets and, like I said, LUNA liquidity is kind of paramount to making that stable
> and robustly possible at reasonable size in periods where the UST economy is
> significantly contracting or expanding. . . .  Do started off saying the first time we
> spoke was in 2019, and I hadn't really quite internalized that until now.  And so,
> yeah, it's been really, really awesome working with you and the rest of the Terra
> community for over two years now.  Kind of quite stunning to think about how far
> things have come, so yeah, just wanted to say that it's been awesome.

69.     In March 2022, Kariya responded to a tweet about potential "arbitrage" opportunities

for UST traders by stating that "UST is in high demand [at the moment] and is generally trading at a

premium."   Kariya again misleadingly omitted any mention of Jump's prior intervention to

manipulate the prices of UST and aUST.  Kariya published this tweet from within the United States,

as follows:



70.     The statements identified in ¶¶54-69, above, were materially false and misleading

when made.  As Defendants knew, or were reckless in not knowing, Jump, by covertly purchasing

more than 62 million UST tokens between approximately May 23 and May 27, 2021, artificially

inflated the price of UST to approximately its $1 apparent peg.  These secret purchases and

Defendants' materially false and misleading statements and omissions as detailed herein had the

effect of artificially inflating and maintaining the prices of UST and aUST until their collapses in May 2022. In addition, as Defendants knew or recklessly disregarded, UST and aUST were subject to a material undisclosed risk of collapse in the face of market volatility: UST was not effectively pegged to $1, the TFL algorithm used to maintain the UST peg had failed and was likely to fail in the future, and Defendants had entered into a scheme to conceal these adverse facts, as well as to conceal their manipulative actions in furtherance of the scheme and their ill-gotten proceeds from the investing public. These misrepresentations misled Plaintiff and other members of the Class, who acquired UST and aUST on the reasonable belief that their prices were based on legitimate market activities, that Defendants' statements regarding UST and aUST were truthful and materially complete, and that following its de-pegging UST had, as Kwon put it, "automatically self-heal[ed]" – in other words, that UST's algorithm had allowed UST to maintain an effective $1 peg even in the face of market disruptions and that it was insulated from such shocks in the future.

71. Defendants continually took advantage of the manipulated prices of UST and aUST by trading UST and aUST throughout the Class Period from within the United States.

**D. The Collapse of UST, aUST, and the Terra Blockchain in May 2022**

72. As of May 6, 2022, there were nearly 19 billion total UST tokens in circulation, of which approximately 14 billion UST tokens were deposited in the Anchor Protocol in exchange for approximately 14 billion aUST.

73. Beginning on May 8, 2022, UST again de-pegged from $1, but this time the dislocation was substantially more significant and the price, without Jump's artificial price support, did not recover. The price of UST dropped to $0.81 on May 9, $0.16 on May 13, and under $0.06 by May 21. Similarly, the price of aUST fell from $1.21 on May 9, to $0.76 on May 11, to $0.13 on May 13, to $0.08 on May 22. By the end of May 2022, UST and aUST were essentially worthless,

and the promised returns of nearly 20% interest were never fulfilled for holders of aUST, whose UST was deposited in the Anchor Protocol.

74.     During the collapse, representatives of Defendant Jump discussed a possible bailout of UST with employees of Alameda and Jane Street Group, LLC ("Jane Street").  The communications took place on the encrypted messaging service Telegram.  Although a bailout never happened, federal prosecutors are reportedly investigating whether Jump continued their market manipulation at this time.

75.     The collapse of UST and aUST took LUNA, the Anchor Protocol, and the entire Terra blockchain down with them, destroying $40 billion in combined market value, including over $18 billion of value in UST and aUST.  Purchasers of UST and those who deposited their UST on the Anchor Protocol with the ability to swap their aUST holdings for UST lost everything.  Some of these individuals lost their life savings.  It has been reported that some even contemplated suicide.

76.     Jump, however, retained the $1.28 billion in profits it obtained as a result of its May 2021 intervention to manipulate the prices of UST and aUST.  Jump also retained all the trading fees generated by transfers of UST through Wormhole.

