UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 23-MC-23855

TERRAFORM LABS PTE. LTD.,

      Movant,

        - vs. -

CITADEL SECURITIES, LLC

      Respondent.

[Re: Civil Action No. 23-cv-1346,
Action pending in the United States District
Court for the Southern District of New York,
Hon. Jed S. Rakoff]

**SUPPLEMENTAL DECLARATION OF RACHEL J. RODRIGUEZ IN SUPPORT OF
MOVANT TERRAFORM LABS PTE. LTD.'S MOTION TO COMPEL COMPLIANCE
WITH ITS NON-PARTY SUBPOENA DUCES TECUM OR,
ALTERNATIVELY, TO TRANSFER TO THE SOUTHERN DISTRICT OF NEW YORK**

      I, Rachel J. Rodriguez, declare under penalty of perjury under 28 U.S.C. § 1746 that the

following is true and correct:

      1.      I am a counsel with the law firm Elliott Kwok Levine & Jaroslaw LLP ("EKLJ"),

having offices at 565 Fifth Avenue, 7th Floor, New York, NY 10017.  EKLJ is counsel for Movant

Terraform Labs Pte. Ltd. ("Movant" or "Terraform"), and I have been admitted *Pro Hac Vice* in

this matter.

      2.      I submit this Declaration in further support of Terraform's motion to compel

compliance with its non-party subpoena issued to Citadel Securities, LLC ("Citadel Securities")

in the case captioned *Securities and Exchange Commission v. Terraform Labs, PTE LTD, and Do

Hyeong*, Case No. 1:23-cv-01346, pending in the United States District Court for the Southern

District of New York (hereinafter, the "Underlying Action").

      3.      Attached hereto as **Exhibit L** is a true and correct copy of the document produced

to Movant by Citadel Securities on September 28, 2023.

4.      Attached hereto as **Exhibit M** is a true and correct copy of the Memorandum of Law in support of the motion of the SEC to Exclude the Testimony and Opinions of Dr. Christine A. Parlour, Dkt. No. 92 in the Underlying Action.

5.      Attached hereto as **Exhibit N** is a true and correct copy of the Memorandum of Law in support of the motion of Movant to Exclude the Opinions of Prof. Bruce Mizrach, Dkt. No. 74 in the Underlying Action.

Dated: November 2, 2023                         Respectfully submitted,

By:  _____
        Rachel J. Rodriguez
565 Fifth Avenue, 7th Floor
New York, NY 10017
(212) 321-0510
rrodriguez@ekljlaw.com
Admitted *Pro Hac Vice*
*Attorneys for Movant Terraform Labs Pte. Ltd.*

# EXHIBIT L



# EXHIBIT M

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, Plaintiff, v. TERRAFORM LABS PTE LTD. and DO HYEONG KWON, Defendants. | No. 1:23-cv-1346 (JSR) |

**SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM
OF LAW IN SUPPORT OF ITS MOTION TO EXCLUDE THE
TESTIMONY AND OPINIONS OF DR. CHRISTINE A. PARLOUR**

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*523 IP LLC v. CureMD.Com,*
    48 F. Supp. 3d. 600 (S.D.N.Y. 2014)..............................................................................13

*Amorgianos v. Amtrak,*
    303 F. 3d. 256 (2d Cir. 2002)..........................................................................................12

*CFTC v. Moncada,*
    No. 12 Civ. 8791(CM), 2014 WL 2945793, (S.D.N.Y. June 30, 2014)......................13, 14

*Daubert v. Merrell Dow Pharm., Inc.,*
    509 U.S. 579 (1993)..................................................................................................5, 6, 7

*Gen. Elec. Co. v. Joiner,*
    522 U.S. 136 (1997)........................................................................................................12

*In re Elysium Health-ChromaDex Litig,*
    No. 17-CV-7394 (LJL), 2022 WL 421135 (S.D.N.Y. Feb. 11, 2022).............................11

*In re Rezulin Prod. Liab. Litig.,*
    309 F. Supp. 2d 531 (S.D.N.Y. 2004)...........................................................................6, 7

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.,*
    209 F. Supp. 3d 612 (S.D.N.Y. 2016).........................................................................10, 14

*Linkco, Inc. v. Fujitsu Ltd.,*
    2002 WL 1585551 (S.D.N.Y. July 16, 2002) ..................................................................13

*Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie,*
    No. 11-CV-681 KBF, 2015 WL 5459662 (S.D.N.Y. Sept. 16, 2015).............................12

*United States v. Ulbricht,*
    2015 WL 413318 (S.D.N.Y. Feb. 1, 2015)......................................................................13

*River Light V, L.P. v. Lin & J Int'l, Inc.,*
    No. 13-cv-3669 (DLC), 2015 WL 3916271 (S.D.N.Y. June 25, 2015) ...........................14

*SEC v. Tourre,*
    950 F. Supp. 2d 666 (S.D.N.Y. 2013).......................................................6, 10, 11, 12, 13

*Scentsational Techs. LLC v. Pepsi, Inc.,*
    No. 13 Civ. 8645, 2018 WL 1889763 (S.D.N.Y. Apr. 18, 2018).......................................7

*United States v. Napout,*
    963 F.3d 163 (2d Cir. 2020)...............................................................................................5

## RULES

Federal Rule of Evidence 403 .......................................................................................10

Federal Rule of Evidence 702 .........................................................5, 6, 10, 11, 14, 17

## PRELIMINARY STATEMENT

Plaintiff Securities and Exchange Commission ("SEC") respectfully submits this memorandum of law in support of its Motion to Exclude the Testimony and Opinions of Dr. Christine A. Parlour, who Defendants Terraform Labs PTE, Ltd. ("Terraform") and Do Hyeong Kwon ("Kwon") have proffered as an expert witness to testify at trial.

Dr. Parlour should be precluded from offering opinions and testifying in this case, and her report should be disregarded in connection with the parties' motions for summary judgment. First, Dr. Parlour's opinions are irrelevant factual narratives that would be unhelpful to the jury. Her first opinion purports to describe the "characteristics" of Terraform's crypto assets, along with their "applications and use cases." But Dr. Parlour merely repackages Terraform's marketing materials with an expert witness gloss; she offers no opinions of her own. Dr. Parlour's second opinion is that "academic literature and industry participants discussed the risk" that Terraform's so-called stablecoin, Terra USD ("UST"), which Terraform designed to stay pegged at $1, could drop from that peg due to a "run" on UST. Expert Report of Christine A. Parlour, attached as Ex. 1, at 27. But Dr. Parlour again offers no opinions; she merely rehashes what others have "discussed" regarding the UST depeg risk. Worse, Dr. Parlour does not opine that a "run" actually caused UST's depeg from $1, making her recount of others' observations regarding the risk of a "run" unhelpful and confusing.

Second, and relatedly, Dr. Parlour employs no methodology or reliable principles to form her opinions. For example, she cites no supporting objective criteria or standards for those opinions. Compounding her lack of methodology, Dr. Parlour offers no opinions about how Terraform's crypto assets actually functioned, instead opining on the irrelevant question of how Terraform "aimed" for them to function.

Third, Dr. Parlour did not consider sufficient data, and did not consider data in a reliable manner.  Dr. Parlour did not review a single Terraform internal document in forming her opinions, she did not review a single deposition transcript of a fact witness, she did not speak with a single Terraform witness, and she did not review Kwon's or Terraform's many public statements on issues directly relevant to her report.  Dr. Parlour never even spoke with Defendants' counsel until after she issued her report, instead receiving her report assignment from the consulting firm Cornerstone Research, who then found the supporting materials for her report.  Dr. Parlour also did no analysis whatsoever of the Terraform blockchain and failed to consider a Terraform white paper and Defendants' public statements that minimized the risk of a UST depeg, the very issue she purports to opine about.

## **FACTUAL BACKGROUND**

I.  <u>Terraform's Crypto Assets and Related Protocols</u>

From April 2018 through May 2022, Terraform and Kwon developed, managed, and marketed the Terra blockchain and related blockchain protocols, together with several crypto assets that came to include UST, LUNA, MIR, and mAssets ("crypto assets" or "tokens").  Am. Compl. ¶ 105.  After creating the crypto assets, Defendants aggressively marketed and sold them to the public as profit-seeking investments in a barrage of social media and other advertising.  *Id.* at ¶ 42.

A.  <u>LUNA token</u>

Terraform launched the Terra blockchain in April 2019 and created 1 billion LUNA tokens on the blockchain.  *Id.* at ¶ 31.  Terraform then sold hundreds of millions of LUNA to investors beginning in 2018.  *Id.* at ¶ 107.  In doing so, Defendants promised LUNA token holders that they would receive fees from transactions on the blockchain and that the LUNA

token would appreciate in value with increased use of the Terra blockchain, touting their expertise and managerial efforts to accomplish that goal. *Id.* at ¶ 3.

B.  UST and the Anchor Protocol

In June 2020, Defendants began marketing a "principal protected" blockchain protocol to investors, dubbed the Anchor Protocol, which promised to pay 19-20% interest on Terraform's so-called stablecoin UST, the value of which was supposedly pegged at $1 based on a Terraform proprietary algorithm tied to the value of LUNA. *Id.* at ¶ 3. Investors bought in, depositing more than 14 billion UST in the Anchor Protocol, representing 74 percent of the available UST. *Id.* at ¶ 75.

