# EXHIBIT M

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| v. | No. 1:23-cv-1346 (JSR) |
| TERRAFORM LABS PTE LTD. and DO HYEONG KWON, | |
| Defendants. | |

**SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO EXCLUDE THE TESTIMONY AND OPINIONS OF DR. CHRISTINE A. PARLOUR**

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*523 IP LLC v. CureMD.Com,*
    48 F. Supp. 3d. 600 (S.D.N.Y. 2014)..............................................................13

*Amorgianos v. Amtrak,*
    303 F. 3d. 256 (2d Cir. 2002)........................................................................12

*CFTC v. Moncada,*
    No. 12 Civ. 8791(CM), 2014 WL 2945793, (S.D.N.Y. June 30, 2014).....................13, 14

*Daubert v. Merrell Dow Pharm., Inc.,*
    509 U.S. 579 (1993).............................................................................5, 6, 7

*Gen. Elec. Co. v. Joiner,*
    522 U.S. 136 (1997)..................................................................................12

*In re Elysium Health-ChromaDex Litig,*
    No. 17-CV-7394 (LJL), 2022 WL 421135 (S.D.N.Y. Feb. 11, 2022).............................11

*In re Rezulin Prod. Liab. Litig.,*
    309 F. Supp. 2d 531 (S.D.N.Y. 2004)..........................................................6, 7

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.,*
    209 F. Supp. 3d 612 (S.D.N.Y. 2016)..........................................................10, 14

*Linkco, Inc. v. Fujitsu Ltd.,*
    2002 WL 1585551 (S.D.N.Y. July 16, 2002) ........................................................13

*Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie,*
    No. 11-CV-681 KBF, 2015 WL 5459662 (S.D.N.Y. Sept. 16, 2015).............................12

*United States v. Ulbricht,*
    2015 WL 413318 (S.D.N.Y. Feb. 1, 2015).........................................................13

*River Light V, L.P. v. Lin & J Int'l, Inc.,*
    No. 13-cv-3669 (DLC), 2015 WL 3916271 (S.D.N.Y. June 25, 2015) ...........................14

*SEC v. Tourre,*
    950 F. Supp. 2d 666 (S.D.N.Y. 2013).........................................................6, 10, 11, 12, 13

*Scentsational Techs. LLC v. Pepsi, Inc.,*
    No. 13 Civ. 8645, 2018 WL 1889763 (S.D.N.Y. Apr. 18, 2018).........................................7

*United States v. Napout,*
    963 F.3d 163 (2d Cir. 2020).................................................................................5

**RULES**

Federal Rule of Evidence 403 ...............................................................................10

Federal Rule of Evidence 702 ........................................................5, 6, 10, 11, 14, 17

## PRELIMINARY STATEMENT

Plaintiff Securities and Exchange Commission ("SEC") respectfully submits this memorandum of law in support of its Motion to Exclude the Testimony and Opinions of Dr. Christine A. Parlour, who Defendants Terraform Labs PTE, Ltd. ("Terraform") and Do Hyeong Kwon ("Kwon") have proffered as an expert witness to testify at trial.

Dr. Parlour should be precluded from offering opinions and testifying in this case, and her report should be disregarded in connection with the parties' motions for summary judgment. First, Dr. Parlour's opinions are irrelevant factual narratives that would be unhelpful to the jury. Her first opinion purports to describe the "characteristics" of Terraform's crypto assets, along with their "applications and use cases." But Dr. Parlour merely repackages Terraform's marketing materials with an expert witness gloss; she offers no opinions of her own. Dr. Parlour's second opinion is that "academic literature and industry participants discussed the risk" that Terraform's so-called stablecoin, Terra USD ("UST"), which Terraform designed to stay pegged at $1, could drop from that peg due to a "run" on UST. Expert Report of Christine A. Parlour, attached as Ex. 1, at 27. But Dr. Parlour again offers no opinions; she merely rehashes what others have "discussed" regarding the UST depeg risk. Worse, Dr. Parlour does not opine that a "run" actually caused UST's depeg from $1, making her recount of others' observations regarding the risk of a "run" unhelpful and confusing.

