# Exhibit 3
## Public Filing

**THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

**CASE NO.:  23-mc-23855-KMM**

TERRAFORM LABS PTE. LTD.,        )
                                 )
               Plaintiff,        )        November 9, 2023
v.                               )
                                 )
CITADEL SECURITIES LLC,          )
                                 )        Pages 1 - 51
                                 )
               Defendant.        )
_____/

MOTION HEARING

BEFORE THE HONORABLE LAUREN FLEISCHER LOUIS
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

On behalf of the Plaintiff:

          ELLIOTT KWOK LEVINE & JAROSLAW LLP
          565 Fifth Avenue, 7th Floor,
          New York, NY 10017
          BY:  MATTHEW L. LEVINE, ESQ.
          BY:  LUIS E. SUAREZ, ESQ.

APPEARANCES CONTINUED:


On behalf of Defendant:

                    BARTLIT BECK LLP
                    54 West Hubbard Street,
                    Suite 300,
                    Chicago, IL 60654.
                    BY:  BROOKLYN CUCINELLA, ESQ.
                    BY:  MACGREGORY LEBUHN, ESQ.
                    (Appearing pro hac vice)




Transcribed By:

                    BONNIE JOY LEWIS, R.P.R.
                    7001 SW 13 Street
                    Pembroke Pines, FL  33023
                    954-985-8875
                    caselawrptg@gmail.com

(Thereupon, the following proceeding was held:)

THE COURTROOM DEPUTY:  All rise.

The United States District Court for the Southern District of Florida is now in session with the Honorable Lauren Louis presiding.

Calling Case Number 23-mc-23855; Terraform Labs Limited versus Citadel Securities LLC.

Counsel, announce your appearances beginning with the Plaintiff.

MR. SAUREZ:  Good morning, everybody.

Luis Suarez on behalf of Terraform Labs PTE Limited. Together with me today are Matt Levine and Rachel Rodriguez from the law firm Elliot Kwok Levine and Jaroslaw.

THE COURT:  Thank you, Mr. Suarez.

MR. LEBUHN:  Mac LeBuhn on behalf of Citadel Securities.  I am from the law firm of Bartlit Beck.  With me today is Brook Cucinella of Citadel Securities.

THE COURT:  Okay.  All right.  Mr. Levine, you look like you were standing at first hair.  Are you arguing for Terraform?

MR. LEVINE:  I am, Your Honor.

THE COURT:  You have the floor.

MR. LEVINE:  Would you prefer me there or here?

THE COURT:  I prefer you talking into a microphone because that's the only way that you will end up on a

transcript.

MR. LEVINE:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. LEVINE:  Thank you for hearing our application and for granting the pro hac vice application for myself and my colleague Miss Rodriguez.

If the Court would indulge me a few minutes after Mr. LeBuhn responds to my argument for rebuttal.

THE COURT:  You are the movant.  You get first and last.

MR. LEVINE:  Thank you.

What I will do is just a little bit of background on the underlying action out of which this matter comes from the Southern District of New York and talk about the relevance on our application and then the lack of burden on the Respondent.

THE COURT:  Can I interject just to give you both heads up that I am going to be asking because the Respondent did not put this in the papers.

So I am going be to asking what their position is on me transferring this to Judge Rakoff.  If they say they want that do you still want that?  Just think about it and talk to your team, but know that before you leave here I am going to want an answer from both of you.

MR. LEVINE:  Okay.

THE COURT:  Sure.

MR. LEVINE:  Thank you.

So first the background on the matter before Judge Rakoff.  It is an SEC suit against our client Terraform Labs and the founder of Terraform Labs Do Kwon.  We represent in this matter just Terraform Labs here.

The underlying action is a securities fraud suit relating to a stablecoin called Terra and it is part of what is known as an algorithmic pair stablecoin.  Terra is one part of it and there was another part called LUNA.  And Your Honor may be familiar with the stablecoin in the crypto currency world.

THE COURT:  Only because of this case honestly and the amount of time I have spent on Google.  So it is okay.  You can keep going.

MR. LEVINE:  All right.  Typically a stablecoin, another example is one called Tether.  Tether is the largest stablecoin and it is stable because it is backed by actual assets like treasury securities.

So when you buy a Tether, you get a Tether coin and Tether, the company that issues the coin, buys U.S. Treasuries or secured corporate.

This stablecoin was different and I am a Liberal Arts major and a Google expert, too.  So I am not going to try to explain it except to say that it was designed to be a pair and the pairing of the two coins, the stablecoin Terra and the other coin called LUNA would allow for (inaudible)

opportunities.

And so traders would, if one went up, they would have an incentive to buy the other and shorten the supply of the other.  And then that would effect the other one and it would go back and forth and it was designed to do that.  And it was supposed to be pegged to the dollar, one dollar, stablecoin.

And this stablecoin went on the market, I think, in 2019 from our client Terraform and it was successful.  And there are three key dates here that I would ask you to focus on; May 2021, May 2022 and March of 2022, in that order.

May of 2021 is the date of what was known as the first depeg.  So Terra, the stablecoin came off of that one dollar peg and it reduced in value.  So it was worth less than a dollar and the algorithm is designed to correct that.

And so after a few days it was corrected and it went back to a dollar and that happened in May of 2021.  That was the first depeg.

THE COURT:  Can I ask my first question?

MR. LEVINE:  Absolutely.

THE COURT:  And I think that it matters and I am not just being (inaudible), but the algorithm that you are referring to now, can you help me understand what or how that comes into play because I understand this to have been designed so that it, in fact, did take some human interaction, right?  The purchasers are incentivized to buy LUNA so that it bumps

back Terra up again, right?

MR. LEVINE:  Right.

THE COURT:  But that's a human action.  So I don't understand and I can't tell if I need to know why or how the algorithm interacts in that scenario because ultimately it becomes why you are going after their discovery is because other actors got involved in 2022.

MR. LEVINE:  That's right.

THE COURT:  And the statements that you are accused of making are that no -- please don't quote this part of what I say in anything, but essentially that no human interaction was needed in order to re-stabilize or re-peg your crypto.

MR. LEVINE:  That's pretty close.

I would say it this way.  Algorithm alone is what our client is accused of representing to the public and is being the material misstatement at issue in the SEC suit.

Algorithm alone does not mean that there weren't people who were responding to the algorithm.  When we said algorithm alone, we basically said that that system eventually worked.