## III.     Defendants Successfully Concealed Their Misconduct until February 2023

77.     Defendants continued to conceal their misconduct even after the collapse of UST, aUST, and the Terra blockchain.  On June 2, 2022, Jump published an article on the Jump Crypto website entitled "The Depegging of UST."  The article was written in, and the website was hosted on servers located in, the United States.  The article repeated the misleading description of UST as having an "automatic" mechanism to maintain its purported $1 peg, but Jump omitted any mention of its May 2021 intervention to manipulate the prices of UST and aUST, stating in pertinent part as follows:

> UST was designed to maintain its peg through the on-chain mint and burn mechanism, a virtual automatic market maker (vAMM) rooted in the condition that 1

UST, irrespective of its market value, is worth approximately $1 of LUNA. This mechanism was constructed so that volatility and UST price dislocations could be smoothed out with UST and LUNA supply expansions or contractions via on-chain arbitrageurs.

78.     Defendants' role in manipulating the prices of UST and aUST did not come to light until after the SEC Complaint was filed on February 16, 2023. Although the SEC Complaint did not expressly name Jump and referred instead to an unnamed "U.S. Trading Firm," multiple sources familiar with Jump's May 2021 intervention to manipulate the prices of UST and aUST have revealed that the unnamed firm was Jump. For example, a February 17, 2023 article, entitled "Jump Crypto Is Unnamed Firm That Made $1.28B From Do Kwon's Doomed Terra Ecosystem: Sources," by the cryptocurrency news organization *CoinDesk*, stated that "[a]ccording to people familiar with the matter," the unnamed trading firm "was Chicago-based Jump Crypto." A February 17, 2023 article by *Fortune* entitled, "Jump Trading revealed as 'third party' in SEC claim against Do Kwon and Terraform Labs," and a February 18, 2023 article by *The Crypto Times* entitled, "Jump Crypto Accused of Profiting $1.28B From Collapsed Terra," came to the same conclusion.

79.     On March 13, 2023, *Bloomberg* reported that federal prosecutors were investigating May 2022 communications among employees at Jump, Jane Street, and Alameda on the encrypted messaging app Telegram to determine whether they had engaged in any market manipulation with respect to crypto assets issued by TFL.

80.     On March 23, 2023, *The New York Times* and other news outlets reported that Kwon had been arrested in Montenegro after using forged Costa Rican travel documents at a passport check before a flight to Dubai. Kwon had been a fugitive from justice for months, including from a September 2022 "red notice" by Interpol for his arrest by authorities worldwide. Hours after Kwon's March 23 arrest in Montenegro, prosecutors in the Southern District of New York filed charges against Kwon for commodities fraud and other federal crimes related to the collapse of UST. Kwon's indictment contains the following allegations:

a.     In or about May 2021, [Kwon] contacted representatives of a United States trading and investment firm ("Firm-1") to obtain their assistance in altering the market price of UST.

b.     In or about May 2021, Firm-1, which acted through employees located in the Southern District of New York and elsewhere, deployed trading strategies designed to alter the market price of UST.

c.     On or about May 23, 2021, [Kwon], on behalf of TFL, agreed to modify an existing loan between TFL and Firm-1 to compensate Firm-1 for their assistance in altering the price of UST.

"Firm-1" appears to be the same trading firm as alleged in the SEC Complaint, specifically Jump.

## IV.   Plaintiff Purchased UST and aUST During the Class Period and Suffered Damages

81.     Plaintiff made purchases of UST and aUST during the Class Period at a time when the prices for UST and aUST had been manipulated by Defendants' conduct as detailed herein and were persistently artificial.  Plaintiff suffered damages as a result.