C.  MIR tokens, mAssets, and the Mirror Protocol

In December 2020, Defendants launched the "Mirror Protocol," which included a MIR token, whose value would be based upon, among other things, usage of the Mirror Protocol. *Id.* at ¶¶ 37-38. Using the Mirror Protocol, investors could also engage in transactions to obtain "mirrored assets" or "mAssets" that were intended to "mirror" the price of securities, mostly U.S. equities. *Id.* Investors obtained MIR tokens and mAssets from Terraform's website. *Id.*

II.  UST's May 2021 Depeg and Defendants' Misrepresentations Regarding Its Restoration

In May 2021, UST slipped below and then returned to its $1 peg after several days. *Id.* at ¶¶ 157-58. Kwon told investors that UST had "automatically self-healed" due to the ingenuity of Defendants' blockchain algorithm and Defendants touted their technology over "decision-making of human agents in time of market volatility." *Id.* at ¶¶ 164-65. Terraform further boasted that this event had proven the reliability of the UST $1 peg during an event that was "as intense of a stress test in live conditions as can ever be expected." *Id.* at ¶ 7. In reality, there was no automatic self-healing. Defendants had struck a secret side-deal with a third party to push

3

UST back up to $1, while falsely touting the algorithm's supposed ability to move price of UST on its own.

III.   UST Depegs in May 2022 and Terraform's Crypto Assets Become Worthless

One year later, in May 2022, UST again de-pegged from a $1 price, but this time no third party saved it.  UST's price fell to near zero, as did the prices of other crypto assets in the Terra ecosystem, including LUNA, wLUNA, and MIR.  The May 2022 crash wiped out more than $45 billion of total market value in these assets, including the investments of many U.S. retail investors.

IV.   Dr. Parlour's Expert Report

Defendants have proffered Dr. Parlour, a Professor in the Finance and Accounting Department at the Haas School of Business, University of California, Berkeley, to offer two opinions in this case.  Ex. 1, Parlour Report, ¶ 1.  First, she provides an opinion that the "Terra blockchain is a unique ecosystem with various tokens providing a wide range of applications and use cases."  Ex. 1, Parlour Report at 13.  Dr. Parlour offers opinions about how Terraform's tokens were *designed* to work, not how they actually functioned.  Ex. 2, Parlour Dep. Tr. 134:16-19 ("Q. So you're not offering any opinion about how UST was actually used, just how it was designed.  Is that fair?  A.  That is fair."); Ex. 1, Parlour Report ¶ 61 ("Mirror Protocol *aimed to be* [ ] completely decentralized[.]") (emphasis added); Ex. 2, Parlour Dep. Tr. 174:7-8 ("Q.  Was the Mirror Protocol decentralized?  A.  I don't know.").

Second, Dr. Parlour offers an opinion that "academic literature and industry participants discussed the risk" of a UST depeg.  Ex. 1, Parlour Report at 27; Ex. 2, Parlour Dep. Tr. 224:22-25 ("Q. So your opinion is just that the academic literature and industry participants discussed

4

the risk of a run? A. That's right."). Her only purported methodology for this opinion was the "usual economic and general understanding of what a run is." Ex. 2, Parlour Dep. Tr. 223:11-18.

Finally, Dr. Parlour also includes a "background" section in her report in which she provides "context on blockchain and [decentralized finance] concepts that I use later in my report." Ex. 1, Parlour Report ¶ 9. In this section, Dr. Parlour discusses four different types of tokens, a "utility" token, a "governance" token, a "non-fungible token," and a "stablecoin." Ex. 1, Parlour Report ¶¶ 26-34. Dr. Parlour's report does not categorize any of the Terraform tokens into these categories. *Id.;* Ex. 2, Parlour Dep. Tr. 108:14-16 ("As is evident from my report, I don't map back exactly the particular tokens to these categories.").

## LEGAL STANDARD

"The admissibility of expert testimony in the federal courts is governed principally by Rule 702 of the Federal Rules of Evidence." *United States v. Napout*, 963 F.3d 163, 187 (2d Cir. 2020) (quoting *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005)). Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

The trial court acts as a gatekeeper in determining whether to admit expert testimony. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). "To determine whether a

5

proposed expert's testimony passes muster under Rule 702, this Court must inquire into: (1) the qualifications of the proposed expert; (2) whether each proposed opinion is based upon reliable data and reliable methodology; and (3) whether the proposed testimony would be helpful to the trier of fact." *SEC v. Tourre*, 950 F. Supp. 2d 666, 674 (S.D.N.Y. 2013) (citations omitted). The party seeking to introduce the expert's testimony bears the burden of establishing its admissibility by a preponderance of the evidence. *Daubert*, 509 U.S. at 592 & n.10.

## ARGUMENT

### I.  Dr. Parlour Offers No Relevant Opinions and Merely Narrates Alleged Facts

As gatekeepers of expert testimony, courts are responsible for "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. An expert's testimony should be excluded if the expert's analysis is merely a vehicle for a factual narrative. *Tourre*, 950 F. Supp. 2d at 675 ("It is [ ] inappropriate for experts to become a vehicle for factual narrative."); *Island Intellectual Property LLC v. Deutsche Bank AG*, 2012 WL 526722, at *2 (S.D.N.Y. Feb. 14, 2012) ("No proposed expert will be allowed to act as a vehicle for lengthy factual narrative.").

Dr. Parlour's report should be excluded because, if allowed to testify, she would become a vehicle for Defendants' factual narrative that should instead be presented through fact witnesses with personal knowledge. *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 551 (S.D.N.Y. 2004) (excluding expert testimony when it was offered to narrate facts more "properly presented through percipient witnesses and documentary evidence."). Dr. Parlour's first opinion – that Terraform's crypto assets "had a wide range of applications and use cases"– is a quintessential factual narrative. Ex. 1, Parlour Report ¶¶ 39-78. Dr. Parlour states that "control of the blockchain was not concentrated into the hands of a few founders," citing only a

Terraform webpage for support. *Id.* at ¶ 39. She then discusses numerous steps Terraform took to develop the blockchain and related protocols, citing only Terraform's own statements to support those alleged facts. *Id.* at ¶¶ 41-44. Dr. Parlour next provides a lengthy narrative regarding "some of the key projects on the Terra blockchain and their related tokens, what they offered users (in terms of use case and function), and some high-level mechanics of how those projects worked." *Id.* at ¶¶ 44-73.

If Defendants wish to explain to the jury "some of the key projects on the Terra blockchain" and "how those projects worked," those alleged facts should be presented through fact witnesses with personal knowledge, Fed. R. Evid. 602, not through the gloss of an expert witness. *Scentsational Techs. LLC v. Pepsi, Inc.*, 2018 WL 1889763, at *4 (S.D.N.Y. Apr. 18, 2018) (experts may not "act as a vehicle to present a factual narrative of interesting or useful documents for a case, in effect simply accumulating and putting together one party's 'story'"); *In re Rezulin Prods. Liability Litig.*, 309 F. Supp. 2d at 551 (excluding expert testimony that consisted of a narrative of the background of the case, in part because "the glosses that [the expert] interpolates into his narrative are simple inferences drawn from uncomplicated facts that serve only to buttress plaintiffs' theory of the case").

Even if Dr. Parlour's factual narratives were proper expert opinion (and they are not), they are irrelevant and, in many cases, contradicted by the factual record. *Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."). Dr. Parlour does not offer any opinion about how the Terraform crypto assets actually functioned, just how they were "designed" to work. For example, Dr. Parlour's report repeatedly emphasizes her view that it was important that UST was a "medium of exchange" similar to fiat currency like the U.S. dollar. Ex. 1, Parlour Report at ¶ 46 ("The primary use case

7

for UST was as a medium of exchange that could be used in transactions in the same ways as fiat currency"); *id.* at ¶ 55 ("[A]n important use case of stablecoins was as a medium of exchange, and using UST to make purchases would preclude someone from staking their UST [in the Anchor Protocol].").  But Dr. Parlour does not know if UST was ever used as a "medium of exchange":

> Q.   So when you say 'the primary use case for UST was as a medium of exchange that could be used in transactions in the same way as fiat currency,' are you saying that it was designed for that or that's how it was actually used?
>
> A.   I'm saying that is how it was designed.
>
> Q.   So you're not offering any opinions about how UST was actually used, just how it was designed.  Is that fair?
>
> A.   That's fair.
>
> Q.   And that's because you've done no analysis of how UST was actually used, correct?
>
> A.   That's right.  I haven't done an analysis of wallet-to-wallet flows on the Terra blockchain.

Ex. 2, Parlour Dep. Tr. 134:9-23.  Relatedly, Dr. Parlour could not identify a single merchant, store, or any other entity that accepted UST as "medium of exchange," as suggested by her expert report.  *Id.* at Tr. 133:16-20 ("Q. Was UST actually used as a means of payment?  A. So, as noted, I haven't done a wallet-to-wallet investigation, so peer-to-peer payment flows, which are difficult to do.  I haven't done that, so I can't say."); *Id.* at Tr. 137:6-9 ("Q. But you can't identify an example of UST being used by a store or merchant?  A. That's right.  I don't have a concrete example.").