Second, and relatedly, Dr. Parlour employs no methodology or reliable principles to form her opinions. For example, she cites no supporting objective criteria or standards for those opinions. Compounding her lack of methodology, Dr. Parlour offers no opinions about how Terraform's crypto assets actually functioned, instead opining on the irrelevant question of how Terraform "aimed" for them to function.

Third, Dr. Parlour did not consider sufficient data, and did not consider data in a reliable manner. Dr. Parlour did not review a single Terraform internal document in forming her opinions, she did not review a single deposition transcript of a fact witness, she did not speak with a single Terraform witness, and she did not review Kwon's or Terraform's many public statements on issues directly relevant to her report. Dr. Parlour never even spoke with Defendants' counsel until after she issued her report, instead receiving her report assignment from the consulting firm Cornerstone Research, who then found the supporting materials for her report. Dr. Parlour also did no analysis whatsoever of the Terraform blockchain and failed to consider a Terraform white paper and Defendants' public statements that minimized the risk of a UST depeg, the very issue she purports to opine about.

## FACTUAL BACKGROUND

I. <u>Terraform's Crypto Assets and Related Protocols</u>

From April 2018 through May 2022, Terraform and Kwon developed, managed, and marketed the Terra blockchain and related blockchain protocols, together with several crypto assets that came to include UST, LUNA, MIR, and mAssets ("crypto assets" or "tokens"). Am. Compl. ¶ 105. After creating the crypto assets, Defendants aggressively marketed and sold them to the public as profit-seeking investments in a barrage of social media and other advertising. *Id.* at ¶ 42.

A. <u>LUNA token</u>

Terraform launched the Terra blockchain in April 2019 and created 1 billion LUNA tokens on the blockchain. *Id.* at ¶ 31. Terraform then sold hundreds of millions of LUNA to investors beginning in 2018. *Id.* at ¶ 107. In doing so, Defendants promised LUNA token holders that they would receive fees from transactions on the blockchain and that the LUNA

token would appreciate in value with increased use of the Terra blockchain, touting their expertise and managerial efforts to accomplish that goal.  *Id.* at ¶ 3.

B.  UST and the Anchor Protocol

In June 2020, Defendants began marketing a "principal protected" blockchain protocol to investors, dubbed the Anchor Protocol, which promised to pay 19-20% interest on Terraform's so-called stablecoin UST, the value of which was supposedly pegged at $1 based on a Terraform proprietary algorithm tied to the value of LUNA.  *Id.* at ¶ 3.  Investors bought in, depositing more than 14 billion UST in the Anchor Protocol, representing 74 percent of the available UST. *Id.* at ¶ 75.

C.  MIR tokens, mAssets, and the Mirror Protocol

In December 2020, Defendants launched the "Mirror Protocol," which included a MIR token, whose value would be based upon, among other things, usage of the Mirror Protocol.  *Id.* at ¶¶ 37-38.  Using the Mirror Protocol, investors could also engage in transactions to obtain "mirrored assets" or "mAssets" that were intended to "mirror" the price of securities, mostly U.S. equities.  *Id.*  Investors obtained MIR tokens and mAssets from Terraform's website.  *Id.*

II.  UST's May 2021 Depeg and Defendants' Misrepresentations Regarding Its Restoration

In May 2021, UST slipped below and then returned to its $1 peg after several days.  *Id.* at ¶¶ 157-58.  Kwon told investors that UST had "automatically self-healed" due to the ingenuity of Defendants' blockchain algorithm and Defendants touted their technology over "decision-making of human agents in time of market volatility."  *Id.* at ¶¶ 164-65.  Terraform further boasted that this event had proven the reliability of the UST $1 peg during an event that was "as intense of a stress test in live conditions as can ever be expected."  *Id.* at ¶ 7.  In reality, there was no automatic self-healing.  Defendants had struck a secret side-deal with a third party to push

3

UST back up to $1, while falsely touting the algorithm's supposed ability to move price of UST on its own.