That the algorithm worked with the expected participation by market participants in, let's say, buying one coin and when you buy one coin the other one gets burned.  It gets eliminated.  So it reduces supply.

THE COURT:  Is that the algorithm that it

automatically is doing the burning?

MR. LEVINE:  Yes.  It's called a burnment mechanism. When you buy one it mints and if you are exchanging the other one that gets burned.

THE COURT:  Okay.

MR. LEVINE:  I hope you don't ask me to go much further than that with the algorithm.

THE COURT:  I think that's as much as I need to understand, I think.

MR. LEVINE:  But you are absolutely right because it is key to what the SEC says, which is it says we misrepresented what happened after May 2021 because they say that the company and its founder made material misstatements that it was the algorythym alone that caused the peg to readjust to the one dollar value.

Because after a few days in May it would go back to one dollar and stay that way pretty much for an entire year until May of 2022, which is the other second date I wanted to focus on.

Did I answer your question?

THE COURT:  Yes, I think so.

MR. LEVINE:  So after the May 2021 depeg, the SEC alleges in the underlying action that our client and Mr. Kwon, co-Defendant, made material misstatements about what happened and why it got back to the peg.

They say we said algorythym alone with the understanding of what algorythym means, humans responding to the algorythym. What the SEC says happened is that we agreed with a third party, a trading firm called Jump Trading, to have them intervene during that May 2021 depeg.

And we had an arrangement with them prior to that when we changed the arrangement to incentivize them to buy a ton of the Terra stablecoin. And buying a ton of it would then decrease the supply in the market and incentivize the price for the Terraform stablecoin to go back up by decreasing supply.

And they allege, the SEC, that we concealed this. We didn't tell anybody that we had this secret arrangement with Jump Trading, for lack of a better term, jump in and intervene and secretly do that. And so when after May 2021, the SEC says we made a bunch of statements and we omitted to talk about Jump.

THE COURT: Right.

MR. LEVINE: And they say that is the material misrepresentation. That is the key material misrepresentation that is core of this part of the securities fraud. So they have another prong, but that's not at issue here.

And so now we go to 2022; May of 2022 it depegs again. And this time there is no intervention by Jump Trading according to the SEC's allegations. And it not only depegs, but it basically collapses as does the other coin in the

algorythym pair, the LUNA coin, and they both become worth very little.

And the SEC alleges people lost 40 billion dollars in value. And what the SEC is trying to prove is that the absence of Jump's intervention the second time shows that the intervention the first time was material. That is their argument and so what we say is that's not right.

We say in our answer, Paragraph 170, it was apparent concerted action by other actors in May of 2022 to intentionally cause the collapse of the Terra stablecoin. And they took over a variety of actions, which I don't think are relevant here. I couldn't do a good job of explaining anyway because I am a Liberal Arts major and not a coin major.

But what they say is because Jump did not intervene it was the but for cause of the second depeg. It re-peged the first time because Jump was in and it didn't re-peg the second time because Jump didn't come in.

How do I know the SEC says that? I have submitted it to you in documents. This is from -- if you indulge me for a moment -- Exhibit N to Miss Rodriguez' supplemental declaration to the Court.

The SEC, in a motion of our client to exclude testimony of a SEC expert -- this is from the Southern District action filed just about ten days ago. The SEC says they are trying to -- I'm sorry. Just a moment.

This is a motion of our client to exclude an SEC expert.  And one of the grounds seeking to exclude this SEC expert we say because Professor Misra (phonetic) that the only reason that the U.S.T, the Terra --

THE COURT:  Where are you?

MR. LEVINE:  I'm sorry.  Page 15.

THE COURT:  Of your own memorandum of law.  I mean, in the underlying action Exhibit N.

MR. LEVINE:  In the underlying action which is Exhibit N supplemental action Page 15.

THE COURT:  But this is Terra.

MR. LEVINE:  Yes, our own memorandum of --

THE COURT:  Internal pagination, I assume?

MR. LEVINE:  Yes.  The only reason, what I refer to as the but for cause that the peg was restored, but not in 2022 was because of the supposedly intervening trading by the trading firm, which is referring to Jump Trading in 2021.

So the SEC's expert and what we are trying to keep out is saying is that the but for cause of the re-peg in 2021 was the intervention by Jump Trading.  And what the SEC expert is saying is because there was no intervention in 2022 that's why it didn't re-peg.

And so the SEC's argument, what they want to argue is the absence of Jump Trading in 2022 strengthens the inference in the contribution of Jump Trading in 2021.  They use that,

the absence in 2022, to strengthen the inference of what they want to prove at trial that the intervention in 2021 was material and what we want to say in response is no.

We want to undermine that inference at trial.  We want to say no to the jury.  It wasn't the fact that Jump wasn't involved in 2022 that was the cause of the depeg.  It was this concerted action by other actors.

THE COURT:  Okay.  So in order for you to do that you have to actually show concerted action by other actors.

MR. LEVINE:  That's correct.  And that's why we issued the subpoena to Citadel Securities and Citadel Enterprise of the Americas.

THE COURT:  But I'm sorry.  Did you tell me that other investors have responded to your subpoenas?

MR. LEVINE:  Yes, I did.

THE COURT:  Okay.  So have you at this point amassed evidence that, in fact, there were other actors who shorted the stock in the manner that you originally had accused Citadel of doing in May of 2022?

MR. LEVINE:  I am not in a position to respond to that at this point, Your Honor.  I have a part of this case --

THE COURT:  Okay.

MR. LEVINE:  -- which is this motion.

THE COURT:  I appreciate your candor, but I am so confused about what you are seeking here because do you contest

their representations and what I think is an attorney created document, but I haven't seen any argument about it, but do you contest their representation that Citadel conducted four trades totally approximately 13 cents and that could not have been the whale investor you are looking for?

MR. LEVINE:  I will concede part of that which this document, which I am going to assume, but they won't tell us or give us any other documents to let us know what this is, although there probably are some.

THE COURT:  Are you referring to your Exhibit L?

MR. LEVINE:  Yes, Exhibit L, Your Honor.

I assume this is a trading ledger from a data system that they have that tracks trades.  Citadel is an enormous trading entity and has probably a number of these systems.  And what this shows -- and I think this document is actually good for us and if you would allow me to tell you why.

THE COURT:  Okay.

MR. LEVINE:  What they argue is it is only four test trades and they were in and out of them in seconds or minutes and it was just pennies.  I actually think that supports our point.