82.     Plaintiff made these purchases through two different crypto exchanges during the Class Period.

83.     Initially, Plaintiff purchased tokens of the Binance-based stablecoin BUSD on the Binance.us exchange, which is housed in the United States.  He then initiated further transactions from within the United States to swap BUSD for Terra-based UST tokens, which he in turn swapped for aUST via the Anchor Protocol.  Plaintiff initiated and completed each of these transactions in the United States.  Specifically, he made the following purchases:

- On November 18, 2021, Plaintiff purchased approximately $108.58 in UST, some of which he used to swap for approximately $94.46 in aUST;

- On December 9, 2021, Plaintiff purchased approximately $993.12 in UST, some of which he used to swap for approximately $862.03 in aUST;

- On December 12, 2021, Plaintiff purchased approximately $32,731.27 in UST, some of which he swapped for approximately $28,396.42 in aUST; and

- On December 17, 2021, Plaintiff purchased approximately $2,971.29 in UST, some of which he swapped for approximately $2,568.08 in aUST.

84.     Subsequently, Plaintiff purchased UST on Binance.com, which operated over servers significantly located in California and managed by U.S. personnel.  Plaintiff then swapped via the Anchor Protocol certain of the UST he acquired for aUST.  Plaintiff initiated and completed each of these transactions from within the United States.  Specifically, he made the following purchases:

- On January 19, 2022, Plaintiff purchased approximately $604.24 in UST;

- On March 28, 2022, Plaintiff purchased approximately $32,859.56 in UST, some of which he swapped for approximately $32,848.99 in aUST; and

- On April 12, 2022, Plaintiff purchased approximately $59,578.82 in UST, some of which he swapped for approximately $59,562.55 in aUST.

85.     Following the collapse of UST, aUST, and the Terra blockchain, and as a direct and proximate result of Defendants' misconduct, Plaintiff suffered more than $100,000 in economic losses and actual damages under applicable law.

## CLASS ACTION ALLEGATIONS

86.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3).

87.     Plaintiff seeks class certification on behalf of all persons who, during the Class Period, purchased UST or aUST in the United States and were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Jump at all relevant times, members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

88.     **Numerosity (Rule 23(a)(1))**.  The Class is so numerous so as to make joinder of all members impracticable.  While the exact number of identities of all individual members of the Class is currently unknown, Plaintiff believes, and on that basis alleges, that the Class consists of at least hundreds of people.  For example, as of May 19, 2021, there were approximately 2.1 billion UST

tokens in circulation.  The number of Class members can be determined based on the blockchain and records maintained by crypto asset exchanges and other third parties.

89.  **Commonality and Predominance (Rule 23(a)(2) and (b)(3))**.  Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Class members, including the following:

(a)  whether Defendants' conduct qualifies as a price manipulation under the federal commodities laws and implementing regulations;

(b)  whether Defendants misled the market regarding the value of UST and aUST;

(c)  whether Defendants' conduct during the Class Period constituted aiding-and-abetting a price manipulation and/or a manipulative device under the federal commodities laws and implementing regulations;

(d)  whether artificial prices existed for UST and aUST during the Class Period and the extent and amount of such artificial prices; and

(e)  whether Plaintiff and Class members have suffered damages, and, if so, the nature and extent of those damages.

90.  **Typicality (Rule 23(a)(3))**.  Plaintiff's claims are typical of the claims of the other members of the proposed Class.  Plaintiff suffered injuries as a result of Defendants' wrongful conduct that arise from the same events or course of conduct that gives rise to the Class members' claims.

91.  **Adequacy (Rule 23(a)(4))**.  Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class.  Plaintiff has retained competent legal counsel with experience in complex litigation and large class action cases.  Plaintiff has no interest that conflicts with the interests of the Class and is committed to pursuing this action vigorously.

92.     **Superiority (Rule 23(b)(3))**.  This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable.  Prosecuting each action individually would impose heavy burdens upon the courts and Defendants, would pose a risk of inconsistent or varying adjudications of the questions of law and fact common to members of the Class, and would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.  This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.  Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

93.     Therefore, class certification is appropriate under Fed R. Civ. P. 23(b)(3) because the above questions of law or fact predominate over any questions affecting individual members of the Class, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