Dr. Parlour's report compares UST favorably to "traditional payment methods," like credit cards, because UST "had lower transaction fees" that ranged from "0.1% to 1%," while

other payment methods' fees "exceeded 6%." Ex. 1, Parlour Report at ¶ 47. But Dr. Parlour

admitted in her testimony that she did not know what UST's transaction costs actually were, just

what they were designed to be in marketing material (a white paper) issued by Terraform before

creating UST:

> Q. Let's turn to paragraph 47. You say "Another important feature of UST was its low transaction costs relative to other payment methods." Do you see that?
>
> A. Yes.
>
> Q. Do you know what the actual transaction costs were for UST?
>
> A. I haven't done a wallet-to-wallet investigation so I don't know the specific fees [ ] on average that were paid.
>
> Q. In your report, when you were talking about transaction fees, you're just talking about the transaction fees that were in the [Terraform] white paper, right?
>
> A. Exactly. I'm talking about the transaction fees in the white paper.
>
> Q. So you did no analysis to see what the actual transaction fees were for UST, correct?
>
> A. In order to do that, you have to look wallet-by-wallet, transaction-by-transaction blockchain data, yea.
>
> Q. Could you have done that?
>
> A. Yeah.
>
> Q. But you didn't do it here?
>
> A. That's right, yeah.

*Id*. at Tr. 137:10-138:10.

Dr. Parlour's report also discusses how the Terraform blockchain and protocols were

supposedly "decentralized." Ex. 1, Parlour Report at ¶¶ 39 61, 65, 66. But her opinion merely

parrots what Terraform has stated and narrates alleged facts about Terraform's blockchain and

protocols.  *Id.* (citing Terraform websites and marketing material).  When asked at her

deposition, she admitted she did not know whether aspects of the Terraform ecosystem were

decentralized:

> Q.  Now, you – paragraph 61, you state that:  "As summarized in a
> blog post around its launch, Mirror Protocol aimed to be a
> 'completely decentralized, community-driven project.'"  Do you
> see that?
>
> A.  That's right.  Yes.
>
> Q.  Was the Mirror Protocol decentralized?
>
> A.  It was designed to be decentralized.
>
> Q.  But you don't know if it actually was decentralized, right?
>
> A.  ***As noted, I have not done a – a blockchain level analysis of these
> tokens.***
>
> Q.  Was the Mirror Protocol decentralized?
>
> A.  ***I don't know***.

Ex. 2, Parlour Dep. Tr. 173:18-174:8.  In addition to excluding Dr. Parlour factual narratives as

improper expert testimony, *Tourre*, 950 F. Supp. 2d at 675, the Court should not permit Dr.

Parlour to testify about what Terraform's crypto assets were "designed" or "aimed" to do as it is

irrelevant and will be confusing to the jury.  *LVL XIII Brands, Inc. v. Louis Vuitton Malletier

S.A.*, 209 F. Supp. 3d 612, 641 (S.D.N.Y. 2016) (excluding expert testimony because "the danger

of confusion substantially outweighs any trifling probative value of [the expert's] proffered

opinions, preclusion is required under both Rules 403 and 702.").

Dr. Parlour's second opinion – that "academic literature and industry participants

discussed the risk that large shifts in demand could lead to a run" on UST – is also irrelevant and

not proper expert testimony.  Ex. 1, Parlour Report at ¶¶ 79-90.  First, this opinion includes

improper narration of alleged facts, including that Terraform and Kwon allegedly "directly discussed the risk of a de-peg and took steps to protect against such a risk." *Id.* at 91; *In re Elysium Health-ChromaDex Litig.*, 2022 WL 421135, at *29 (S.D.N.Y. Feb. 11, 2022) (excluding expert opinion because it "'does no more than counsel for plaintiff will do in argument'"—it merely recites facts that other witnesses have firsthand knowledge of and "'propound[s] a particular interpretation of'" those facts); *Tourre*, 950 F. Supp. 2d at 675 ("Acting simply as a narrator of the facts does not convey opinions based on an expert's knowledge and expertise."). The prejudicial impact of allowing Dr. Parlour to serve as a conduit for Defendants' skewed version of the facts is particularly acute here when that Kwon may not appear at trial and be subject to cross-examination.

Dr. Parlour also offers no actual opinions, just a recitation that others have discussed the risk of a "run" on UST. Ex. 1, Parlour Report at ¶¶ 79-90; Ex. 2; Parlour Dep. Tr. 224:22-25 ("Q. So your opinion is just that the academic literature and industry participants discussed the risk of a run? A. That's right."). These opinions should also be excluded as irrelevant, particularly because Dr. Parlour offers no opinion that a "run" caused the depeg of UST in May 2021. Ex. 2; Parlour Dep. Tr. 117:21-24 ("Q. So are you offering an opinion about what caused the UST depeg in your report? A. No, I'm not offering an opinion about what caused the UST depeg.").

## II.     Dr. Parlour Employed No Reliable Methodology to Form Her Opinions

In assessing whether a proffered expert's testimony is reliable, courts consider "the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony 'is the product of reliable principles and methods'; and (3) that 'the witness has applied the principles and methods reliably to the facts of the case.'"

*Amorgianos v. Amtrak*, 303 F. 3d. 256, 265 (2d Cir. 2002). An expert's opinions must be explained based upon on some methodology, so that their reliability can be tested. *E.g., Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006) ("An expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion."). The Court is not required to "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

When an expert merely narrates facts, as Dr. Parlour has done, there is no methodology. *Tourre*, 950 F. Supp. 2d at 675 ("nor is [factual narration] traceable to a reliable methodology . . . mere narration thus fails to fulfill *Daubert*'s most basic requirements."); *Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, 2015 WL 5459662, at *3 (S.D.N.Y. Sept. 16, 2015) (same). Indeed, Dr. Parlour's report never discusses a methodology. *See generally* Ex. 1, Parlour Report. When asked at her deposition, Dr. Parlour could not identify a methodology for her opinions. For her "overview" of the Terraform ecosystem, the only methodology she offered is "the training and the experience that I got in my economics Ph.D to understand the ecosystem." Ex. 2; Parlour Dep. Tr. 53:15-23. For her second opinion regarding whether "academic literature" had discussed the risk of a "run" on UST, she offered the same purported methodology. *Id*. at 54:8-15 ("Q. And what methodology did you employ to reach an opinion on that assignment? [Objection] A. My – I used the training that I got through my economics Ph.D to note or report the academic literature that has discussed the run risk and depegged and also relied on media and other writings in this area."); *id*. at 5:15-23 ("Q. And what methodology are you employing to offer that opinion? A. I'm relying on the usual economic and general understanding of what a run is.").

12

Dr. Parlour's failure to employ any methodology, other than citing her own experience and "general understandings of what a run is," renders her report classic *ipse dixit* testimony that should be excluded. *523 IP LLC v. CureMD.Com*, 48 F. Supp. 3d. 600, 643 (S.D.N.Y. 2014) ("an expert basing his opinion solely on his experience must do more than aver conclusorily that his experience led to his opinion[.]"); *Linkco, Inc. v. Fujitsu Ltd.*, 2002 WL 1585551, at *4 (S.D.N.Y. July 16, 2002) )"[experts] must provide some explanation for their conclusions, rather than referring generally to their experience. Without good explanations, courts cannot assess the reliability of any conclusion drawn by an expert, even if he possesses relevant experience."); *United States v. Ulbricht*, 2015 WL 413318, at *7 (S.D.N.Y. Feb. 1, 2015) ("When an expert witness fails to identify the objective bases for his opinion, the district court cannot perform a proper assessment; a proffered opinion deficient in this manner fails to meet the basic requirements of the Federal Rules of Evidence"); *Tourre*, 950 F. Supp. 2d at 678 (excluding expert's testimony based on "economic logic" as "simply a form of inadmissible *ipse dixit* . . . [t]he law is clear that mere *ipse dixit* is not appropriate expert testimony because it is not based on reliable methodology, as *Daubert* requires."); *CFTC v. Moncada*, No. 12 Civ. 8791(CM), 2014 WL 2945793, at *3-4 (S.D.N.Y. June 30, 2014) (excluding expert opinion that "offers credentials rather than analysis.") (citation omitted).

Dr. Parlour's categorization of tokens into four categories (utility token, governance token, non-fungible token, and stablecoin) should be excluded for the same reason. Ex. 1, Parlour Report ¶¶ 26-30. Her report cites no authoritative source or methodology for this categorization. *Id.*; Ex. 2, Parlour Dep. Tr. 106:20-24 ("Where did you come up with these categories? A. So I don't have a specific source. This is just based on my experience teaching the material."). In any event, Dr. Parlour testified that she could not "map back [the Terraform

13

crypto assets] exactly to these categories," making her opinion irrelevant to this case. Ex. 2, Parlour Dep. Tr. 108:11-16; *LVL XIII Brands, Inc.,* 209 F. Supp. 3d. at 641 ("[T]estimony must be both reliable and relevant in that it 'fits' the facts of the case."). Tellingly, although Dr. Parlour's report is devoid of references to crypto assets being used as investments, Dr. Parlour previously published an article in 2018, in which she described crypto assets as "investible instruments that can even be included in retirement accounts," including a discussion of another category of token, "securities tokens." Ex. 2, Parlour Dep. Tr. 97:9-100:24; *Hu, Albert and Parlour, Christine A. and Rajan, Uday,* *Cryptocurrencies: Stylized Facts on a New Investible Instrument* (May 3, 2018). This publication was not listed in Dr. Parlour's expert report because she said it was "not relevant." Ex. 2, Parlour Dep. Tr. 98:19-22.