### III. UST Depegs in May 2022 and Terraform's Crypto Assets Become Worthless

One year later, in May 2022, UST again de-pegged from a $1 price, but this time no third party saved it. UST's price fell to near zero, as did the prices of other crypto assets in the Terra ecosystem, including LUNA, wLUNA, and MIR. The May 2022 crash wiped out more than $45 billion of total market value in these assets, including the investments of many U.S. retail investors.

### IV. Dr. Parlour's Expert Report

Defendants have proffered Dr. Parlour, a Professor in the Finance and Accounting Department at the Haas School of Business, University of California, Berkeley, to offer two opinions in this case. Ex. 1, Parlour Report, ¶ 1. First, she provides an opinion that the "Terra blockchain is a unique ecosystem with various tokens providing a wide range of applications and use cases." Ex. 1, Parlour Report at 13. Dr. Parlour offers opinions about how Terraform's tokens were *designed* to work, not how they actually functioned. Ex. 2, Parlour Dep. Tr. 134:16-19 ("Q. So you're not offering any opinion about how UST was actually used, just how it was designed. Is that fair? A. That is fair."); Ex. 1, Parlour Report ¶ 61 ("Mirror Protocol *aimed to be* [ ] completely decentralized[.]") (emphasis added); Ex. 2, Parlour Dep. Tr. 174:7-8 ("Q. Was the Mirror Protocol decentralized? A. I don't know.").

Second, Dr. Parlour offers an opinion that "academic literature and industry participants discussed the risk" of a UST depeg. Ex. 1, Parlour Report at 27; Ex. 2, Parlour Dep. Tr. 224:22-25 ("Q. So your opinion is just that the academic literature and industry participants discussed

the risk of a run? A. That's right."). Her only purported methodology for this opinion was the "usual economic and general understanding of what a run is." Ex. 2, Parlour Dep. Tr. 223:11-18.

Finally, Dr. Parlour also includes a "background" section in her report in which she provides "context on blockchain and [decentralized finance] concepts that I use later in my report." Ex. 1, Parlour Report ¶ 9. In this section, Dr. Parlour discusses four different types of tokens, a "utility" token, a "governance" token, a "non-fungible token," and a "stablecoin." Ex. 1, Parlour Report ¶¶ 26-34. Dr. Parlour's report does not categorize any of the Terraform tokens into these categories. *Id.*; Ex. 2, Parlour Dep. Tr. 108:14-16 ("As is evident from my report, I don't map back exactly the particular tokens to these categories.").

## LEGAL STANDARD

"The admissibility of expert testimony in the federal courts is governed principally by Rule 702 of the Federal Rules of Evidence." *United States v. Napout*, 963 F.3d 163, 187 (2d Cir. 2020) (quoting *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005)). Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

The trial court acts as a gatekeeper in determining whether to admit expert testimony. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). "To determine whether a

proposed expert's testimony passes muster under Rule 702, this Court must inquire into: (1) the qualifications of the proposed expert; (2) whether each proposed opinion is based upon reliable data and reliable methodology; and (3) whether the proposed testimony would be helpful to the trier of fact." *SEC v. Tourre*, 950 F. Supp. 2d 666, 674 (S.D.N.Y. 2013) (citations omitted). The party seeking to introduce the expert's testimony bears the burden of establishing its admissibility by a preponderance of the evidence. *Daubert*, 509 U.S. at 592 & n.10.

## ARGUMENT

### I.   Dr. Parlour Offers No Relevant Opinions and Merely Narrates Alleged Facts

As gatekeepers of expert testimony, courts are responsible for "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. An expert's testimony should be excluded if the expert's analysis is merely a vehicle for a factual narrative. *Tourre*, 950 F. Supp. 2d at 675 ("It is [ ] inappropriate for experts to become a vehicle for factual narrative."); *Island Intellectual Property LLC v. Deutsche Bank AG*, 2012 WL 526722, at *2 (S.D.N.Y. Feb. 14, 2012) ("No proposed expert will be allowed to act as a vehicle for lengthy factual narrative.").