Citadel is a 61 billion dollar entity.  They don't mess around.  They don't do things for no reason.  They do test trades for a reason.  And what we are seeking here are the documents that show that reason.

The reason is I don't know.  The reason is, we suspect, that it may have to do with this concerted action because this takes place in March of 2022.  This is just six weeks before the second depeg when it collapses.  Why are they doing this?  It's not some -- I'm going to do a little surmise here, Your Honor, if you allow me.

It is not some trader at 2:00 in the morning because if you look at the first trade it looks like it is in and out at 2:35 a.m.  It's not some trader that woke up and went to his Citadel laptop or her Citadel laptop and said I am going to try a crypto currency trade.  They think about it.  They do trading strategy memos.  They do back testing memos.

So trading strategy memo is I have a hypothesis.  Here is what I think we could do.  I explained it to my supervisors and if I get the okay they give me the capital to do it and they put limits on my capital and I go out and I do it.

Sometimes before you do a trading strategy, you will do what is known as a back test.  You will take the strategy, but you will use it against historical information and you will run your trading strategy against historical information and you will see how it would have done.

There might be that.  That would be relevant.  After you do these trades, there are sort of an after action report. What was the execution?  What were the results?

There might be an e-mail.  There might be a short

memo.  Those are the several documents we are seeking, Your Honor.  That's just a handful of documents, but they go to the core of why because, otherwise, why are they doing this?

And we think they are doing this because they either were thinking about doing themselves or they are maybe participating with other parties who were coming together in this effort.  And it wasn't just the seven whales, Your Honor, that are referred to in this report.

There were other market participants as well.  There are too many for me to name, but Citadel is a big player.  And if they were, for example, in discussions with other trading houses about an effort to do this that is absolutely relevant to our defense and so that's why we think it is relevant.

I think I answered your question?  I went on for a while.

THE COURT:  No, no, no.  I had the impression on the motion that it was a little circular.  It is relevant because it is central to my defense, but I don't understand and I know that there are also limits on how much I need to understand about the merits of your defense.

I think your point is well made that neither I, nor the subpoena Respondent will replace our judgment for Judge Rakoff in terms of the merits of your defense.  Only the relevance, but I still don't understand how discovering the why if there was no what is relevant to the defense you have

asserted.

Meaning, if they didn't conduct the -- like, you advance that there were a couple of reasons.  One, they were thinking about doing this themselves.  I keep coming back to so what if they didn't or that they were thinking about doing it with others.

Is the point that you are looking to identify those others?  If not, it seems like this could be even more narrowed.  Like, looking to find out what they intended to do, but didn't helps you how?  Makes what fact in dispute in your underlying suit more likely to be true or not?

MR. LEVINE:  If they are not just thinking about -- let's say planning.  They didn't actually do it according to what they tell us.  We will take them at their word at this point.

What if they started to plan six weeks ahead of the depeg with others to tank the peg and tank the Terra coin?  That could lead us to the evidence of the concerted effort, right?  It is one step in the chain.  It is reasonably calculated to lead to the discovery of admissible evidence.

THE COURT:  I get it, but I mean everybody's reliance on pre 2015 law is a thing, right?

MR. LEVINE:  Yes.  I'm sorry.  It is baked into my memory.

THE COURT:  I get it.  And yet, I think when you lay

that chain out you are answering me, yes, you are looking for evidence that Citadel might have of who actually did what you originally accused Citadel of doing.

MR. LEVINE:  That's correct, Your Honor.

THE COURT:  Okay.

MR. LEVINE:  I think that may be a trading strategy memo.  It could be in an e-mail or two.  It could be in a back testing analysis.  It could be in an after action report.  It could be in any of those documents.

THE COURT:  Okay.  All right.

MR. LEVINE:  And I think that if we get that that will help us undermine the SEC's core claim of materiality, which is that no Jump in 2022 shows that Jump in 2021 is the ball game.  And Jump in 2021 is the ball game and we lied about it, that's securities fraud.

It is a little bit of a way to get there, Your Honor, but it is certainly within the realm of a reasonable request.  And you know, the SEC wants to put a knife through the heart of our client and we have to do everything we can, within reasonable bounds of the law, to try and obtain that discoverable evidence.

THE COURT:  Could I ask the reality of how your transactions occur question?  Why isn't it just a knowable fact who sold on the date.  I mean, are these things concealed?

MR. LEVINE:  So that's the thing about crypto

currency.

THE COURT:  The answer is, yes, that you can only see the wallet?

MR. LEVINE:  Yes.

THE COURT:  Okay.

MR. LEVINE:  You see the wallet address.  It's an IP address.

THE COURT:  Got it.  So all of the wallets listed in your subpoena, those are the accounts on which the sales were made in May?

MR. LEVINE:  Those were the ones that were most involved in the tanking of the peg in May of 2022.  And so that is why we selected those wallets.

THE COURT:  Got it.  Okay.

MR. LEVINE:  And you reminded me of a point that I wanted to make, Your Honor, which is one of the reasons to do a test trade is to test out your wallets and see if the wallet is working.

So these are quick round trips in and out of a perpetual future for -- and again, I don't exactly know because they haven't given us anything more, but it looks like the position currency is U.S.D.T.  That's at the time they are.

That is a stablecoin and it looks like it's a future betting Tether against LUNA.  One would go up and one would go down.  And if you are trying to crash LUNA and you bet against

it and the feather would go up that might be the vehicle to do that.

But I don't know because we don't have any more information and I think the trading strategy documents that we are seeking will shed light on that.

THE COURT:  Okay.

MR. LEVINE:  Any other questions about relevance, Your Honor?

THE COURT:  For purposes of proportionality, discovery is closed.  Experts have been disclosed.  Can you still make use of this information?

MR. LEVINE:  Yes, we can, Your Honor.

The trial is two and-a-half months away.  We filed our motion ahead of the discovery deadline.  The discovery deadline was October 17th.  We filed our motion, I believe, on October 9th.

And there is no, as I am aware, there is no prohibition on using this information.  And as Your Honor knows, you accumulate information even after discovery closes as you get ready for a trial.  It may not come from a deposition or a subpoena.

Sometimes there are subpoenas which were issued earlier and there are additional documents that get responded to those subpoenas.  Sometimes there are other sources of information, but the bottom line is there is nothing in the

docket that I am aware of in Judge Rakoff's case that prevents us from receiving this information and using it at trial two and-a-half months away.  I am sure there will be motion in limine about what is available at that time and Judge Rakoff will decide those at that time.