### COUNT I

**Commodity Price Manipulation and Manipulative Contrivance**
**CEA §§2(a)(1)(B), 6(c), 9(a)(2), 13(a), and 22(a)(1),**
**7 U.S.C. §§2(a)(1)(B), 9, 13(a)(2), 13c(a), and 25(a)(1)**
**CFTC Regulations 180.1 and 180.2 17, C.F.R. §§180.1 and 180.2**
**Against All Defendants**

94.     Plaintiff restates and realleges all preceding allegations as if fully set forth herein.

95.     Plaintiff brings this claim under CEA §22(a)(1), 7 U.S.C. §25(a)(1), for violations of CEA §§2(a)(1)(B), 6(c)(1), 6(c)(3), 9(a)(2), and 13(a), 7 U.S.C. §§2(a)(1)(B), 9(1), 9(3), 13(a)(2), and 13c(a), as well as CFTC Regulations 180.1(a) and 180.2, 17 C.F.R. §§180.1(a) and 180.2.

96.　CEA §22(a)(1) provides in relevant part: "Any person . . . who violates this chapter or who willfully aids, abets, counsels, induces, or procures the commission of a violation of this chapter shall be liable for actual damages . . . caused by such violation to any other person . . . (B) who made through such person any contract of sale of any commodity for future delivery (or option on such contract or any commodity) or any swap; or who deposited with or paid to such person money, securities, or property (or incurred debt in lieu thereof) in connection with any order to make such contract or any swap; . . . (D) who purchased or sold a contract referred to in subparagraph (B) hereof or swap if the violation constitutes – (i) the use or employment of, or an attempt to use or employ, in connection with a swap, or a contract of sale of a commodity, in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative device or contrivance in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after July 21, 2010; or (ii) a manipulation of the price of any such contract or swap or the price of the commodity underlying such contract or swap." 7 U.S.C. §25(a)(1).

97.　CEA §2(a)(1)(B) provides: "The act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person." 7 U.S.C. §2(a)(1)(B).

98.　CEA §6(c)(1) makes it "unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of" the rules of the Commodity Futures Trading Commission ("CFTC"). 7 U.S.C. §9(1).

99.     CEA §9(a)(2) makes it unlawful for "[a]ny person to manipulate or attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, or of any swap, or to corner or attempt to corner any such commodity or knowingly to deliver or cause to be delivered for transmission through the mails or interstate commerce by telegraph, telephone, wireless, or other means of communication false or misleading or knowingly inaccurate reports concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce, or knowingly to violate the provisions of section 6."  7 U.S.C. §13(a)(2).

100.     CEA §13(a) provides that "[a]ny person who commits, or who willfully aids, abets, counsels, commands, induces, or procures the commission of, a violation of any of the provisions of this chapter, or any of the rules, regulations, or orders issued pursuant to this chapter, or who acts in combination or concert with any other person in any such violation, or who willfully causes an act to be done or omitted which if directly performed or omitted by him or another would be a violation of the provisions of this chapter or any of such rules, regulations, or orders may be held responsible for such violation as a principal."  7 U.S.C. §13c(a).

101.     In relevant part, CFTC Regulation 180.1(a), 17 C.F.R. §180.1, makes it unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:

> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;
>
> (2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; [or]
>
> (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person . . . .

- 31 -

17 C.F.R. §180.1(a).

102.    CEA §6(c)(3) provides in relevant part that "it shall be unlawful for any person, directly or indirectly, to manipulate or attempt to manipulate the price of any swap, or of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity."  7 U.S.C. §9(3).

103.    CFTC Regulation 180.2, 17 C.F.R. §180.2, provides in relevant part: "It shall be unlawful for any person, directly or indirectly, to manipulate or attempt to manipulate the price of any swap, or of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity."  17 C.F.R. §180.2.

104.    At all relevant times, neither Defendant Jump, nor Defendant Kariya, nor TFL, nor Kwon was a "registered entity" or "registered futures association" as defined under 7 U.S.C. §§1a(40) or 25(a)(1).