### III.     Dr. Parlour did not Consider Sufficient Facts or Data to Form Her Opinions

Expert witness must base their opinions on sufficient facts or data. Fed. R. Evid. 702(b); *CFTC v. Moncada*, 2014 WL 2945793, at *3-4 (S.D.N.Y. June 30, 2014) (excluding expert who had done "nothing at all except look at a fraction of the data in his possession and conclude that [defendant's] activity had no impact on the market," and noting that "[t]he mere fact that so much relevant data was not even 'eye-balled,' let alone analyzed, renders [the expert's] testimony about the lack of market impact … highly suspect"); *see also River Light V, L.P. v. Lin & J Int'l, Inc.*, 2015 WL 3916271, at *4 (S.D.N.Y. June 25, 2015) (where expert did not examine financial records, his "data is not just inadequate—it is nonexistent," and his calculations unreliable).

Dr. Parlour failed to base her opinions on sufficient facts or data. Even though Dr. Parlour's opinions purport to detail the characteristics of the Terraform ecosystem, she never spoke with a single Terraform employee, did not review any deposition transcripts of Terraform

former or current employees, and did not review a single internal Terraform document.[1] Ex. 1, Parlour Report, at Appendix C; Ex. 2, Parlour Dep. Tr. 22:19-23:1 ("Q. Did you speak with anyone at Terraform Labs before issuing your report? A. To the best of my knowledge, I've never spoken with anyone at Terraform Labs. Q. Did you ask to speak with anyone at Terraform Labs? A. I didn't ask to speak with anyone at Terraform Labs."). Defendants' counsel did not even speak with Dr. Parlour until *after* she issued her expert report. Ex. 2, Parlour Dep. Tr. 35:17-21 ("Q. When was the first time you spoke with someone at Dentons regarding this case? A. The first time I spoke to somebody at Dentons about this case was after I had filed by report."). Although her report states that she was "asked by counsel for Terraform" to provide an opinion, her assignment actually came from Cornerstone Research. Ex. 2, Parlour Dep. Tr. 35:25-36:1 ("Q. So you have in your report what your assignment was. Do you recall that? A. Um-hum. Q. Who provided that assignment? A. [ ] Cornerstone provided that assignment.").

Dr. Parlour second opinion regarding the public's anticipation of UST "run" was similarly not based on sufficient facts or data. Ex. 1, Parlour Report ¶¶ 89-90. Dr. Parlour cited historical examples of "bank runs," *id*. at ¶ 80, but ignored a Terraform white paper that minimized the risk of a depeg. In the white paper, entitled "Terra Money: Stability Stress Test," Terraform touted that UST's "peg is highly robust" and has a "high resilience" based on "100 different stress settings and 1 million years' worth of simulations." *Platias, Nicholas and Di Maggio, Marco, Terra Money: Stability Stress Test*, (May 2019). Dr. Parlour testified that she

---

[1] Dr. Parlour reviewed two bates-stamped documents that were agreements between Terraform and third parties regarding distribution of MIR tokens. Ex. 1, Parlour Report, at Appendix C; Ex. 2, Parlour Dep. Tr. 175:22-25.

knew about the white paper but did not cite it in her report because it was "wasn't relevant." Ex. 2, Parlour Dep. Tr. 201:22-202:10.

Dr. Parlour also did not review Kwon's or Terraform's still-active Twitter accounts or Terraform's other public communications. Ex. 2, Parlour Dep. Tr. 20:15-19; Tr. 82:18-20. In several public statements, such as the below from March 11, 2022, Kwon touted the stability of the UST peg and assured investors that UST would *not* depeg.



> **Do Kwon** 🌕 ✔
> @stablekwon
>
> If there is any confusion left at this point, we will keep growing reserves until it becomes mathematically impossible for idiots to claim depeg risk for $UST
>
> $UST is mighty

Do Kwon, @stablekwon, https://twitter.com/stablekwon/status/1502226320989700097 (March 11, 2022, 5:13 am); Ex. 2, Dep. Tr. 243:20-244:1.

Dr. Parlour's report also compares the "de-peg and collapse of the British pound in September 1992," which she describes as "Black Wednesday," to UST's complete collapse. Ex. 1, Parlour Report ¶¶ 81. n.110. Dr. Parlour uses this example to support her conclusion that UST's depeg was not a "wholly unanticipated event." *Id.* at 90. Even putting aside the inapt comparison,[2] she ignored that Do Kwon dismissed the risk of a "Black Wednesday"-type event to his millions of followers:

---

[2] The British pound depreciated by 25 percent against the U.S. dollar and later recovered (Ex. 1, Parlour Rep. ¶ 81) while UST, as Dr. Parlour put it, "spectacularly depegged" and currently has no value. Ex. 2, Parlour Dep. Tr. 229:23-230:2 ("Q. Did the UST algorithm work? A. It was spectacularly depegged. Q. So the answer is no? A. The answer is no, yes.").



**Do Kwon** 🟡 ✓
@stablekwon

Probably the most retarded thread ive read this decade.

Silence is a perfectly acceptable option if stupid.

Billionaires in my following, go ahead, see what happens

> **FreddieRaynolds** ✓ @FreddieRaynolds · Nov 25, 2021
> A few weeks ago I responded to @tbr90's tweet with a brief outline of how a wealthy attacker could not only break @terra_money but profit heavily doing it with a Soros style Black Wednesday attack. Below I provide a detailed breadown...~$1B capital needed.
> twitter.com/tbr90/status/1...

5:04 AM · Nov 28, 2021

Do Kwon, @stablekwon, https://twitter.com/stablekwon/status/1464897977793728514?lang=en (November 28, 2021, 5:04 am). Dr. Parlour also ignored that Kwon told investors that purchasing UST and depositing it into the yield-bearing Anchor Protocol "was not a venture bet," and that it was "commercial suicide not to." Parlour Dep. Tr. 207:23-208:14. Dr. Parlour's failure to consider Do Kwon's public statements on the very issues she opines further shows that her report is based on insufficient facts and should be excluded.

## CONCLUSION

For the foregoing reasons, the Court should preclude Dr. Parlour from offering opinions in this case under Fed. R. Evid. 702.

Dated:  October 27, 2023                    Respectfully submitted,

                                            /s/ James P. Connor
                                            Christopher J. Carney
                                            James P. Connor, admitted *pro hac vice*
                                            Carina A. Cuellar, admitted *pro hac vice*
                                            Laura E. Meehan
                                            Devon L. Staren, admitted *pro hac vice*
                                            Attorneys for Plaintiff
                                            U.S. SECURITIES AND EXCHANGE
                                            COMMISSION
                                            100 F Street NE
                                            Washington, DC 20549
                                            Tel: (202) 551-8394
                                            Email: connorja@sec.gov

# EXHIBIT N

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>           Plaintiff,<br><br>   v.<br><br>TERRAFORM LABS, PTE. LTD. and DO HYEONG KWON,<br><br>          Defendants. | Civil Action No. 1:23-cv-01346-JSR<br><br>Hon. Jed S. Rakoff |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO EXCLUDE THE OPINIONS OF PROF. BRUCE MIZRACH**

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION .................................................................................................... 1

STANDARD OF REVIEW ....................................................................................... 2

ARGUMENT ............................................................................................................ 3

    I.      PROF. MIZRACH'S OPINIONS ARE UNRELIABLE ...................................... 3

          A.      Prof. Mizrach's Proposed Methodology Is Conceptually Flawed ............. 3

          B.      Prof. Mizrach's Analyses Are Not The Product of Reliable
                Principles and Methods ............................................................................. 8

          C.      Prof. Mizrach Failed to "Sanity Test" His Economic Modeling
                Against Actual Real-World Data ............................................................. 11

    II.     PROF. MIZRACH'S TESTIMONY IS NOT RELEVANT TO THE
          ISSUES IN THIS CASE ................................................................................. 13

          A.      Prof. Mizrach's Proposed Opinions Regarding The 2022 Depeg
                Events Are Irrelevant, Inadmissible Evidence and Should Not
                Be Admitted ............................................................................................ 14

          B.      Prof. Mizrach Has No Basis to Claim that the May 2022
                De-Pegging Event Serves As "Validation" That the Trading
                Firm's Trading Caused The 2021 Re-Pegging. ....................................... 15

CONCLUSION ......................................................................................................... 16

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*American Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*,
    135 F. Supp. 2d 1031 (N.D. Cal. 2001) .......................................................5

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002).......................................................... *passim*

*Bank of Am., N.A. v. Bear Stearns Asset Mgmt.*,
    969 F. Supp. 2d 339 (S.D.N.Y. 2013).......................................................7

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*,
    752 F.3d 82 (1st Cir. 2014).......................................................9

*City of Providence, Rhode Island v. Bats Glob. Markets, Inc.*,
    No. 14-CV-2811, 2022 WL902402 (S.D.N.Y. Mar. 28, 2022) ..........................1, 12

*City of Tuscaloosa v. Harcros Chemicals, Inc.*,
    158 F.3d 548 (11th Cir. 1998) .......................................................5

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)........................................................ *passim*

*DePaepe v. General Motors Corp.*,
    141 F.3d 715 (7th Cir. 1998) .......................................................6

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997).......................................................1, 3

*Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*,
    103 F. Supp. 2d 268 (S.D.N.Y. 2000).......................................................7

*Lippe v. Bairnco Corp.*,
    99 Fed.Appx. 274 (2d Cir. 2004).......................................................11

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
    525 F.Supp.2d 558 (S.D.N.Y. 2007).......................................................11, 13

*In re Mirena IUD Prod. Liab. Litig.*,
    169 F. Supp. 3d 396 (S.D.N.Y. 2016).......................................................9

*In re Rezulin Products Liability Litig.*,
    309 F.Supp.2d 531 (March 15, 2004) .......................................................6