Dr. Parlour's report should be excluded because, if allowed to testify, she would become a vehicle for Defendants' factual narrative that should instead be presented through fact witnesses with personal knowledge. *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 551 (S.D.N.Y. 2004) (excluding expert testimony when it was offered to narrate facts more "properly presented through percipient witnesses and documentary evidence."). Dr. Parlour's first opinion – that Terraform's crypto assets "had a wide range of applications and use cases"– is a quintessential factual narrative. Ex. 1, Parlour Report ¶¶ 39-78. Dr. Parlour states that "control of the blockchain was not concentrated into the hands of a few founders," citing only a

Terraform webpage for support. *Id.* at ¶ 39. She then discusses numerous steps Terraform took to develop the blockchain and related protocols, citing only Terraform's own statements to support those alleged facts. *Id.* at ¶¶ 41-44. Dr. Parlour next provides a lengthy narrative regarding "some of the key projects on the Terra blockchain and their related tokens, what they offered users (in terms of use case and function), and some high-level mechanics of how those projects worked." *Id.* at ¶¶ 44-73.

If Defendants wish to explain to the jury "some of the key projects on the Terra blockchain" and "how those projects worked," those alleged facts should be presented through fact witnesses with personal knowledge, Fed. R. Evid. 602, not through the gloss of an expert witness. *Scentsational Techs. LLC v. Pepsi, Inc.*, 2018 WL 1889763, at *4 (S.D.N.Y. Apr. 18, 2018) (experts may not "act as a vehicle to present a factual narrative of interesting or useful documents for a case, in effect simply accumulating and putting together one party's 'story'"); *In re Rezulin Prods. Liability Litig.*, 309 F. Supp. 2d at 551 (excluding expert testimony that consisted of a narrative of the background of the case, in part because "the glosses that [the expert] interpolates into his narrative are simple inferences drawn from uncomplicated facts that serve only to buttress plaintiffs' theory of the case").

Even if Dr. Parlour's factual narratives were proper expert opinion (and they are not), they are irrelevant and, in many cases, contradicted by the factual record. *Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."). Dr. Parlour does not offer any opinion about how the Terraform crypto assets actually functioned, just how they were "designed" to work. For example, Dr. Parlour's report repeatedly emphasizes her view that it was important that UST was a "medium of exchange" similar to fiat currency like the U.S. dollar. Ex. 1, Parlour Report at ¶ 46 ("The primary use case

for UST was as a medium of exchange that could be used in transactions in the same ways as fiat

currency"); *id.* at ¶ 55 ("[A]n important use case of stablecoins was as a medium of exchange,

and using UST to make purchases would preclude someone from staking their UST [in the

Anchor Protocol]."). But Dr. Parlour does not know if UST was ever used as a "medium of

exchange":

> Q.   So when you say 'the primary use case for UST was as a
> medium of exchange that could be used in transactions in
> the same way as fiat currency,' are you saying that it was
> designed for that or that's how it was actually used?
>
> A.   I'm saying that is how it was designed.
>
> Q.   So you're not offering any opinions about how UST was
> actually used, just how it was designed. Is that fair?
>
> A.   That's fair.
>
> Q.   And that's because you've done no analysis of how UST
> was actually used, correct?
>
> A.   That's right. I haven't done an analysis of wallet-to-wallet
> flows on the Terra blockchain.

Ex. 2, Parlour Dep. Tr. 134:9-23. Relatedly, Dr. Parlour could not identify a single merchant,

store, or any other entity that accepted UST as "medium of exchange," as suggested by her

expert report. *Id.* at Tr. 133:16-20 ("Q. Was UST actually used as a means of payment? A. So,

as noted, I haven't done a wallet-to-wallet investigation, so peer-to-peer payment flows, which

are difficult to do. I haven't done that, so I can't say."); *Id.* at Tr. 137:6-9 ("Q. But you can't

identify an example of UST being used by a store or merchant? A. That's right. I don't have a

concrete example.").