THE COURT:  Okay.  Did I give you a full opportunity to present your argument?

MR. LEVINE:  I did want to touch on the burden argument briefly.

THE COURT:  Okay.

MR. LEVINE:  The burden argument here is purely rhetorical.  There is no actual factual basis for the burden. They provided one document and they said it was from *de minimus* trading and logically there should be a *de minimus* amount of looking for the few additional documents we are looking for related to the trading strategy or strategies.

This is a sophisticated entity, as I mentioned.  This is probably done by the same trader.  I don't know what their system says, but it has a T-key at the end.  That is probably the way they use this system to find which of the other documents related to these trades.

THE COURT:  Is it your understanding that that document was produced as it was kept or that it was created for this litigation?  Do you know?

MR. LEVINE:  I don't know the answer to that, Your

Honor.

THE COURT:  It looked to me like somebody created and that's why I was wondering.

MR. LEVINE:  I am not a trader, but it looked to me like a printout from that a trading ledger.

THE COURT:  Okay.

MR. LEVINE:  That was my best guess.

This is a sophisticated entity that responds to subpoenas and discovery requests all the time.  I am sure they sent out a competent litigation hold.  They know who to send it to when they got our subpoena.

*De minimus* trading means, as I said, a likelihood of *de minimus* burden.  The record you have before you, Your Honor, is a declaration of Mr. LeBuhn on burden.  Mr. LeBuhn's declaration gives details about this document, the trading record.  It says nothing about burden.

You have no declaration from Miss Cucionella from the client about the burden of the company.  So it is purely speculation and rhetoric about the burden.  If they wanted to establish a burden they could have told you that and they didn't.

We believe that because it is actually a *de minimus* burden to them, it is a couple of clicks and they could find these documents and they declined to even look for them they said.  And I don't believe they met their responsibility to do

that in this manner.

And it leaves us with a question what are they testing?  And we believe this could lead us to discoverable evidence.  I just want to add one more thing.

We took steps to minimize the burden and this goes to your earlier point.  We issued a subpoena both to Citadel Securities and Citadel Enterprises of America.  When they told us that Citadel Enterprises America had no trading whatsoever we did not pursue them.  We let that be.  We are only are seeking the trading strategy document or documents from Citadel Securities.

We gave them extra time to file their responses and objections.  We did several meet and confers with them.  We dramatically narrowed our request to just what is before you now.  The trading strategy document or documents.

We have no motive to make things difficult for them. We are not a competitor of them.  You know, we are not in the same city as them.  We are doing this because we are in a fight for our lives and we believe we have the right to come and try to seek discoverable evidence.

I think unless Your Honor has any further questions.

THE COURT:  Not yet.  Please consider with your team the one that I did ask, though, when you come up with your reply.

MR. LEVINE:  I will get you an answer on that.  Thank

you.

THE COURT:  Okay.

MR. LEBUHN:  Good morning, Your Honor.  Mac LeBuhn on behalf of Citadel Securities.

Starting with the transfer point, our view is the transfer would be unnecessary in this matter.

THE COURT:  What is the transfer point?  I'm sorry.

MR. LEBUHN:  Transferring this motion to the Southern District of New York.

THE COURT:  Okay.  Thank you.

MR. LEBUHN:  Our view is that this would be unnecessary.  It is plain that Your Honor has a thorough understanding of the material and that in our view it is plain that Citadel Securities should not be subject to this discovery request and that we think that this motion can be resolved here.

THE COURT:  Okay.

MR. LEBUHN:  I would like to start by addressing the discussion on the relevance of the 2022 trading strategy materials.  Now, Terraform had said that, according to the SEC, the but for cause of the May 2022 depeg was because Jump had not intervened in May of 2022.

Now the exhibit that he pointed to you was an exhibit -- was a motion prepared by the movant.  If we look at the SEC's complaint, at Paragraph 170, they identify in their words

of what happened in May of 2022.  They say several factors contributed to the crash.  Including the sale of large amounts of U.S.T by one or more sophisticated trading firms beginning on or about May 7th of 2022.  Again, that is Paragraph 170 of the SEC's complaint.

What Terraform is seeking to establish here is not inconsistent with the SEC's allegations.  As Terraform identified in oral argument, the key of the SEC's misrepresentation claims regards the May of 2021 transactions involving Jump.  What happened in May of 2022 is not relevant to those fraud allegations.

Now --

THE COURT:  So this is the first time today that I heard the explanation that the materiality of the Jump investment, which we both agree that is what the SEC is traveling on, right?

MR. LEBUHN:  Yes.

THE COURT:  The omission.

MR. LEBUHN:  Yes.

THE COURT:  The failure to disclose Jump.

That the SEC will seek, through its expert, to prove -- I understand I had the materials.  I didn't understand the argument and now I do.

That the SEC will seek to prove the materiality of that omission by showing that the same action didn't occur in

2022.  Jump did not invest in 2022 and we had this reaction it did in 2021.  Thus, we know it was material.

That's how I understand it now and it is pretty persuasive.  So I agree with you that Jump's investment -- or I'm sorry -- large actors conduct in 2022 do not relate in any form of the word to Terraform's decision to either disclose it or not, but that's not the point that they are making at this juncture.

So it helps -- I agreed with you in your response.  I was like, yes, you can't prove what happened in 2021 by what happened in 2022, but the smaller slice of it, the materiality, if you can respond to that that would be more meaningful to me because I agreed with you on the papers.

MR. LEBUHN:  What I am contending is that their characterizations of the SEC's positions are based on their own papers.  The exhibit that they cited to this Court is one that they prepared.  The SEC's positions are not inconsistent with the notion that there was this trading activity occurring by other large trading --

THE COURT:  Have you seen the expert report that they are moving to exclude?

MR. LEBUHN:  No, Your Honor.

THE COURT:  So neither you or I are in a meaningful position, I would think, to contest whether or not as the memorandum suggests the expert advance by the SEC, in fact,

says what the memo says it says.

So you and I might be at an informational disadvantage, but that memo seems to line up the opinions that they are moving to exclude suggests that those opinions have been advanced.

MR. LEBUHN:  Our view, again, is that the participation of large trading firms in May of 2022 is not relevant as a general matter.

However, the specific fact as to Citadel Securities is that this discovery is not relevant to us because of the materials that we have produced to Terraform.

Specifically we have provided information indicating that we had engaged in just two test transactions and this is the discovery that is sufficient to show that it was Citadel Securities lack of involvement that indicates that we are not one of these trading firms who would have been involved to the extent that this discovery (inaudible) at all in May of 2022.