105.    CEA §1a(47)(A)(iii) defines a "swap" as, in relevant part, "any agreement, contract, or transaction . . . that provides on an executory basis for the exchange, on a fixed or contingent basis, of 1 or more payments based on the value or level of 1 or more . . . currencies, commodities, . . . or other financial or economic interests or property of any kind, or any interest therein or based on the value thereof, and that transfers, as between the parties to the transaction, in whole or in part, the financial risk associated with a future change in any such value or level without also conveying a current or future direct or indirect ownership interest in an asset."  7 U.S.C. §1a(47)(A)(iii).

106.    At all relevant times, UST was a swap or otherwise a contract of sale of any commodity in interstate commerce because it provided, on an executory basis, for the exchange of 1 UST (a commodity) for $1 worth of either LUNA or another Terra stablecoin, such as TerraKRW, or an equivalent amount of aUST, and transferred, as between the parties to such transaction, the financial risk associated with a future change in the value of such tokens.

107.     At all relevant times, aUST was a swap or otherwise a contract of sale of any commodity in interstate commerce because it provided, on an executory basis, for the exchange for the original amount of UST (a commodity) that was deposited to create such aUST, plus interest at the stable rate set by the Anchor Protocol.  The UST thus obtained could then be exchanged for LUNA or another Terra stablecoin.

108.     A substantial proportion of UST and aUST trades were conducted by persons, including Plaintiff, in the United States.  Moreover, Defendants performed their trades of UST and aUST from the United States.  Class members in the United States also exchanged money in connection with their UST and aUST transactions in the United States.  Thus, all Class members incurred irrevocable liability in the United States.

109.     On or about May 21, 2021, the price of UST de-pegged from $1.  TFL, Kwon, and Defendant Jump implemented a scheme to have Jump make significant purchases of UST to artificially restore its $1 peg.

110.     Between approximately May 23 and 27, 2021, Jump intentionally or recklessly manipulated the price of UST by making net purchases of more than 62 million UST tokens on multiple crypto trading platforms to restore UST's $1 peg.  These purchases contributed to and were the proximate cause of UST's peg being restored.

111.     These trades were intended by Jump to send, and succeeded in sending, a false signal to the market that TFL's algorithm had achieved the re-pegging of UST to its $1 peg, so that prices for UST and aUST generated as a result of Jump's transactions were not representative of true supply and demand for UST and aUST.

112.     TFL rewarded Jump for its intervention by waiving certain contractual conditions on Jump's ability to purchase 61.4 million LUNA tokens at a 99.6% discount.  Jump also profited from fees generated by the use of Wormhole to facilitate asset transfers across blockchains.

113.     Persistently throughout the Class Period, Defendants intentionally or recklessly, in connection with contracts of sale of UST and aUST, directly or indirectly: used or employed, or attempted to use or employ, a scheme or artifice to defraud; and/or engaged in, or attempted to engage in, acts, practices, or a course of business that operated or would operate as a fraud or deceit on purchasers of UST and aUST.

114.     Specifically, throughout the Class Period, Defendants intentionally or recklessly made material misstatements of fact and misleading omissions concerning their manipulation of the market prices for UST and aUST as detailed herein and as further summarized in part as follows:

(a)     In a series of tweets on May 23, 2021, the day Jump began manipulating UST's and aUST's prices, Kwon falsely denied that UST's price was being manipulated. Defendants did not correct this misstatement.

(b)     The next day, May 24, 2021, TFL tweeted that UST's $1 peg was restored through "real-time levers" and "[a]lgorithmic, calibrated adjustments." Defendants did not correct this misstatement.

(c)     In September 2021, when Jump Crypto was formally announced as Jump's cryptocurrency arm, Jump Crypto President Kariya tweeted that it had "been a real pleasure working with [Kwon] and the Terra team over the last couple of years." Kariya omitted any mention of Jump's manipulation of UST's and aUST's prices four months earlier.

(d)     In an October 11, 2021 blog post, two Jump Crypto officers described UST as a "prominent example" of an algorithmic stablecoin and "the most elegant solution for creating a highly scalable and more decentralized stablecoin." The post omitted any mention of Jump's prior active manipulation of UST's and aUST's prices.