*In re Namenda Indirect Purchaser Antitrust Litig.*,
   No. 1:15-cv-6549, 2021 WL 2403727 (S.D.N.Y. June 11, 2021) ............................................2

*Nemes v. Dick's Sporting Goods, Inc.*,
   No. 17-CV-1688 (NSR), 2019 WL 3982212 (S.D.N.Y. Aug. 23, 2019) ................................2

*Nimely v. City of New York*,
   414 F.3d 381 (2d Cir. 2005)................................................................................................3, 13

*Raskin v. Wyatt Co.*,
   125 F.3d 55 (2d Cir. 1997)........................................................................................................13

*Reed Const. Data Inc. v. McGraw-Hill Companies, Inc.*
   449 F.Supp.3d 385 (S.D.N.Y. September 24, 2014) .........................................................11, 12

*Taylor v. Evans,*
   No. 94 Civ. 8425, 1997 WL 154010 (S.D.N.Y. April 1, 1997)..............................................6

*U.S. v. Mejia*,
   545 F.3d 179 (2d Cir. 2008)......................................................................................................13

## Rules and Regulations

Federal Rules of Evidence
   Rule 702 ...............................................................................................................................2, 3, 13

## Other Authorities

Daniel L. Rubinfeld, *Reference Guide on Multiple Regression*, in REFERENCE
   MANUAL ON SCIENTIFIC EVIDENCE: THIRD EDITION (2011) ............................................4, 6, 9

Jonathan Brogaard, Terrence Hendershott, and Ryan Riordan, "Price Discovery
   Without Trading: Evidence from Limit Orders," Evidence from Limit
   Orders," *The Journal of Finance* 74, no. 4 (2019)..................................................................8

Jonathan Brogaard, Terrence Hendershott, and Ryan Riordan, "High-Frequency
   Trading and Price Discovery," *The Review of Financial Studies* 27, no. 8
   (2014)......................................................................................................................................9

Joel Hasbrouck, "Measuring the Information Content of Stock Trades," *The
   Journal of Finance* 46, no. 1 (1991) ....................................................................................3, 4

Mark D. Griffiths et al., "The costs and determinants of order aggressiveness,"
   *Journal of Financial Economics* 56, no. 1 (2000) ...................................................................9

Defendants Terraform Labs Pte LTD. and Kwon Do Hyeong ("Defendants") respectfully submit this memorandum of law in support of their motion to exclude the opinions of Prof. Bruce Mizrach that have been offered by the Securities and Exchange Commission ("SEC").

## INTRODUCTION

Prof. Mizrach purports to opine on the "price impact" allegedly caused by the Trading Firm's trading of UST on May 23, 2021 and opines that but for the Trading Firm's trading, UST would have lost its peg on May 23, 2021 and not recovered back to $1.00. The SEC offers Prof. Mizrach's opinions to support its allegation that the Trading Firm's trading was the sole cause of the May 2021 repeg and that Defendants committed fraud by failing to disclose that alleged fact. But when a proposed expert's models cannot, as a matter of science, do what the expert tries to use them for, his opinions must be excluded. *See, e.g., Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered" to permit admission); *City of Providence, Rhode Island v. Bats Glob. Markets, Inc.*, No. 14 Civ. 2811, 2022 WL902402, *8-10 (S.D.N.Y. Mar. 28, 2022) (Furman, J.) (excluding proposed expert's testimony in relevant part because there was too large an analytical gap between the expert's methods and his conclusions).

Prof. Mizrach's opinions suffer from this problem for multiple reasons. Prof. Mizrach's analysis is conceptually flawed and does not offer a reliable basis for his opinions regarding the "but-for" price of UST on May 23, 2021. Assessing the validity or invalidity of such a hypothetical proposition requires a model of how the market would have behaved in the absence of the Trading Firm's trading. Yet Prof. Mizrach's methodology does not even attempt to estimate how other market participants would have traded or how UST prices would have moved without the Trading Firm's trading. His analysis also fails to account for the extent to which other market participants' trading contributed to UST re-pegging.

Prof. Mizrach's analysis is also methodologically flawed. It is premised on a number of speculative assumptions that are unsupported by empirical evidence. Correcting for each of these flawed assumptions, even individually, substantially changes Prof. Mizrach's price impact estimates, which demonstrates that his analysis is not sufficiently reliable to be admissible. As a

result of the multiple flaws, Prof. Mizrach's model yields unreliable and economically nonsensical results: It implies, for example, that but for the Trading Firm's trading, the price of UST would have been *negative, even though Prof. Mizrach concedes that UST could not have a negative price*.

Prof. Mizrach also offers no evidence to support his assertions regarding the UST/LUNA mint-and-burn mechanism being ineffective. His own data shows that the Trading Firm engaged with the mint-and-burn mechanism and that its trading through that mechanism was profitable.

Finally, Prof. Mizrach's opinion that the 2022 de-peg demonstrated the 2021 re-peg was the result of the Trading Firm's trading likewise has no reliable basis. He provides no analysis of the causes of the 2022 de-peg and fails to recognize the different market environments that were present during the 2021 and 2022 de-pegging events.

Prof. Mizrach's analyses cannot reliably measure the price impact of the Trading Firm's May 23, 2021 trading, let alone a "but for" price, s*ee* Ex. A, Expert Rep. of T. Hendershott (Sep. 28, 2023) ("Hendershott Report") ¶¶ 52-59, because his proposed analysis is so conceptually and methodologically flawed that it cannot be fixed. His methodology is the epitome of the type of created-for-litigation expert theories that courts routinely exclude. *See Nemes v. Dick's Sporting Goods, Inc.*, No. 17-CV-1688 (NSR), 2019 WL 3982212, at *13 (S.D.N.Y. Aug. 23, 2019).

Because Prof. Mizrach's opinions are inadmissible under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) and Fed. R. Evid. 702, they must be excluded.

## STANDARD OF REVIEW

Fed. R. Evid. 702 provides that:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

The Second Circuit has "distilled Rule 702's requirements into three broad criteria: (1) qualifications, (2) reliability, and (3) relevance and assistance to the trier of fact." *In re*

*Namenda Indirect Purchaser Antitrust Litig.*, No. 1:15-cv-6549, 2021 WL 2403727, at *7 (S.D.N.Y. June 11, 2021); *see also Nimely v. City of New York*, 414 F.3d 381, 396-97 (2d Cir. 2005). "The party proffering the expert's opinions 'has the burden to establish the [Rule 702] admissibility requirements, with the district court acting as a 'gatekeeper' to ensure that the 'expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Id.* A court is not required "to admit opinion evidence that is connected to [the facts] only by the ipse dixit of the expert," or where "there is simply too great an analytical gap" between the data and the opinion proffered. *Joiner*, 522 U.S. at 146.

## ARGUMENT[1]

## I. PROF. MIZRACH'S OPINIONS ARE UNRELIABLE

When assessing whether a proposed expert's opinions are sufficiently reliable to be admitted as evidence, the Court "should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony 'is the product of reliable principles and methods; and (3) that 'the witness has applied the principles and methods reliably to the facts of the case.'" *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting Rule 702). Prof. Mizrach's proposed opinions fail all three aspects of the reliability analysis.

### A. Prof. Mizrach's Proposed Methodology Is Conceptually Flawed

The basis for Prof. Mizrach's opinions, particularly his "price impact analysis," is a Vector Autoregression ("VAR") methodology which he claims to base on an allegedly similar methodology articulated by Joel Hasbrouck in "Measuring the Information Content of Stock Trades," *The Journal of Finance* 46, no. 1 (1991) ("Hasbrouck") at p. 179-207.[2] *See* Ex. B, Mizrach Dep. (Sep. 22, 2023) ("Mizrach Tr.") at 44:10-15. Hasbrouck's methodology requires (i)

---

[1] Because the conceptual and methodological flaws in Prof. Mizrach's opinions are sufficient to require exclusion of his opinions under *Daubert*, Defendants are not here asserting lack of qualification. In the event that the Court does not strike Prof. Mizrach's opinions, Defendants reserve the right to challenge his qualifications in advance of trial.

[2] Hasbrouck is available here: https://citeseerx.ist.psu.edu/document?repid=rep1&type=pdf&doi=175830f91b916ef57aa54474b b0c676874ddb9a6.

a series of mid-quotes (which represent the price of the asset at any given time and can be used to calculate the return of that asset from one period to the next) and (ii) a series of market transactions that can be characterized as representing the direction of the trading—positive when buyer-initiated and negative when seller-initiated—and taking the values of 1 (buy) and -1 (sell). Hendershott Report ¶ 61. Hasbrouck's methodology then estimates the extent to which an unpredicted trade is correlated with further price movements. *Id*. ¶ 61. Using an "impulse response function" ("IRF") that he derives, Prof. Mizrach then tries to estimate "the impact [that] one additional buy or sell purchase [has] on the market price" of UST. *See id*. ¶ 61; Ex. C, Expert Report of Prof. B. Mizrach (Sep. 7, 2023) ("Mizrach Report") at p. 32.