Dr. Parlour's report compares UST favorably to "traditional payment methods," like

credit cards, because UST "had lower transaction fees" that ranged from "0.1% to 1%," while

other payment methods' fees "exceeded 6%."  Ex. 1, Parlour Report at ¶ 47. But Dr. Parlour

admitted in her testimony that she did not know what UST's transaction costs actually were, just

what they were designed to be in marketing material (a white paper) issued by Terraform before

creating UST:

> Q.    Let's turn to paragraph 47.  You say "Another important feature of
>        UST was its low transaction costs relative to other payment
>        methods."  Do you see that?
>
> A.    Yes.
>
> Q.    Do you know what the actual transaction costs were for UST?
>
> A.    I haven't done a wallet-to-wallet investigation so I don't know the
>        specific fees [ ] on average that were paid.
>
> Q.    In your report, when you were talking about transaction fees,
>        you're just talking about the transaction fees that were in the
>        [Terraform] white paper, right?
>
> A.    Exactly.  I'm talking about the transaction fees in the white paper.
>
> Q.    So you did no analysis to see what the actual transaction fees were
>        for UST, correct?
>
> A.    In order to do that, you have to look wallet-by-wallet, transaction-
>        by-transaction blockchain data, yea.
>
> Q.    Could you have done that?
>
> A.    Yeah.
>
> Q.    But you didn't do it here?
>
> A.    That's right, yeah.

*Id*. at Tr. 137:10-138:10.

Dr. Parlour's report also discusses how the Terraform blockchain and protocols were

supposedly "decentralized."  Ex. 1, Parlour Report at ¶¶ 39 61, 65, 66.  But her opinion merely

parrots what Terraform has stated and narrates alleged facts about Terraform's blockchain and

protocols.  *Id.* (citing Terraform websites and marketing material).  When asked at her

deposition, she admitted she did not know whether aspects of the Terraform ecosystem were

decentralized:

> Q.  Now, you – paragraph 61, you state that:  "As summarized in a
> blog post around its launch, Mirror Protocol aimed to be a
> 'completely decentralized, community-driven project.'"  Do you
> see that?
>
> A.  That's right.  Yes.
>
> Q.  Was the Mirror Protocol decentralized?
>
> A.  It was designed to be decentralized.
>
> Q.  But you don't know if it actually was decentralized, right?
>
> A.  ***As noted, I have not done a – a blockchain level analysis of these
> tokens.***
>
> Q.  Was the Mirror Protocol decentralized?
>
> A.  ***I don't know***.

Ex. 2, Parlour Dep. Tr. 173:18-174:8.  In addition to excluding Dr. Parlour factual narratives as

improper expert testimony, *Tourre*, 950 F. Supp. 2d at 675, the Court should not permit Dr.

Parlour to testify about what Terraform's crypto assets were "designed" or "aimed" to do as it is

irrelevant and will be confusing to the jury.  *LVL XIII Brands, Inc. v. Louis Vuitton Malletier

S.A.*, 209 F. Supp. 3d 612, 641 (S.D.N.Y. 2016) (excluding expert testimony because "the danger

of confusion substantially outweighs any trifling probative value of [the expert's] proffered

opinions, preclusion is required under both Rules 403 and 702.").

Dr. Parlour's second opinion – that "academic literature and industry participants

discussed the risk that large shifts in demand could lead to a run" on UST – is also irrelevant and

not proper expert testimony.  Ex. 1, Parlour Report at ¶¶ 79-90.  First, this opinion includes

improper narration of alleged facts, including that Terraform and Kwon allegedly "directly discussed the risk of a de-peg and took steps to protect against such a risk." *Id*. at 91; *In re Elysium Health-ChromaDex Litig.*, 2022 WL 421135, at *29 (S.D.N.Y. Feb. 11, 2022) (excluding expert opinion because it "'does no more than counsel for plaintiff will do in argument'"—it merely recites facts that other witnesses have firsthand knowledge of and "'propound[s] a particular interpretation of'" those facts); *Tourre*, 950 F. Supp. 2d at 675 ("Acting simply as a narrator of the facts does not convey opinions based on an expert's knowledge and expertise."). The prejudicial impact of allowing Dr. Parlour to serve as a conduit for Defendants' skewed version of the facts is particularly acute here when that Kwon may not appear at trial and be subject to cross-examination.