Further, we represented to Terraform that we had no interactions with the target wallets that were the subject of the May 2022 depeg, which further indicates that contrary to what was just suggested at oral argument that we may have been trying to test some interaction with target wallets down the road, we represented and it is available in the papers before the Court at Exhibit K, that we had no interaction with the target wallets, which I think indicates that whatever proposed

relevance for Citadel Securities is all the less likely both because of the lack of significant trading that we had engaged in, as well as the fact that we represented that for the target wallets that purportedly were involved in this May 2022 depeg, Citadel Securities had no interactions with them.

THE COURT:  I am going to confess that that assumes a little more expertise on my part than I have.  So understanding that the target wallet is, as best as I would translate it to the world in which I operate, like a bank account number. Fair?

MR. LEBUHN:  Yes.

THE COURT:  So would it also be fair that I might have more than one bank account number so that not having interacted with this particular wallet is not necessarily indicative of whether or not you interacted with the person or persons who control that wallet.

I don't know how far to take the representation that you didn't interact with this wallet.  I don't know if that is meaningful for purposes of what they are arguing.

MR. LEBUHN:  What all these indications go to is whether or not Citadel Securities is a proper target for this discovery.  Both because of the lack of meaningful trading that we engaged in, as well as our lack of interaction with these target wallets, it makes it less likely that further discovery is going to uncover the relevant information that Mr. Levine

suggests that it would.

Now, he proposes in the reply brief and at argument that perhaps Citadel Securities had coordinated with other entities and there were other entities who had engaged in the May 2022 depeg.

However, at this point, we are in a world of pure speculation that Citadel Securities would be involved in this way.  The actual discovery produced to date regarding Citadel Securities cuts entirely against that suggestion.

We were not meaningfully trading.  We have no interaction with the target wallets and the materials that they have offered for support are these social media posts that themselves are not credible indicators that Citadel Securities was involved with this May 2022 depeg.

You know, specifically the two that they have offered to suggest that Citadel Securities is a proper target for this discovery, the first is a tweet from Jacob Canfield who says, and I quote, rumor is Citadel is the culprit.  I want to just underscore that this is a tweet relaying rumors about Citadel's involvement.

The second, at Exhibit D, is the posts from a Mr. Weber (phonetic) and at Exhibit D we see it's a chat that was entered at 4:48 a.m. where he says he has lunch twice a month with Ken Griffin where they share a nice bacon rib and over one of these lunches Mr. Griffin had divulged his plan regarding

the crypto currencies.

Now in response to these social media posts, you can see at Exhibit D users responding with laughing emojis.  A frog holding a briefcase.  This is not indicators that this is a credible representation that Citadel was involved.

These are indicators that Mr. (Inaudible) was making a joke and there is nothing more substantive than that that Terraform has offered to indicate that further discovery in the Citadel Securities would be appropriate.

We have already --

THE COURT:  We have already disclosed that there was *de minimus* trading.  What response to the point that if there was *de minimus* trading there should be a similarly *de minimus* amount of documents identifiable that relate to those trades.

MR. LEBUHN:  Well, I would make two responses to that. The first is that Terraform cannot seek irrelevant discovery simply because it has a low burden.  And for the reasons we have already discussed, our view is that this is not relevant information for Terraform.  So regardless of the burden, they don't move past the relevance hurdle.

But beyond that, I think this would represent a significant burden to Citadel Securities.  Their request asks for all documents describing any --

THE COURT:  I will give you, I promise, a chance to go down that path.  I just want you to know that I don't think it

is responsive to the questions that I asked you.  So whether you want to go down there and I will circle back or just know that I don't think you are answering what I asked.

MR. LEBUHN:  All right.  To the extent the question is *de minimus* --

THE COURT:  Right.  The specific observation -- and again, you guys operate in a world that I don't.  So I don't know if there are trading memos or a memo that correlates to a trade or test trade.

This is news to me and, yet, it has been represented that with respect to these four test trades or perhaps this one example of four trades, there would be usually a memo that memorializes the trader's intention to test this stock and perhaps a reaction thereto and it would be *de minimus*.

Your response to that is?

MR. LEBUHN:  Yes.  Well, looking at the reply brief where they characterize these documents, one of the categories is internal e-mails describing outcomes and execution.

Now, these internal e-mails represent a potentially significant scope of documents.  Any internal e-mails describing any trading strategy, which is the language of their request, is not a *de minimus* request.  That represents a potentially significant burden.  There is not the specificity that the answer that Mr. Levine provided is not evident from the face of this request.  We would need to hunt and peck

through internal communications to identify what is describing any trading strategy.

THE COURT:  How are you in a position to represent that to me?  What efforts have you or your client taken to ascertain that?

MR. LEBUHN:  What I am trying to represent is that the scope of this request is all documents describing any trading strategy in the relevant crypto currencies.

Describing any trading strategy isn't bounded in any meaningful respect.  And so because there is a lack of specificity as to what is being sought, that is what we were concerned about regarding the burden here.

THE COURT:  I hear you.  And again, you might be in a position to know that, but you are assuming expertise on behalf of your Judge that she lacks.

Mr. Levine -- did I say your name wrong?  Levine?

MR. LEVINE:  It is Levine.  Thank you, Your Honor.

THE COURT:  Okay.  Mr. Levine represents that in the ordinary course one would expect there to be one or two memos that relate to the trades.

And while I very much liked your analogy to asking an architect firm to produce an e-mails about the doors, if it is a solo practitioner or they only do windows, it depends on the facts.  And I don't feel armed with the facts from your side.

MR. LEBUHN:  At the end of the day it sounds like what

Mr. Levine is ultimately interested in is any documents describing any trading strategies that disclose coordination with other trading firms pertaining to the May 2022 depeg.

And we can represent that we were not involved in this and we don't have any documents that would suggest that narrower scope exists.

THE COURT:  Sorry.  Say that again.  How do you know they don't exist?

MR. LEBUHN:  Your Honor, what we are representing is that in the context of the May 2022 depeg, our involvement in this matter pertains to the fact that we had these two test transactions at a point when Citadel Securities was exploring whether to engage in the crypto currency market.

We had a very limited involvement that is disclosed by the materials that we have produced.  They have postulated a much broader role for Citadel Securities.  The documents that they are seeking, the narrower scope that they have discussed at today's hearing, are documents that we can indicate Citadel Securities was not involved in this area.