(e)     The January 2022 announcement for LFG – which Jump Crypto funded and whose governing council included Kwon, another TFL co-founder, and Kariya – falsely stated that

- 34 -

UST's $1 peg had been restored by TFL's algorithm and omitted the truth about Jump's intervention. Defendants did not correct this misstatement.

(f)     On January 28, 2022, Kariya tweeted reassurances about UST's stability but failed to disclose Jump's prior manipulation of UST's price.

(g)     During a March 1, 2022 episode of Jump Crypto's podcast "The Ship Show," Kwon reiterated his false description of UST's re-peg as "purely algorithmic," "natural[]," and "automatically self-healing," omitting the truth about Jump's intervention. Kariya, who also participated in the episode, did not correct Kwon's false statements.

(h)     Kariya tweeted on March 8, 2022 about the "high demand" for UST, but omitted the truth about Jump's prior manipulation of UST's and aUST's prices.

115.     These misrepresentations and omissions concerned material information that would have influenced a reasonable purchaser. In particular, the ability of the TFL algorithm to maintain UST's $1 peg was key to the value of UST and aUST. When making a decision to purchase a purportedly algorithmic stablecoin such as UST, a reasonable person would consider the extent to which the stablecoin's price was manipulated to maintain its $1 peg.

116.     Defendants had actual and superior knowledge of their efforts to manipulate the prices of UST and aUST during the Class Period because Jump had entered into a secret agreement with Kwon and TFL to conduct that manipulation and had participated in the manipulation of UST's and aUST's prices between approximately May 23 and 27, 2021 through the secret purchase of UST at a steep discount and subsequent misrepresentations throughout the Class Period to conceal these manipulative acts and convey false information to the market regarding the value of UST and aUST and their attendant risks.

Case 1:23-cv-01832-KMW-D
Case 1:23-cv-01346-KMW-DD
Document 22-1
Document 22-1
Filed 05/09/23
Filed 04/25/2023
Page 39 of 45
Page 39 of 45

117.     These representations were materially false and misleading because TFL's algorithm had failed to restore UST's $1 peg naturally or automatically, and instead the peg was restored because of Jump's secret intervention.

118.     At all relevant times, Defendant Kariya was acting for his own benefit and the benefit of Jump Trading.  To the extent Kariya was acting as an agent on behalf of Jump or its cryptocurrency arm Jump Crypto, Kariya is still liable for his own misconduct under CEA §2(a)(1)(B), 7 U.S.C. §2(a)(1)(B).

119.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff suffered more than $100,000 in economic losses and actual damages under applicable law, and members of the Class suffered billions of dollars in economic losses and actual damages under applicable law.

## COUNT II

**Aiding and Abetting Commodity Price Manipulation and Manipulative Contrivance**
**CEA §§2(a)(1)(B), 6(c), 9(a)(2), 13(a), and 22(a)(1)(D),**
**7 U.S.C. §§2(a)(1)(B), 9, 13(a)(2), 13c(a), and 25(a)(1)(D)**
**CFTC Regulations 180.1 and 180.2, 17 C.F.R. §§180.1 and 180.2**
**Against All Defendants**

120.     Plaintiff restates and realleges all preceding allegations as if fully set forth herein.

121.     Plaintiff brings this claim under CEA §22(a)(1)(D), 7 U.S.C. §25(a)(1)(D), for violations of CEA §§2(a)(1)(B), 6(c)(1), 6(c)(3), 9(a)(2), and 13(a), 7 U.S.C. §§2(a)(1)(B), 9(1), 9(3), 13(a)(2), and 13c(a), as well as CFTC Regulations 180.1(a) and 180.2, 17 C.F.R. §§180.1(a) and 180.2.

122.     Persistently throughout the Class Period, as detailed herein, Defendants willfully aided, abetted, counseled, induced, or procured TFL's and Kwon's manipulation of the prices of UST and aUST; manipulative device, scheme, or artifice to defraud investors in UST and aUST; untrue or misleading statements of a material fact regarding UST and aUST; omissions to state a material fact necessary in order to make the statements made not untrue or misleading regarding

UST and aUST; and acts, practices, or courses of business that operated as a fraud or deceit upon investors in UST and aUST during the Class Period.