But there is a deep conceptual flaw in what Prof. Mizrach does, because Hasbrouck's model was designed to measure the information content of asset trades, not whether the asset price would have moved more or less if the trading being studied had not occurred. *See* Hendershott Report ¶¶ 65-71; Hasbrouck at p. 183 & 185. Put differently, whereas Hasbrouck's methodology can be used to study what price changes the Trading Firm's May 23, 2021 trading might have *predicted*, Prof. Mizrach tries to use that methodology to determine what prices that trading *caused*, for which the methodology cannot be used. *See* Hendershott Report ¶¶ 66-67. Prof. Mizrach's conceptual error is thus a version of one of the most common mistakes made when incorrectly using regression models (of which a VAR is just a more complex example)—confusing correlation with causation. *See* Daniel L. Rubinfeld, *Reference Guide on Multiple Regression*, in REFERENCE MANUAL ON SCIENTIFIC EVIDENCE: THIRD EDITION (2011) 305, 309 ("Rubinfeld").

The SEC alleges (Amended Complaint, Doc. No. 25 ("AC") ¶¶ 7 & 158) and Prof. Mizrach opines (Mizrach Report at p. 2 & 19) that the Trading Firm's UST purchases on May 23 were the actual cause of UST repegging in May 2021. But elementary science and law mandate that causality cannot be inferred just from data analysis—a proposed expert must base causation opinions on an underlying causal theory that explains the relationship between the variables that are studied, and even with such a model causation can "never" be inferred directly because the causal relationship must be tested empirically. *See* Rubinfeld at p. 311-312. Failure to properly

4

design, specify, and test a regression model is fatal, and courts regularly strike opinions based on such regressions.[3]

These are precisely the types of errors Prof. Mizrach made in trying to apply the Hasbrouck methodology to the Trading Firm's trading data. *See* Hendershott Report ¶¶ 72-100 & Ex. E, Hendershott Decl. in Support of Defs. Mot. For Summary J. (Oct. 27, 2023) ("Hendershott Decl.") ¶¶ 7-26. And as Prof. Hendershott demonstrated—and Prof. Mizrach did not rebut—the flaws that Prof. Mizrach introduced into his model were easy to identify (indeed, the fact that Prof. Mizrach neither calculated, nor even discussed, the potential error rate of his model is itself fatal under *Daubert*, *see Amorgianos*, 303 F.3d at 266).

*First*, although Prof. Mizrach claimed that his methodology accounted for trading by entities other than the Trading Firm by including the mid-quotes (Mizrach Tr. 94:16-21), he provided no evidence supporting that claim. Prof. Hendershott readily demonstrated that it was incorrect, and that Prof. Mizrach's model neither included nor controlled for non-Trading Firm trading. Hendershott Report ¶ 73 & Hendershott Decl. ¶¶ 7-22.

*Second*, Prof. Mizrach claimed that trades made in certain "categories" of the Trading Firm's trades are consistent with the SEC's theory of intervention. *See* Mizrach Report at p. 18-23. But Prof. Hendershott demonstrated, by means of analyses of the same internal Trading Firm data available to Prof. Mizrach (which Prof. Mizrach could have analyzed, but did not), that trades made by the Trading Firm in other "categories" are consistent with non-directional trading by the Trading Firm and are thus inconsistent with and not explainable by Prof. Mizrach's opinions (and thus the SEC's theory of the case). *See* Hendershott Report ¶¶ 75-81 & Hendershott Decl. ¶¶ 7-14.

*Third*, and again using the same Trading Firm data used by Prof. Mizrach, Prof. Hendershott analyzed the Trading Firm's *directional* trades—the trades the SEC contends

---

[3] *See, e.g., City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548 (11th Cir. 1998) (striking plaintiffs' regression-based *expert* testimony and granting summary judgment to defendants); *American Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031, 1041 (N.D. Cal. 2001) (striking model that contained "too many assumptions and simplifications that are not supported by real-world evidence").

"actually" restored the UST peg—in the context of the overall market. That analysis—which Prof. Mizrach does not challenge—demonstrates that the majority of the Trading Firm's directional UST purchases occurred *after* large UST price movements had already occurred, were made through passive orders as opposed to active orders, and represented a small share of the active buy volume on KuCoin on May 23, 2021. *See* Hendershott Report ¶¶ 82-100; Ex. D, Mizrach Expert Report ("Mizrach Rebuttal") at p. 6; Hendershott Decl. ¶ 18.

Even more egregiously, Dr. Mizrach then, without any supporting analyses or clearly identified assumptions, extrapolates his assumed causal impact to an opinion on what the but-for price of UST would have been absent the Trading Firm's trading. Rather than identifying, articulating, and testing the assumptions necessary to extrapolate an estimated correlation to a but-for price, Dr. Mizrach repeatedly relies on baseless assertions about the Trading Firm's "unique" and "real" motives. He claims that "others did not join" the Trading Firm in purchasing UST due to a lack of such incentives. Not only is this demonstrably false (other entities *did* join the Trading Firm in purchasing UST), but his repeated reliance on what he assumes are the real motives of the Trading Firm has no reliable or scientific basis. The fact that Dr. Mizrach *chose* his methodology based on assumptions of the Trading Firm's intent, motives, and supposed "goals" is yet another reason why his analysis fails under *Daubert*. *Compare* Mizrach Rebuttal pp. 3, 5, 6 ("While this type of analysis could make sense in other contexts, since [the Trading Firm]'s goal was to restore the peg, it does not make sense [here].") *with, e.g., In re Rezulin Products Liability Litig.*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004) (Kaplan, J.) (excluding expert testimony where "opinions [of expert witnesses] on the intent, motives, or states of mind of corporations, regulatory agencies and others have no basis in any relevant body of knowledge or expertise"); *Taylor v. Evans,* No. 94 Civ. 8425 (CSH), 1997 WL 154010, at *2 (S.D.N.Y. April 1, 1997) (excluding similar expert testimony as "musings as to defendants' motivations [that] would not be admissible if given by any witness—lay or expert."); *DePaepe v. General Motors Corp.,* 141 F.3d 715, 720 (7th Cir. 1998) (trial court erred by allowing expert to testify as to why General Motors had reduced the amount of padding in its automobile sun visors; expert "lacked any scientific basis for an opinion about the motives of GM's designers").

Why are these conceptual errors important from a *Daubert* perspective?  Because the core of Prof. Mizrach's opinions, and the SEC fraud allegations they are intended to support, is that "manual" or "interventional" trading by the Trading Firm was the sole cause of the May 2021 UST repeg.  Mizrach Report at 20, 23; Mizrach Tr. 172:21-173:19.  Despite that, Prof. Mizrach neither differentiated between the types of trades that the Trading Firm appeared to have engaged in for arbitrage or other non-directional trading strategies and potential "interventional" or directional trades, nor explained why the non-directional strategies should be included in the analysis of the Trading Firm's supposed trading impact given the SEC's allegations in the Amended Complaint.  Indeed, Prof. Mizrach conceded in his deposition that the Trading Firm's non-directional trading likely had a negative impact on the price of UST on May 23, 2021.  *See* Mizrach Tr. 147:18-21 & 150:4-17.

But the conceptual problems with Prof. Mizrach's model are even worse than the foregoing indicates.  *First*, after reaching a "local" low price of $0.902 at 9:10:27 CDT, the price of UST rebounded to $0.952 without any "interventional" UST purchases by the Trading Firm.  *See* Hendershott Report ¶ 95.  Prof. Mizrach does not take this into account at all.  This is precisely the type of model design validation that is necessary for even a basic regression analysis to be admissible, *see* Rubinfeld at 311-312, let alone a complex regression such as a VAR.

*Second*, Hendershott Report Figure 13 shows a period of significant UST price increase (from $0.92 to just over $0.98), but the vast majority of purchases on KuCoin during this period of time were not made by the Trading Firm.  *See* Hendershott Report ¶¶ 97-98, Figure 15.  Prof. Mizrach's opinions neglect the fact that the majority of the UST price change during this period occurred while the Trading Firm was not actively trading.  *See id*.

*Third*, Prof. Mizrach's opinions cannot account for the price of UST during the period from May 24-25, 2021, when the peg was re-established.  If the theory that the Trading Firm "purchas[ed] large quantities of UST … continuing through May 27 in an effort to restore the peg" (AC ¶ 162) was true, one would expect the Trading Firm's trading to account for a substantial portion of the buy-side trading volume during this window.  But its active purchases were just 2% of the KuCoin active trading volume during this period, and Prof. Mizrach offers no explanation

for how such a small share of active volume could be consistent with the allegation that the Trading Firm's purchases were the "true" cause of the UST re-peg. *See* Hendershott Report ¶ 100.

These conceptual errors, which even a novice expert candidate reading the REFERENCE MANUAL ON SCIENTIFIC EVIDENCE would not make, on their own render Prof. Mizrach's opinions inadmissible under *Daubert*.

### B. Prof. Mizrach's Analyses Are Not The Product of Reliable Principles and Methods

Prof. Mizrach's opinions also suffer from methodological flaws, including a reliance on unstated, untested, speculative, and unsupported assumptions. At least four particularly consequential assumptions are unsupported by empirical evidence or data: that the Trading Firm's bookstacker_UST trades (which Prof. Mizrach assumes are interventional) have the same price impact as the Trading Firm's other trades, that the Trading Firm's passive trading had the same price impact as its active trading, that Prof. Mizrach's *per-trade* impulse response estimates can be scaled based on the average size of all the Trading Firm's trades as a way to estimate the price impact of the Trading Firm's net purchase *volume*, and that the results of his analyses make any economic sense. But when each of these assumptions is tested empirically using the data available to Prof. Mizrach, they are unsupported by the data, which shows that Prof. Mizrach's opinion is neither robust nor reliable. This is critical, because proposed expert opinions based on flawed assumptions must be excluded. *See Bank of Am., N.A. v. Bear Stearns Asset Mgmt.*, 969 F. Supp. 2d 339, 358 (S.D.N.Y. 2013); *Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*, 103 F. Supp. 2d 268, 284 (S.D.N.Y. 2000).