Dr. Parlour also offers no actual opinions, just a recitation that others have discussed the risk of a "run" on UST. Ex. 1, Parlour Report at ¶¶ 79-90; Ex. 2; Parlour Dep. Tr. 224:22-25 ("Q. So your opinion is just that the academic literature and industry participants discussed the risk of a run? A. That's right."). These opinions should also be excluded as irrelevant, particularly because Dr. Parlour offers no opinion that a "run" caused the depeg of UST in May 2021. Ex. 2; Parlour Dep. Tr. 117:21-24 ("Q. So are you offering an opinion about what caused the UST depeg in your report? A. No, I'm not offering an opinion about what caused the UST depeg.").

## II.    Dr. Parlour Employed No Reliable Methodology to Form Her Opinions

In assessing whether a proffered expert's testimony is reliable, courts consider "the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony 'is the product of reliable principles and methods'; and (3) that 'the witness has applied the principles and methods reliably to the facts of the case.'"

*Amorgianos v. Amtrak*, 303 F. 3d. 256, 265 (2d Cir. 2002). An expert's opinions must be explained based upon on some methodology, so that their reliability can be tested. *E.g., Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006) ("An expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion."). The Court is not required to "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

When an expert merely narrates facts, as Dr. Parlour has done, there is no methodology. *Tourre*, 950 F. Supp. 2d at 675 ("nor is [factual narration] traceable to a reliable methodology . . . mere narration thus fails to fulfill *Daubert*'s most basic requirements."); *Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, 2015 WL 5459662, at *3 (S.D.N.Y. Sept. 16, 2015) (same). Indeed, Dr. Parlour's report never discusses a methodology. *See generally* Ex. 1, Parlour Report. When asked at her deposition, Dr. Parlour could not identify a methodology for her opinions. For her "overview" of the Terraform ecosystem, the only methodology she offered is "the training and the experience that I got in my economics Ph.D to understand the ecosystem." Ex. 2; Parlour Dep. Tr. 53:15-23. For her second opinion regarding whether "academic literature" had discussed the risk of a "run" on UST, she offered the same purported methodology. *Id*. at 54:8-15 ("Q. And what methodology did you employ to reach an opinion on that assignment? [Objection] A. My – I used the training that I got through my economics Ph.D to note or report the academic literature that has discussed the run risk and depegged and also relied on media and other writings in this area."); *id*. at 5:15-23 ("Q. And what methodology are you employing to offer that opinion? A. I'm relying on the usual economic and general understanding of what a run is.").

12

Dr. Parlour's failure to employ any methodology, other than citing her own experience and "general understandings of what a run is," renders her report classic *ipse dixit* testimony that should be excluded. *523 IP LLC v. CureMD.Com*, 48 F. Supp. 3d. 600, 643 (S.D.N.Y. 2014) ("an expert basing his opinion solely on his experience must do more than aver conclusorily that his experience led to his opinion[.]"); *Linkco, Inc. v. Fujitsu Ltd*., 2002 WL 1585551, at *4 (S.D.N.Y. July 16, 2002) )"[experts] must provide some explanation for their conclusions, rather than referring generally to their experience. Without good explanations, courts cannot assess the reliability of any conclusion drawn by an expert, even if he possesses relevant experience."); *United States v. Ulbricht*, 2015 WL 413318, at *7 (S.D.N.Y. Feb. 1, 2015) ("When an expert witness fails to identify the objective bases for his opinion, the district court cannot perform a proper assessment; a proffered opinion deficient in this manner fails to meet the basic requirements of the Federal Rules of Evidence"); *Tourre*, 950 F. Supp. 2d at 678 (excluding expert's testimony based on "economic logic" as "simply a form of inadmissible *ipse dixit* . . . [t]he law is clear that mere *ipse dixit* is not appropriate expert testimony because it is not based on reliable methodology, as *Daubert* requires."); *CFTC v. Moncada*, No. 12 Civ. 8791(CM), 2014 WL 2945793, at *3-4 (S.D.N.Y. June 30, 2014) (excluding expert opinion that "offers credentials rather than analysis.") (citation omitted).