THE COURT:  Okay.  So, again, I am trying to keep up with you because I don't have the benefit of the facts that you do.  And I am not sure that I understand if your position is that the documents, there are *de minimus* documents, but they don't show what Mr. Levine is looking for.

MR. LEBUHN:  Can you restate the question?  I'm sorry.

THE COURT:  I am not sure that I am following your point on this.  I think you are coming back to relevance where I was trying to engage you in understanding your factual position on a response to Mr. Levine's observation that normally one would expect at least a trading memo.  Probably a trading memo that sought permission and then a summary of the event that that would be in the normal course that one would expect.

And I am trying to understand if your response is these things don't exist or they don't show what Mr. Levine says they would or something else.

MR. LEBUHN:  Well, I would say several things.

One I think as to the items that they have listed in their reply brief as potentially responsive, the subpoena that we were served and the request that is in front of the Court is not limited to those categories of documents where we are compelled to search for all documents describing any trading strategy in the relevant crypto currencies.

It is not at all clear that the subpoena request is tied just to the test transactions that we have produced.  This is a much broader request .  It would sweep up any trading strategy that any party might have engaged in or trading strategies that were hypothetical that were never acted upon.

This is a much broader request than the narrow characterization that the Court has been supplied with since.

To meet the full scope of this request would be very burdensome.  That's what I was trying to address with respect to the lack of specificity.

THE COURT:  Okay.

MR. LEBUHN:  As to the specific aspects of what they are requesting, it sounds like at the end of the day there is a narrower core of documents that is being sought here and these are documents that would disclose any trading strategy in which there is coordination with other entities.

In preparing our responses to the subpoena we did, you know, conduct fact-finding to understand our client's involvement in this area and we can represent that as to this narrower scope of documents, the burden would be *de minimus* because there is no involvement that we have in this space in the manner that they have characterized.

Now to take the broader view of what they are seeking as to these documents, they would be asking us to produce trading strategy documents that may have no relevance to the May 2022 depeg.

And the reason I say that is because the test transactions that occurred in March were at a period when Citadel Securities was considering engaging in the crypto market.

Now to the extent that there are trading strategy documents associated with those test transactions, there is a

missing link between those test transactions and any relationship to the May 2022 depeg.

There is speculation that those trading strategies may show some coordination with other entities, but there is nothing to back that up. We don't even have a tweet in support the idea that Citadel Securities was actually coordinating other firms to engage in this May 2022 depeg. That is something that is -- there is not support for that extension.

And so to the extent that we had to search through our documents to identify the trading strategies to the extent any exist, for those two test transactions, there is no meaningful showing that those trading strategies would have anything to do with the May 2022 depeg versus the normal business activities of the market maker.

THE COURT: So here is how I understand it and I appreciate the benefit of your response. But I understand the argument to be we know in May of 2022 several whale investors shortened of the stock -- I apologize if I am using colloquialisms , but we know that there were -- let's just call them bad actors in May of 2022. It appears that it was a concerted effort to cause this collapse.

We know that Citadel and its founder have a reputation for shortening stock. We know that Citadel engaged in these test transactions in March, which would otherwise be suspicious we think because that's not how Citadel would normally behave.

So we want to know why they did that.

That's how I think I understand Terra's argument because it is suspicious enough that we think the trading memos are going to show that this was part of the bigger action.  I think I am responding or at least trying to flesh out and making sure that you are fully responding to what I am hearing because if I am wrong, you should tell me.

But I want to make sure that I have given you the opportunity to flesh out any facts that you think I should not be weighing, right?  So you said there is no link.  That's how I understand them to say there is a link.  It is not pure speculation.

MR. LEBUHN:  So as to the amount of trading that occurred, if there was substantial trading it would show that, you know, by Terraform's account it would show that we were involved in the May 2022 depeg.

THE COURT:  Okay.

MR. LEBUHN:  And if there was insubstantial trading it would say that's weird and we must be involved in the May 2022 depeg.  So I don't find that to be persuasive --

THE COURT:  Okay.

MR. LEBUHN:  As to the question of why Citadel Securities might engage in test transactions, the fact is we are an asset neutral market maker, which means that we --

THE COURT:  Say that again.  You are a what?

MR. LEBUHN:  We are an asset neutral market maker. That means we provide liquidity and make markets in a variety of different assets.

So it is unsurprising that in 2022, with the crypto market in full swing, that Citadel Securities may have explored entering the crypto currency market.

Now these sorts of exploratory steps hardly indicate that Citadel Securities was prepping for a coordination.  And on top of that, it is not exactly clear how these test transactions would support coordinating with other entities. As our production makes clear, we did not engage in the substantial May 2022 trading that led to the depeg.

Terraform's materials make clear that the May 2022 depeg involved billions of dollars of daily transactions.  So, again, I don't see the link for why these isolated test transactions would support the inference that Citadel Securities was somehow prepping another entity who is capable of billions of dollars of daily transactions to participate in this May 2022 depeg.

THE COURT:  I am concerned that we are wandering into the merits of their defense as opposed to the relevance for purposes of Rule 26 because the argument you make is good and logical, but I am afraid that it is too narrow for what I have to consider here.

I am additionally -- I will continue to make the

observation there was no showing on burden at all.

MR. LEBUHN: Well, let me take those one at a time.

So to take a step back in terms of just Black Letter discovery law our view is that -- and there are Southern District of Florida cases that routinely cite this. Discovery is not appropriate for fishing expeditions. You need something more than speculation to pursue discovery.

What we were presented with --

THE COURT: And yet your memo relied on all pre 2015 law and the commentary even, or the cases that you cited rely on the 2000 commentary that reigned in discovery before in 2015 the Courts said it is too narrow, right?

So, again, I am not limited to the world of what was cited in the papers before me, but I just want to again make sure that we are all on the same page about how narrow it is supposed to be in this circuit.

MR. LEBUHN: That is very fair, Your Honor.

That said, the basis that they offered to pursue discovery in the Citadel Securities was, again, these two social media posts that stood at odds with the materials that we prepared.

What they offered was what they characterize as open source information saying that we were the culprit. Meaning, we were the ones that Citadel had been the ones that had engineered the May 2022 depeg.

However, while production makes clear is that we simply could not have played that role with our *de minimus* trading.  Now they have pivoted and said, well, maybe the discovery will show who the other trading firms were that engaged in this and Citadel Securities is just a step in the chain.