123. On or about May 21, 2021, the price of UST de-pegged from $1. TFL, Kwon, and Jump implemented a scheme to have Jump make significant purchases of UST to artificially restore its $1 peg.

124. Defendants intentionally or recklessly manipulated the price of UST by having Jump make net purchases of more than 62 million UST tokens on multiple crypto trading platforms to restore the appearance of UST's $1 peg between approximately May 23 and 27, 2021 and making the materially false and misleading statements detailed herein throughout the Class Period.

125. These trades and materially false and misleading statements by Defendants were intended by Defendants to send, and succeeded in sending, a false signal to the market that TFL's algorithm had achieved the re-pegging of UST to its $1 peg, so that prices for UST and aUST generated because of Jump's transactions were not representative of true supply and demand for UST and aUST.

126. TFL rewarded Defendants for their intervention by waiving certain contractual conditions on Jump's ability to purchase 61.4 million LUNA tokens at a 99.6% discount. Defendants also profited from fees generated by the use of Wormhole to facilitate asset transfers across blockchains.

127. Persistently throughout the Class Period, Defendants willfully aided, abetted, counseled, induced, or procured material misstatements of fact and misleading omissions concerning Jump's manipulation of UST's price during the Class Period as detailed herein and as summarized in part as follows:

(a)     In a series of tweets on May 23, 2021, the day Jump began manipulating UST's and aUST's prices, Kwon falsely denied that UST's price was being manipulated. Defendants did not correct this misstatement.

(b)     The next day, May 24, 2021, TFL tweeted that UST's $1 peg was restored through "real-time levers" and "[a]lgorithmic, calibrated adjustments." Defendants did not correct this misstatement.

(c)     In September 2021, when Jump Crypto was formally announced as Jump's cryptocurrency arm, Jump Crypto President Kariya tweeted that it had "been a real pleasure working with [Kwon] and the Terra team over the last couple of years." Kariya omitted any mention of Jump's manipulation of UST's and aUST's prices four months earlier.

(d)     In an October 11, 2021 blog post, two Jump Crypto officers described UST as a "prominent example" of an algorithmic stablecoin and "the most elegant solution for creating a highly scalable and more decentralized stablecoin." The post omitted any mention of Jump's prior active manipulation of UST's and aUST's prices.

(e)     The January 2022 announcement for LFG – which Jump Crypto funded and whose governing council included Kwon, another TFL co-founder, and Kariya – falsely stated that UST's $1 peg had been restored by TFL's algorithm and omitted the truth about Jump's intervention. Defendants did not correct this misstatement.

(f)     On January 28, 2022, Kariya tweeted reassurances about UST's stability but failed to disclose Jump's prior manipulation of UST's price.

(g)     During a March 1, 2022 episode of Jump Crypto's podcast "The Ship Show," Kwon reiterated his false description of UST's re-peg as "purely algorithmic," "natural[]," and "automatically self-healing," omitting the truth about Jump's intervention. Kariya, who also participated in the episode, did not correct Kwon's false statements.

(h)    Kariya tweeted on March 8, 2022 about the "high demand" for UST, but omitted the truth about Jump's prior manipulation of UST's and aUST's prices.

128.    These misrepresentations and omissions concerned material information that would have influenced a reasonable purchaser.  In particular, the ability of the TFL algorithm to maintain UST's $1 peg was key to the value of UST and aUST.  When making a decision to purchase a purportedly algorithmic stablecoin such as UST, a reasonable person would consider the extent to which the stablecoin's price was manipulated to maintain its $1 peg.

129.    Defendants had actual and superior knowledge of their efforts to manipulate the prices of UST and aUST during the Class Period because Jump had entered into a secret agreement with Kwon and TFL to conduct that manipulation and had participated in Jump's manipulation of UST's and aUST's prices between approximately May 23 and 27, 2021 through the secret purchase of UST at a steep discount and subsequent misrepresentations throughout the Class Period to conceal these manipulative acts and convey false information to the market regarding the value of UST and aUST and their attendant risks.