*First*, the Trading Firm's bookstacker_UST trades did not have the same price impact as the Trading Firm's other trades. Prof. Hendershott performed the same analysis, using the same data, as Prof. Mizrach, except he separated the Trading Firm's trades into bookstacker_UST and non-bookstacker_UST categories. That single change showed that the bookstacker_UST trades— which contributed entirely to the Trading Firm's directional position, and were the trades Prof. Mizrach assumed to be "interventional"—had less price impact than the non-bookstacker_UST trades. *See* Hendershott Report ¶¶ 103-109. This necessarily means that Prof. Mizrach's model

overestimates the alleged "total price impact" that Prof. Mizrach claims is solely due to the Trading Firm's trading and is thus not reliable.

*Second*, Prof. Mizrach assumes that active trades have the same price impact as passive trades (essentially assuming what he is trying to prove and, by extension, assuming what the SEC bears the burden of proving). This is not an esoteric issue: Testing for different price impacts of active and passive trades is common in academic literature. *See* Jonathan Brogaard, Terrence Hendershott, and Ryan Riordan, "Price Discovery Without Trading: Evidence from Limit Orders," *The Journal of Finance* 74, no. 4 (2019): 1621-1658; Jonathan Brogaard, Terrence Hendershott, and Ryan Riordan, "High-Frequency Trading and Price Discovery," *The Review of Financial Studies* 27, no. 8 (2014): 2267-2306; Mark D. Griffiths et al., "The costs and determinants of order aggressiveness," *Journal of Financial Economics* 56, no. 1 (2000): 65–88, p. 66. And Prof. Mizrach knows that this is a testable issue. *See* Mizrach Tr. 166:7-166:10. Rather than performing an empirically sound and unbiased examination of the data, Prof. Mizrach actively chose a model that *would not* test the difference, claiming that "it would not make sense" to, because "[the Trading Firm]'s *goal* was to restore the peg." *See* Mizrach Rebuttal p. 6. Choosing a methodology based on beliefs of "intent" or "goals" is, alone, basis to exclude Prof. Mizrach's opinions.

When Prof. Hendershott adjusted Prof. Mizrach's model to account for whether Trading Firm trades were active or passive (but made no other changes), the results were clear, unambiguous, and consistent with the academic literature that Prof. Mizrach failed to cite: the Trading Firm's passive orders were associated with negative price impacts on UST and its active orders were associated with positive price impacts on UST. *See* Hendershott Report ¶¶ 110-116. This error is especially important in light of how much of the bookstacker_UST trading was passive. By not separating the Trading Firm's active and passive trading *even though the data he had enabled him to do so*, Prof. Mizrach assumed that the bookstacker_UST passive trading had the same price impact as the Trading Firm's active trading even though that assumption was easily shown to be unfounded and contradicted by the data in Prof. Mizrach's possession. This is why *Daubert* does not permit experts to assume what they are trying to prove. *See e.g., In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396, 431-32 (S.D.N.Y. 2016) (concluding that an expert

opinion was inadmissible where "the conclusions [were] linked to [the] studies only by [the expert's] say-so").

*Third*, Prof. Mizrach attempts to calculate price impact of the Trading Firm's trades by estimating how many trades the Trading Firm *could* have used to purchase a given amount of UST despite having the data showing how many trades the Trading Firm *actually* used. That is, instead of using the Trading Firm's actual trade data, Prof. Mizrach created hypothetical trade data in order to estimate his total price impact. This is especially odd given that Prof. Mizrach has conducted analyses in his published work in which he has used actual, not estimated, trade volumes. *See* Mizrach Tr. 127:8-20. Prof. Mizrach provides no support from peer-reviewed literature to justify such an approach, and Prof. Hendershott has explained that there is no such support. *See* Hendershott Report ¶ 119.

This single unsupported methodological choice has dramatic repercussions. On the one hand, it results in Prof. Mizrach using an estimate that is *ten times* larger than the number of trades the Trading Firm actually made. *See* Hendershott Report ¶¶ 119-120. That unnecessary and unexplained ten-fold difference flows through the entirety of Prof. Mizrach's opinions, and yet Prof. Mizrach admitted during his deposition that his estimated trade counts are meaningless. *See* Mizrach Tr. 103:2-104:2; Hendershott Report ¶ 122. Defendants are unaware of a court finding that a proposed expert who used estimated data whose meaning he could not explain when he had actual data available to him satisfied *Daubert*. *Cf.* Rubinfeld at 317 ("the expert should be prepared to explain why any chosen method … was more suitable than the alternatives"); *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 89 (1st Cir. 2014) (when constructing a benchmark statistic, the regression analyst may not "cherry-pick" the time-frame or data points so as to make her ultimate conclusion stronger).

But even that does not fully address the problem with this methodological flaw, because Prof. Mizrach's approach cannot actually control for the effect of trading volume. *See* Hendershott Report ¶ 121. In other words, Prof. Mizrach asks this Court to allow into evidence an opinion based on a methodological choice that is inconsistent with his prior work, that he cannot explain

the meaning of or reason for, that inflates his numeric results by a factor of ten, and that cannot do what he claims he needs it to do. That is the very definition of inadmissible opinion.

### C. Prof. Mizrach Failed to "Sanity Test" His Economic Modeling Against Actual Real-World Data

*Finally*, Prof. Mizrach made no attempt to examine the results of his opinions against the real-world data his opinions purport to explain—in other words, he did not conduct a sanity check. The Supreme Court has identified a number of factors bearing on reliability that district courts may consider, which include whether a theory or technique "*can be (and has been) tested*," *Daubert,* 509 U.S. at 593 (emphasis added); *Amorgianos*, 303 F.3d 256 at 266.[4]

Prof. Mizrach's reliance on speculative and unsupported assumptions, as well as his failure to properly account for other entities' trading, results in price impact estimates that are economically nonsensical. In short, Prof. Mizrach's models "fail the test," as Prof. Hendershott has identified a number of real-world red flags that should have alerted Prof. Mizrach to the fact that his analysis inevitably yields absurd results. For example, Prof. Hendershott shows how the inability of Prof. Mizrach's model to control for trade volumes further highlights the flaws in his methodology. To illustrate this point, Prof. Hendershott explains that Prof. Mizrach's price impact analysis yields the same results regardless of the size of the trades at issue. Hendershott Report ¶¶ 121. Taking this point to the extreme, if all of the Trading Firm's trades were 100 times larger (or smaller) than they were at the time of the 2021 depeg, and the Trading Firm's net UST position had been 1.516 billion (or .15 million), rather than 15.16 million, Prof. Mizrach's price impact analysis would yield *the exact same result*—an absurdity, because it would mean that the price impact estimates from Prof. Mizrach's analysis would be the same between two distinct scenarios with a 10,000 fold difference in trade sizes and trade volumes. *Id.; cf. Lippe v. Bairnco Corp.,* 99 Fed.Appx. 274, 279 (2d Cir. 2004) (inconsistent results are an "indicia of unreliability" in an expert's methodologies, and this principle is clearest in the context of inconsistent results produced

---

[4] An expert's methodology is to be assessed step-by-step, and "it is critical that an expert's analysis be reliable at every step." *Amorgianos*, 303 F.3d at 267. "[A]ny step that renders the analysis unreliable under the Daubert factors renders the expert's testimony inadmissible." *Id.* (emphasis omitted).

by the same methodology); *Louis Vuitton Malletier v. Dooney & Bourke, Inc.,* 525 F.Supp.2d 558, 569 (S.D.N.Y. 2007) (finding "unexplained inconsistency between the results" produced by two iterations of the same methodology to be a basis for exclusion). Again, this is why using the actual trade count—as opposed to a hypothetical average imagined by Prof. Mizrach—is critical to the analysis. *See Reed Const. Data Inc. v. McGraw-Hill Companies, Inc.* 449 F.Supp.3d 385, 400-01 (S.D.N.Y. September 24, 2014) (to be admissible, a regression analysis must control for the "major factors" that might influence the dependent variable). Prof. Hendershott explains that this in fact is a major oversight, because using the actual number of net purchase trades by the Trading Firm, rather than Prof. Mizrach's estimated number, "reduces his price impact estimate tenfold." Hendershott Report ¶ 122.

In another example, Prof. Hendershott highlights how Prof. Mizrach's model again yields an economically absurd result. Prof. Mizrach's report estimated that the Trading Firm's trading resulted in a lower bound price impact estimate of $0.9452, a mid-point price impact estimate of $1.30, and an upper-bound price impact estimate of over $1.60. Hendershott Report ¶ 123. But as Prof. Hendershott points out, the actual price of UST never declined below $0.854 on May 23, 2021, so when the price recovered to $0.99, this was a price change of about $0.14 from the lowest intra-day price point. *Id.* But applying Prof. Mizrach's flawed methodology predicts that the Trading Firm's trading had a mid-point price impact of $1.30, which suggests that, based on Prof. Mizrach's own logic, in the absence of any trading by the Trading Firm at all, the price at the end of the episode would have been approximately -$0.30. *Id.* This is nonsensical, because an asset such as UST cannot have a negative price.[5] *Id.* When asked to explain this real-world absurdity, Prof. Mizrach first replied "I don't know the answer to that," but then later conceded that he was unaware of a time when the trading price of a spot asset (like UST) has ever gone negative, stating that "nothing is coming to mind." Hendershott Report ¶ 125. As Prof. Hendershott explained, "[t]he disconnect between the economic reality of the UST spot market and the results of Prof.