Dr. Parlour's categorization of tokens into four categories (utility token, governance token, non-fungible token, and stablecoin) should be excluded for the same reason. Ex. 1, Parlour Report ¶¶ 26-30. Her report cites no authoritative source or methodology for this categorization. *Id*.; Ex. 2, Parlour Dep. Tr. 106:20-24 ("Where did you come up with these categories? A. So I don't have a specific source. This is just based on my experience teaching the material."). In any event, Dr. Parlour testified that she could not "map back [the Terraform

crypto assets] exactly to these categories," making her opinion irrelevant to this case. Ex. 2, Parlour Dep. Tr. 108:11-16; *LVL XIII Brands, Inc.,* 209 F. Supp. 3d. at 641 ("[T]estimony must be both reliable and relevant in that it 'fits' the facts of the case."). Tellingly, although Dr. Parlour's report is devoid of references to crypto assets being used as investments, Dr. Parlour previously published an article in 2018, in which she described crypto assets as "investible instruments that can even be included in retirement accounts," including a discussion of another category of token, "securities tokens." Ex. 2, Parlour Dep. Tr. 97:9-100:24; *Hu, Albert and Parlour, Christine A. and Rajan, Uday, Cryptocurrencies: Stylized Facts on a New Investible Instrument* (May 3, 2018). This publication was not listed in Dr. Parlour's expert report because she said it was "not relevant." Ex. 2, Parlour Dep. Tr. 98:19-22.

### III. Dr. Parlour did not Consider Sufficient Facts or Data to Form Her Opinions

Expert witness must base their opinions on sufficient facts or data. Fed. R. Evid. 702(b); *CFTC v. Moncada*, 2014 WL 2945793, at *3-4 (S.D.N.Y. June 30, 2014) (excluding expert who had done "nothing at all except look at a fraction of the data in his possession and conclude that [defendant's] activity had no impact on the market," and noting that "[t]he mere fact that so much relevant data was not even 'eye-balled,' let alone analyzed, renders [the expert's] testimony about the lack of market impact … highly suspect"); *see also River Light V, L.P. v. Lin & J Int'l, Inc.*, 2015 WL 3916271, at *4 (S.D.N.Y. June 25, 2015) (where expert did not examine financial records, his "data is not just inadequate—it is nonexistent," and his calculations unreliable).

Dr. Parlour failed to base her opinions on sufficient facts or data. Even though Dr. Parlour's opinions purport to detail the characteristics of the Terraform ecosystem, she never spoke with a single Terraform employee, did not review any deposition transcripts of Terraform

14

former or current employees, and did not review a single internal Terraform document.[1]  Ex. 1,

Parlour Report, at Appendix C; Ex. 2, Parlour Dep. Tr. 22:19-23:1 ("Q. Did you speak with

anyone at Terraform Labs before issuing your report?  A. To the best of my knowledge, I've

never spoken with anyone at Terraform Labs.  Q.  Did you ask to speak with anyone at

Terraform Labs?  A.  I didn't ask to speak with anyone at Terraform Labs.").  Defendants'

counsel did not even speak with Dr. Parlour until *after* she issued her expert report.  Ex. 2,

Parlour Dep. Tr. 35:17-21 ("Q.  When was the first time you spoke with someone at Dentons

regarding this case?  A.  The first time I spoke to somebody at Dentons about this case was after

I had filed by report.").  Although her report states that she was "asked by counsel for

Terraform" to provide an opinion, her assignment actually came from Cornerstone Research.

Ex. 2, Parlour Dep. Tr. 35:25-36:1 ("Q.  So you have in your report what your assignment was.

Do you recall that?  A.  Um-hum.  Q.  Who provided that assignment?  A.  [ ] Cornerstone

provided that assignment.").