What is troubling to me about that is that, again, fact discovery has been closed in this matter for nearly a month as of today's hearing.  They have served subpoenas on other trading firms.

If there is anything more substantive suggesting that Citadel Securities had been involved in some sort of coordinated scheme with other trading firms where we didn't trade except for test transactions to set up other entities that did, that would have been bourne out in discovery.

We don't have anything like that substantive that has been presented.  What is in front of the Court is the materials that Citadel Securities has produced as well as the isolated social media posts that they have offered in support.

THE COURT:  Fair point.

MR. LEBUHN:  And I would like to talk briefly about the timeliness of this request.  In the case management order that Terraform had attached, it states that they could have served written discovery as early as April.  They served their subpoena in August.  Now we served our responses to them on

August 25th and they waited nearly two weeks before asking us to meet and confer on those responses.

We haven't produced our trading data to them on September 28th.  They waited nearly another two weeks before moving to compel and this approach to discovery has created a couple of issues for them.

For one, they took 46 days in total between the date they received our responses and objections and the day that they moved to compel.  Under 26(1)(d) discovery has to be pursued so that you are completed with it before close of fact discovery, which hasn't happened here.

And under 26(1)(g) Terraform had to raise this issue within 28 days of our responses and objections.  Again they waited 46 days.

THE COURT:  46 from the date of your service?

MR. LEBUHN:  That's right, Your Honor.

THE COURT:  Okay.  Do you contest the dates that they advanced in their motion that lay out the dates on which the meet and confers is conducted and the time to respond?

MR. LEBUHN:  I don't contest those dates, Your Honor. I think there is a disagreement between the parties as to whether fact discovery for them closes on October 13th or October 17th.

The case management order says it is October 13th. The Southern District of New York's docket says that that fact

discovery deadline was extended for one subpoena to October 17th, but it was otherwise closed as of October 13th, but outside of that we don't have any disagreement about the dates.

THE COURT:  Okay.  I just want to make sure that I understand the timeline.  They gave you an extension of time of about, it looks like, maybe two weeks to respond.

And then, after the first meet and confer it looks like -- I mean, if these dates are right, it takes about 15 days for them to get a response after the September 11th meet and confer.

So you are also, I am sure, aware of the local rules that requires that both sides meet and confer essentially exhaustively before they can file -- and it requires both sides to participate in good faith in an effort to resolve that dispute.

So I have, at least in my mind, a doubt of whether or not one can rely on the rule that you have to bring the dispute within 28 days if one takes 15 days to respond in the meet and confer process.  That was at least my reaction.

I wondered whether or not Citadel really thought it was particularly a strong response since it was relegated to a footnote I might have the same response.  It is untimely, but I am also not sure that it would be unjust for me to hear it anyway under the circumstances.  That's my take, but you are

welcome to tell me I am wrong.

MR. LEBUHN:  Well, no, Your Honor.

The one thing I would note in terms of timing discovery the parties have to attend to whatever the fact discovery deadline is.  And it was their choice to serve the subpoena in August rather than what appears to be the earlier dates that they might have been able to serve it.

THE COURT:  So the way that we would -- and I apologize.  As I sit here I don't know if you practice in my district or in New York most of the time.

MR. LEBUHN:  I'm pro hac in here.

THE COURT:  Okay.

MR. LEBUHN:  I'm out of Chicago.

THE COURT:  So the way that we would apply that local rule is that the subpoena has to be served with enough time to have lawful response.

Meaning, at least 14 days before the close of discovery.  You have to file the motion to compel before the discovery cutoff, but it does not anticipate, again, 15-day periods of absence of participating in a conferral process built into it.  That would be my take on our local rule.

MR. LEBUHN:  Understood, Your Honor.

THE COURT:  But I did notice it, too, when the motion was filed and waited to hear what your response was.  I am not going to disregard the motion on the timeliness basis.  I don't

know why it took 15 days to respond.  Maybe because it is incredibly complex and novel in some ways.  What I am saying is I don't fault either side for the *de minimus* exaggeration of timelines in this case and will decide it on its merits.

MR. LEBUHN:  Thank you, Your Honor.

THE COURT:  Okay.  Did I give you a fulsome opportunity to respond?

MR. LEBUHN:  Yes.

THE COURT:  Okay.  And your take on it is decided here and decided quickly and we don't need to send it to Judge Rakoff.

MR. LEBUHN:  Yes, Your Honor.

THE COURT:  All right.  Mr. Levine, that takes care of that because as the Respondent, if they are not consenting to its transfer, I don't think it falls into a place where I would send it to Judge Rakoff.

MR. LEVINE:  And we are very happy to have you decide it, Your Honor.  You have invested time in this.  You have heard us this morning.  We think it is fully appropriate for you to do so.

THE COURT:  Okay.

MR. LEVINE:  May I respond to his comments?

THE COURT:  Yes, you can.

MR. LEVINE:  I will try not to take too long.  I know that's what most of the lawyers say and I will try to be honest

about that.

Your Honor, Mr. LeBuhn harped on the speculation theory over and over again and social media and I want to come to the social media in a second, but here's where the suspicion that you articulated, I think, probably better than I have in our arguments what our suspicion is.  It is their trading as you pointed out.

And here is an additional fact about suspicion which is -- and this is at Page 9 of our memorandum of law.  We point out that Citadel, twice in the period of May 22nd when the second depeg was happening, they denied trading in any stablecoin including Terra.

THE COURT:  So now that you brought that up, I am going to tell you that I don't understand the import of that denial.  Meaning, I don't know who that denial is -- it is just Forbes Magazine.  They are telling the public, but they are not telling the SEC.  I don't know how much to -- not credit.  That's the wrong word.  I don't know what to read from that.

MR. LEVINE:  It adds to the suspicion and that's what I would argue.  Why say it?  Why say anything at all ?  There were a lot of rumors about Citadel being involved.  Why did they feel they had to say something?  Why were they concerned?  What were they trying to hide that they were actually involved in this?  I think it reinforces that point.

The other point that I will make is where did they say

that?  Social media.  Social media is integral now to the trading environment.  It is no longer the Wall Street Journal and the Business Section of the Miami Herald and Wall Street Week on PBS.  Social media is integral to the world.  So I don't take as dim a view of the importance of social media, Twitter, discord in terms of --

THE COURT:  I don't think it was the platform that was their point.  It was the speaker.

So we are going from someone who may or may not actually be having lunch with Ken Griffin to whether it is your company or their company that is using their social media account because that would be a different thing, I think.