130.    These representations were materially false and misleading because TFL's algorithm had failed to restore UST's $1 peg naturally or automatically, and instead the peg was restored because of Jump's secret intervention.

131.    At all relevant times, Defendant Kariya was acting for his own benefit and the benefit of Jump Trading.  To the extent Kariya was acting as an agent on behalf of Jump or its cryptocurrency arm Jump Crypto, Kariya is still liable for his misconduct under CEA §2(a)(1)(B), 7 U.S.C. §2(a)(1)(B).

132.    As a direct and proximate result of the wrongful conduct of Defendants, TFL, and Kwon, Plaintiff suffered more than $100,000 in economic losses and actual damages under

applicable law, and members of the Class suffered billions of dollars in economic losses and actual damages under applicable law.

**COUNT III**

**Common Law Unjust Enrichment**
**Against Defendant Jump Trading**

133.   Plaintiff restates and realleges all preceding allegations as if fully set forth herein.

134.   As a reward for manipulating the prices of, and markets for, UST and aUST, Jump received more than 61.4 million LUNA tokens at a greater than 99% discount from their then-current market price, which Jump later resold at a $1.28 billion profit.

135.   Jump obtained this benefit through the wrongful conduct of price and market manipulation to manipulate the prices of, and markets for, UST and aUST.

136.   Jump retained this benefit to the detriment of Plaintiff and members of the Class, who made purchases of UST and aUST during the Class Period in reliance on public statements by Jump, Kariya, TFL, and Kwon.

137.   Plaintiff and members of the Class were deprived of their investments as a result of Jump's manipulation when the prices of, and markets for, UST and aUST collapsed.

138.   Jump profited from its manipulation of the price of, and market for, UST and aUST, and it would be unjust for Jump to retain the $1.28 billion in ill-gotten gains from its misconduct, as it would violate the fundamental principles of justice, equity, and good conscience, and no contract governs this dispute.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, prays for judgment against Defendants as to each and every count, including:

- 40 -

A.     An order certifying this action and the Class requested herein as a class action, designating Plaintiff as the representative of the Class, and appointing Plaintiff's counsel as counsel to the Class;

B.     An order declaring that Defendants' actions, as set forth above, constitute violations of the federal laws and common law set forth above, and that Defendants are liable to Plaintiff and the Class, as described herein, for damages arising therefrom;

C.     A judgment awarding Plaintiff and the Class all appropriate damages, in an amount to be determined at trial;

D.     A judgment awarding equitable, injunctive, and/or declaratory relief as may be appropriate including, but not limited to, rescission, restitution, and disgorgement;

E.     A judgment awarding Plaintiff and the Class prejudgment and post-judgment interest, as permitted by law;

F.     A judgment awarding Plaintiff and the Class costs and fees, including attorneys' fees, as permitted by law; and

G.     Such other legal, equitable, or further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff respectfully demands a trial by jury on all claims so triable.

Dated: May 9, 2023                              Respectfully submitted,
       Chicago, Illinois

SELENDY GAY ELSBERG PLLC              ROBBINS GELLER RUDMAN & DOWD LLP


/s/ Jordan A. Goldstein                        /s/ Brian E. Cochran
_____                   _____

Jordan A. Goldstein
Oscar Shine
Babak Ghafarzade
1290 Avenue of the Americas, 17th Floor
New York, NY  10104
jgoldstein@selendygay.com
oshine@selendygay.com
bghafarzade@selendygay.com

Brian E. Cochran
655 W. Broadway, Suite 1900
San Diego, CA  92101
bcochran@rgrdlaw.com

Chad Johnson
Noam Mandel
Jonathan Zweig
420 Lexington Avenue, Suite 1832
New York, NY  10170
chadj@rgrdlaw.com
noam@rgrdlaw.com
jzweig@rgrdlaw.com

Eric I. Niehaus
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
ericn@rgrdlaw.com

*Attorneys for Plaintiff and the Proposed Class*