---

[5] And of course, applying Prof. Mizrach's upper bound price impact figure of above $1.60 would have yielded an even more deeply negative price, an even greater absurdity. Hendershott Report ¶ 124.

Mizrach's analyses are, alone, enough to draw into question the causal conclusions he reaches based on his model." *Id.*

In yet a third example of a real-world absurdity, Prof. Hendershott applied Prof. Mizrach's model to consider the Trading Firm's trading between the 14:30 and 15:00 UTC. *See* Hendershott Report ¶ 126. Prof. Mizrach observed that during that period "the Trading Firm made 30 purchases of more than 100,000 UST," and purchased a total of approximately 10 million UST. *Id.* Based on his model, Prof. Mizrach would then estimate the Trading Firm's price impact to be nearly $0.62 at that time. *Id.* Yet as Prof. Hendershott observed, during this 30-minute period, the price of UST increased by only $0.03, a twenty-fold difference, further emphasizing the utter lack of reliability of Prof. Mizrach's model. *Id.*

Because Prof. Mizrach failed to sanity-test his analysis with easy to perform basic checks, when he was confronted with this fact at his deposition, he was repeatedly at a loss to explain these issues. A model is only as reliable as its ability to correctly explain real-world phenomena. As Prof. Hendershot states, the presence of so many economically nonsensical results suggests that Prof. Mizrach's theoretical framework is flawed conceptually, or his model implementation is flawed methodologically, or both. Hendershott Report ¶ 128. As these flaws preclude Prof. Mizrach from drawing any conclusions with respect to the Trading Firm's trading and what would have happened in the UST market absent that trading, his opinions are not admissible. *Id.*[6]

## II. PROF. MIZRACH'S TESTIMONY IS NOT RELEVANT TO THE ISSUES IN THIS CASE

Rule 702 requires a determination of whether a proposed expert's testimony will assist the trier of fact, *see Nimely*, 414 F.3d at 397, which "goes primarily to relevance," *Daubert*, 509 U.S.

---

[6] In addition, as Prof. Hendershott points out, Prof. Mizrach's opinions regarding arbitrage are also unreliable. *See* Hendershott Report ¶¶ 129-133. Prof. Mizrach offers no empirical evidence for his *ipse dixit* conclusion that because swap fees increased, the arbitrage mechanism became unprofitable. *Id.* ¶ 131. But as Prof. Hendershott explains, the presence of high swap fees does not necessarily preclude the opportunity for profit via the mint-and-burn mechanism. *Id.* In fact, Prof. Hendershott identified relevant transaction records which provide evidence that profitable trading opportunities utilizing the mint-and-burn mechanism *did* exist on May 23, 2021. *See id.* ¶¶ 131-33. In contrast, Prof. Mizrach offers opinions on arbitrage causes and effects, but without any supporting analysis. Here again, the "gap" between Prof. Mizrach's analysis and his causal statements render his opinions inadmissible, *See, e.g., City of Providence, Rhode Island,* No. 14-CV-2811, 2022 WL902402, *8.

at 591. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 n.5 (2d Cir. 1997); *see also Malletier v. Dooney & Bourke, Inc.*, 525 F.Supp. 2d 558, 572-73 (S.D.N.Y. 2007) (excluding expert because expert's methodology did not "fit" the theory of liability). Prof. Mizrach's opinions do not fit this case.

A.  **Prof. Mizrach's Proposed Opinions Regarding The 2022 Depeg Events Are Irrelevant, Inadmissible Evidence and Should Not Be Considered**

Prof. Mizrach is only offering opinions about what he considers to be the price impact of the Trading Firm's trading on the May 23, 2021 depeg event. Therefore, Prof. Mizrach's opinions regarding the May 2022 depeg event are irrelevant and should be excluded. Although Prof. Mizrach's report contains a purported discussion of similarities between the May 2022 depeg and the May 2021 depeg, that discussion is simply a recitation of purported facts and is therefore inadmissible. A party cannot use a proposed expert to shoehorn evidence into the record that it could not otherwise authenticate or prove admissible.

For example, an expert may not simply serve as a conduit to transmit evidence such as hearsay to the jury. *See U.S. v. Mejia,* 545 F.3d 179, 197 (2d Cir. 2008) ("When an expert is no longer applying his extensive experience and a reliable methodology, *Daubert* teaches that the testimony should be excluded."). Instead, the expert must form his own opinions by applying his or her experience and a reliable methodology to the inadmissible materials. *Id.* at 197. Otherwise, the expert is simply "repeating hearsay evidence without applying any expertise whatsoever," a practice that allows [a party] "to circumvent the rules prohibiting hearsay." *Id.*

Here, Prof. Mizrach's discussion of the 2022 depeg is merely a rote recitation of alleged facts, without any analysis whatsoever. *See* Mizrach Report at p. 4, 24-25, 28-30. The ultimate purpose of this recitation is to benefit the SEC by filling holes in its factual record with purported "expert" statements. Such pseudo-factual statements disguised as expert "analysis" cannot be used to avoid the usual evidentiary requirements to demonstrate authenticity, foundation, hearsay exceptions, and the like, to which percipient witnesses must adhere. Because Prof. Mizrach's "analysis"—more accurately, "discussion"—of the 2022 depeg events contains no application of

"experience" to a "reliable methodology," Second Circuit precedent requires the Court to strike all of Prof. Mizrach's discussions about the 2022 depeg.

> **B.     Prof. Mizrach Has No Basis to Claim that the May 2022 De-Pegging Event Serves As "Validation" That the Trading Firm's Trading Caused The 2021 Re-Pegging.**

Lastly, to the extent that this Court considers Prof. Mizrach's opinions regarding the 2022 depeg event—and it should not, as discussed above—those opinions are also inadmissible because they are unreliable and based on no analysis. Prof. Mizrach claims that the May 2022 de-pegging "provides further validation that the prior recovery of the price of UST to $1 in May 2021 was not a result of the functioning of that algorithm" because of a "failure of the swap mechanism" to restore and/or prevent the de-pegging in 2022. Mizrach Report, p. 4. But as is the case with his other opinions, he presents no reliable basis for this one.

In fact, Prof. Mizrach offers no analysis at all in support of this claim, while at the same time, the Hendershott Report explains that there are significant factual disconnects between the events of the 2021 depeg and the events of the 2022 depeg, all of which Prof. Mizrach ignores. Among other things:

- Prof. Mizrach fails to account for the vast differences between the market environments of May 2021 and May 2022, during which the market capitalization of UST grew from $2.0 billion in 2021 to $18.6 billion in 2022, and the average daily trading volume on CEXs increased over nine-fold. With this increase in market size, the magnitude and characteristics of the selling pressure that UST faced in 2022 were vastly different than in 2021. *See* Hendershott Report ¶ 136.

- In addition, Prof. Hendershott analyzes that much of the selling pressure with respect to the 2022 depeg event originated from just four wallets. In fact, documents and data produced by one entity in this matter show that it sold 99.9% of its total UST holding (as of May 6, 2022) in one trading day on May 7, 2022. Approximately 45% of its selling happened in one transaction. This indicates that a coordinated effort by a few individuals and entities was at play, unlike the events of the May 2021 depeg. But Prof. Mizrach failed to analyze these sudden, large concentrated transactions and their impact on the 2022 depeg. *See* Hendershott Report ¶¶ 135-151.

- In another example, Prof. Mizrach's thesis is that the only reason the UST peg was restored in 2021, but not in 2022, was because of the supposedly "intervening" trading by the Trading Firm in 2021. But this fails to acknowledge that TFL and LFG spent roughly $*3 billion* in resources—and purchased much more UST (*i.e.*,

compared to the roughly $15 million net UST purchased by the Trading Firm in 2021) to "intervene" in 2022, albeit without success.  Hendershott Report ¶¶ 160-61.

As with his other opinions, Prof. Mizrach's conclusory observations regarding the causes of the depeg events are long on *ipse dixit* and short on analysis.  Accordingly, under *Daubert* and its progeny, they must be excluded.

## CONCLUSION

As demonstrated above, the opinions offered by Prof. Mizrach suffer from a combination of deep conceptual flaws, inherent methodological flaws, and demonstrably incorrect assumptions (some of which essentially assume what Prof. Mizrach is trying to prove).  These flaws render Prof. Mizrach's opinions inadmissible.  For all of the foregoing reasons, the Court should exclude the opinions of Prof. Mizrach.

Dated: October 27, 2023

Respectfully submitted,

By: */s/ Douglas W. Henkin*

**DENTONS US LLP**
Douglas W. Henkin
David L. Kornblau
Louis A. Pellegrino
1221 Avenue of the Americas
New York, New York 10020
Tel: (212) 768-6700
douglas.henkin@dentons.com
david.kornblau@dentons.com
louis.pellegrino@dentons.com

Mark G. Califano
1900 K Street, NW
Washington, DC 20006-1102
Tel: (202) 496-7500
mark.califano@dentons.com

*Counsel for Defendants Terraform Labs*
*Pte LTD. and Kwon Do Hyeong*

## <u>CERTIFICATE OF SERVICE</u>

I, Douglas W. Henkin, certify that I caused a true and correct copy of the foregoing to be

served on all counsel of record via the Court's ECF system on October 26, 2023.

*/s/ Douglas W. Henkin*
Douglas W. Henkin