      Dr. Parlour second opinion regarding the public's anticipation of UST "run" was

similarly not based on sufficient facts or data.  Ex. 1, Parlour Report ¶¶ 89-90.  Dr. Parlour cited

historical examples of "bank runs," *id*. at ¶ 80, but ignored a Terraform white paper that

minimized the risk of a depeg.  In the white paper, entitled "Terra Money: Stability Stress Test,"

Terraform touted that UST's "peg is highly robust" and has a "high resilience" based on "100

different stress settings and 1 million years' worth of simulations."  *Platias, Nicholas and Di

Maggio, Marco, Terra Money: Stability Stress Test*, (May 2019).  Dr. Parlour testified that she

---

[1]  Dr. Parlour reviewed two bates-stamped documents that were agreements between Terraform
and third parties regarding distribution of MIR tokens.  Ex. 1, Parlour Report, at Appendix C;
Ex. 2, Parlour Dep. Tr. 175:22-25.

knew about the white paper but did not cite it in her report because it was "wasn't relevant." Ex. 2, Parlour Dep. Tr. 201:22-202:10.

Dr. Parlour also did not review Kwon's or Terraform's still-active Twitter accounts or Terraform's other public communications. Ex. 2, Parlour Dep. Tr. 20:15-19; Tr. 82:18-20. In several public statements, such as the below from March 11, 2022, Kwon touted the stability of the UST peg and assured investors that UST would *not* depeg.



> **Do Kwon** 🌕 ✓
> @stablekwon
>
> If there is any confusion left at this point, we will keep growing reserves until it becomes mathematically impossible for idiots to claim depeg risk for $UST
>
> $UST is mighty

Do Kwon, @stablekwon, https://twitter.com/stablekwon/status/1502226320989700097 (March 11, 2022, 5:13 am); Ex. 2, Dep. Tr. 243:20-244:1.

Dr. Parlour's report also compares the "de-peg and collapse of the British pound in September 1992," which she describes as "Black Wednesday," to UST's complete collapse. Ex. 1, Parlour Report ¶¶ 81. n.110. Dr. Parlour uses this example to support her conclusion that UST's depeg was not a "wholly unanticipated event." *Id.* at 90. Even putting aside the inapt comparison,[2] she ignored that Do Kwon dismissed the risk of a "Black Wednesday"-type event to his millions of followers:

---

[2] The British pound depreciated by 25 percent against the U.S. dollar and later recovered (Ex. 1, Parlour Rep. ¶ 81) while UST, as Dr. Parlour put it, "spectacularly depegged" and currently has no value. Ex. 2, Parlour Dep. Tr. 229:23-230:2 ("Q. Did the UST algorithm work? A. It was spectacularly depegged. Q. So the answer is no? A. The answer is no, yes.").



**Do Kwon** 🟡 ✔
@stablekwon                                              ···

Probably the most retarded thread ive read this decade.

Silence is a perfectly acceptable option if stupid.

Billionaires in my following, go ahead, see what happens

> 🧑 **FreddieRaynolds** ✔ @FreddieRaynolds · Nov 25, 2021
> A few weeks ago I responded to @tbr90's tweet with a brief outline of how a
> wealthy attacker could not only break @terra_money but profit heavily doing it
> with a Soros style Black Wednesday attack. Below I provide a detailed
> breadown...~$1B capital needed.
> twitter.com/tbr90/status/1...

5:04 AM · Nov 28, 2021

Do Kwon, @stablekwon, https://twitter.com/stablekwon/status/1464897977793728514?lang=en (November 28, 2021, 5:04 am). Dr. Parlour also ignored that Kwon told investors that purchasing UST and depositing it into the yield-bearing Anchor Protocol "was not a venture bet," and that it was "commercial suicide not to." Parlour Dep. Tr. 207:23-208:14. Dr. Parlour's failure to consider Do Kwon's public statements on the very issues she opines further shows that her report is based on insufficient facts and should be excluded.

## CONCLUSION

For the foregoing reasons, the Court should preclude Dr. Parlour from offering opinions in this case under Fed. R. Evid. 702.

17

Dated: October 27, 2023              Respectfully submitted,

/s/ James P. Connor
Christopher J. Carney
James P. Connor, admitted *pro hac vice*
Carina A. Cuellar, admitted *pro hac vice*
Laura E. Meehan
Devon L. Staren, admitted *pro hac vice*
Attorneys for Plaintiff
U.S. SECURITIES AND EXCHANGE
COMMISSION
100 F Street NE
Washington, DC 20549
Tel: (202) 551-8394
Email: connorja@sec.gov