MR. LEVINE:  And that's a fair point, but we are looking at the totality of the circumstances, but we get past that when we get to this, which is they actually traded and they traded right about the time when the activities were aimed at the May 2022 depeg was happening.

Just a couple of other points to respond to.  Mr. LeBuhn made the point about whether the SEC has taken the position about what their view is of the lack of intervention by Jump Trading.  Your Honor, they have actually taken that position.  That's at Exhibit N of the supplemental declaration of Miss Rodriguez, which is a motion of the SEC to preclude one of our experts.

And in the internal pagination in that exhibit, the

SEC says one year later in May of 2022, U.S.T, Terra, again depeged from a one-dollar price, but this time no third party saved it.  So that is their position.  There was an absence of Jump intervention.  It is not just our motion seeking to exclude their expert.  They are actually saying it and that's an exhibit.

Your Honor, I want to come to the architect analogy for a moment, which I also thought was clever, but because they only did a few trades the analogy does not fit.  What the analogy should be is the architect is asked for the specific blueprint for a specific building, right?

Because they said this is all there was.  So they know where that blueprint is.  The architect knows which file drawer it is in and so does Citadel.

THE COURT:  Does your request ask Citadel to conduct a search over all electronic data?

MR. LEVINE:  The request, the narrow request that is the subject of this motion, all documents describing any trading strategy in any of the Terra native tokens or Terra financial instruments.  So this would be one or the other of those, this trading on this document, during the time period of March 1st of 2022 through May 31st of 2022.

So if this is all there is, there is not going to be a massive search.  They know exactly when these occurred.  They know exactly how to cabin the timeframes.  If it was something

they wanted to discuss with us, we would have been happy to discuss trying to narrow the search, but we didn't even have the opportunity because they told us verbally and in writing -- it is in the record -- we are not going to search for anything. Sorry.  We didn't have that opportunity.

And I think that's where they left us.  They left us with that choice.  And so it may be that there are a few e-mails.  There may be no e-mails.  I think they will not have a burden in finding that.

And let me make one more point, Your Honor, which is the representations that Mr. LeBuhn said about -- he says there are no documents showing a concerted effort by Citadel to participate in the May 2022 depeg.  Well, there is no declaration before you on that.

I don't lack trust in Mr. LeBuhn, but we have to work with the record that we have and we have a record here of trading.  It is suspicious.  It is within the window leading up to the May 2022 depeg.

And we respectfully submit that we have shown that there is some bearing, which I believe is the standard.  There is some bearing of our request on the relevance here is what we have to show.

May I consult with local counsel for a moment, Your Honor?

Your Honor, I have no further argument.  If you have

any questions, I am happy to answer them.  Otherwise, we are very grateful for your time.

THE COURT:  I appreciate it.  I am scanning my notes and seeing if I have any questions for either of you, candidly.

Mr. Levine, you are good.

MR. LEVINE:  Okay.  Thank you, Your Honor.

MR. LEBUHN:  One item, though.

THE COURT:  Will you still use the microphone, though?

MR. LEBUHN:  Yes.  With respect to the last item that Mr. Levine made, to the extent that we disagree with the relevance of the discovery that we are seeking, were the Court to consider it requiring Citadel Securities to conduct discovery, we would offer as a compromise searching for and reviewing and producing any memos or communications relating to concerted action among trading firms concerning trading in the Terra or LUNA during the relevant time period.

THE COURT:  Say it again?  Sorry.  Searching for and producing documents that --

MR. LEBUHN:  Relating to concerted action among trading firms relating to Terra and LUNA during the relevant time period.

THE COURT:  How would you undertake to search that? I'm being very specific.  Do you know the custodians that you would have to search?

Do you have a sense of how many e-mail accounts you

49

would have to search?  Do you have a sense of whether there has been a migration in your platform and there are backup tapes?  It wasn't that long ago, but do you have a sense of what that would entail and how long it would take?

MR. LEBUHN:  No, Your Honor.

THE COURT:  Okay.  But it is helpful to know that.  Thank you.

Okay.  All right.  Last call.  If anybody has something, will you tell me now?  You have traveled.

MR. LEVINE:  Nothing from us, Your Honor.  Thank you.

THE COURT:  Okay.

MR. LEBUHN:  Nothing, Your Honor.  Thank you so much.

THE COURT:  Thank you.  At the end of any Rule 37 hearing, I always talk about the shifting of fees if it is required.  It is neither a motion that rises to the level of frivolity that I would find it would require shifting fees to the Respondent for having to respond, nor am I likely to ask either of you for an accounting.

I think that the positions here were taken even if you disagree with each other and I am going to disagree with one of you, I think that the arguments were well placed and thoughtful.

There has not been any talk about and under Rule 45, if you are to produce what, if any, cost the other side should bear.  And I understand why because you have taken the position

that there won't be any, but should we end up having to have any further proceedings with respect to cost shifting, I would be inclined to do it over the telephone so you don't have to come back here.

Would you prefer that?

MR. LEVINE:  We are happy to do that, Your Honor. Thank you.

THE COURT:  Okay.  I don't know that it is going to be important.  I like to talk to my parties about any procedural matters that I have before you leave here so that I know what your preferences are.

You may actually have Miami offices and prefer to be here.  I don't know.  I don't want to make assumptions for you. If I have to have future proceedings, do you want them virtually?  That's all I am really asking.

MR. LEVINE:  We don't have a Miami office.  I love visiting Miami, but I think --

THE COURT:  Because it is winter?  You're subtle, Mr. Levine.  I get it.

MR. LEVINE:  I think it is a great city and I have family here, but I think for efficiency purposes for both to save costs on both sides it would be fine.

THE COURT:  Same?

MR. LEBUHN:  Agreed.

THE COURT:  Okay.  I don't know that I will see you

again, but if I have to I know that your preference is not to come back in person.  Though it is very helpful for me to have contested argument in person.  So thank you for being here today.

With that you are adjourned and excused.

MR. LEVINE:  Thank you, Your Honor.

THE COURT:  Thank you for your appearances.

(Thereupon, the proceedings concluded.)

CERTIFICATE


      I hereby certify that the foregoing transcript is an

accurate transcript of the audiotape recorded proceedings in

the above-entitled matter.




11/15/23                    Bonnie Joy Lewis,
                    Registered Professional Reporter
                       CASE LAW REPORTING, INC.
                       7001 Southwest 13 Street,
                     Pembroke Pines, Florida 33023
                           954-985-8875